IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI, SOUTHERN DIVISION

CHRISTOPHER K. SPATES,                )
                                      )
            Plaintiff,                )
                                      )
                                      ) Case No.
            vs.                       ) 18-CV-3150-MDH
                                      )
GEORGE A. LOMBARDI, et al.,           )
                                      )
            Defendants.               )


             CIVIL JURY TRIAL - VOLUME 2
       BEFORE THE HONORABLE M. DOUGLAS HARPOOL
              TUESDAY, AUGUST 22, 2023
                SPRINGFIELD, MISSOURI

APPEARANCES:
FOR THE PLAINTIFF:        MS. LAURA C. ROBINSON
                          HUSCH BLACKWELL LLP
                          3810 E. Sunshine, Ste. 300
                          Springfield, MO  65809

                          MR. J. BRENT DULLE
                          HUSCH BLACKWELL LLP
                          190 Carondelet Plaza, Ste. 600
                          St. Louis, MO  63105

FOR THE DEFENDANTS:       MR. AUSTIN DAVIS
                          MISSOURI ATTORNEY GENERAL'S OFFICE
                          P.O. Box 899
                          Jefferson City, MO  65102

                          MS. JESSICA L. WARD
                          MISSOURI ATTORNEY GENERAL'S OFFICE
                          149 Park Central Square, Ste. 1017
                          Springfield, MO  65806

                          MS. DIANE F. PETERS
                          MISSOURI ATTORNEY GENERAL'S OFFICE
                          615 East 13th Street, Ste. 401
                          Kansas City, MO  64106

COURT REPORTER:           MS. JEANNINE RANKIN, RPR,CSR,CCR
                          UNITED STATES DISTRICT COURT
                          222 N. Hammons Parkway
                          Springfield, MO  65806

# I N D E X

Page No.

AUGUST 21, 2023 - Volume 1

RECORD . . . . . . . . . . . . . . 4

INSTRUCTION NOS. 2-7 READ . . . . . . . . 5

OPENING STATEMENT BY MS. ROBINSON . . . . . 8

OPENING STATEMENT BY MR. DAVIS . . . . . . 14

PLAINTIFF'S EVIDENCE

WITNESSES:

CHRISTOPHER K. SPATES
Direct Examination by Ms. Robinson . . . 19
Cross-Examination by Ms. Ward . . . . 41
Redirect Examination by Ms. Robinson . . 47

INSTRUCTION NO. 8 READ . . . . . . . . . 48

INSTRUCTION NO. 9 READ . . . . . . . . . 48

JULIUS SMITH
Direct Examination by Mr. Dulle . . . 51
Cross-Examination by Ms. Ward . . . . 62
Redirect Examination by Mr. Dulle . . . 64
Recross-Examination by Ms. Ward . . . . 65

ROBERT TURNER
Direct Examination by Ms. Robinson . . . 66
Cross-Examination by Mr. Davis . . . . 92
Redirect Examination by Ms. Robinson . . 99

INSTRUCTION NO. 10 READ . . . . . . . . . 101

RECORD . . . . . . . . . . . . . . 101

AUGUST 22, 2023 - Volume 2

INSTRUCTION RECORD . . . . . . . . . . 112

DEFENSE MOTION . . . . . . . . . . . 125

INSTRUCTION NO. 11 READ . . . . . . . . . 132

# I N D E X

Page No.

### PLAINTIFF'S EVIDENCE (ctd.)

WITNESS:

      DEPOSITION OF ROBERT WIDENER READ . . . 133

PLAINTIFF RESTS . . . . . . . . . . . . 141

DEFENSE RESTS . . . . . . . . . . . . . 142

DEFENSE MOTION . . . . . . . . . . . . 143

INSTRUCTION NOS. 12-23, FORMS OF VERDICT READ . . 148

CLOSING ARGUMENT BY MS. ROBINSON . . . . . . 154

CLOSING ARGUMENT BY MR. DAVIS . . . . . . . 164

REBUTTAL CLOSING ARGUMENT BY MS. ROBINSON . . . 173

JURY QUESTIONS . . . . . . . . . . . . 177

VERDICT . . . . . . . . . . . . . . 179

COURT REPORTER'S CERTIFICATE . . . . . . . 184

\* \* \* \* \* \*

INDEX OF EXHIBITS     OFFERED  ADMITTED

JOINT EXHIBIT:

| J1 | SOP21-1.2 | 68 | 68 |
| J3 | Report of Incident Form | 88 | 88 |
| J5 | Video of 11/12/2015 | 31 | 31 |

DEFENDANTS' EXHIBIT:

| D1 | Enemy Waiver | 41 | 41 |
| D2 | Protective Custody Waiver | 43 | 43 |

\* \* \* \* \* \*

```
 1       CHRISTOPHER K. SPATES v. GEORGE A. LOMBARDI, et al.

 2                   CASE NO. 18-CV-3150-MDH

 3                 CIVIL JURY TRIAL - VOLUME 2

 4                      August 22, 2023

 5                    *   *   *   *   *   *

 6       THE COURT:  Good morning.  Be seated.

 7            Let me first announce that after further reflection

 8  I have discharged the juror who had the babysitting problem.

 9  The more I thought about it, her being here angry at me and

10  angry at the system and worried about her kids is not going to

11  be the kind of juror the parties deserve.  We do still have

12  six, so we will trod on with the six we have.

13            Now on instructions.  I have read so far ten

14  instructions.  Instruction No. 11 based on what I was told

15  yesterday will be the deposition instruction just saying that

16  you're going to read a deposition and it should be treated as

17  evidence.

18            That's all the instructions I know of that will be

19  submitted prior to the close of evidence, at the close of

20  evidence.

21            MS. ROUBAL:  Is there a stipulation one or not?

22            MS. ROBINSON:  No.

23            THE COURT:  The next instruction will be Instruction

24  No. 12 and that will be a 3.01 just saying members of the

25  jury, the instructions I gave you at the beginning of the
```

1    trial.  I call that the transition instruction.

2            Thirteen will be 3.02 saying I don't intend to tell

3    you what your verdict ought to be.

4            Fourteen will be a repeat of the credibility

5    determination which is 3.03.

6            Fifteen will be a burden of proof, and that's 3.04.

7            Then I came to an instruction that I think the

8    plaintiff's tendered.  Says, "This case should be considered

9    and decided by you as an action between persons of equal

10   standing."

11           Now, that is not a proposed Eighth Circuit or MAI

12   instruction.  It looks like you got it out of some case.  Do

13   you want to make your argument as to why you think that should

14   be included?

15           MS. ROBINSON:  Yes, Your Honor.

16           We think that this should be included especially

17   here given the role of our client as an inmate versus the

18   defendants who are officers.  This should help avoid any

19   potential prejudice based on the identity of the parties.

20   This instruction is included in the jury instructions and

21   forms for federal civil cases and case law also indicates that

22   similar instructions are generally given to help avoid that

23   prejudice.

24           THE COURT:  I have a little concern about it in that

25   we've already told them that they could consider the fact that

                                   113

1  the defendant was convicted of a crime in assessing his

2  credibility and when we use the word equal standing in the

3  community, that -- and holding the same or similar stations in

4  life, that's not necessarily true here. That's my concern

5  with that instruction. I certainly agree that they're equal

6  under the law and entitled to the rights but he's entitled to

7  the rights of a prisoner.

8       Has this been given in a prisoner case or has this

9  been given in a different kind of case?

10      MS. ROBINSON: I believe it has been given in a

11  prisoner case but I don't have a case law -- or a case right

12  off the bat that --

13      THE COURT: The case you cite, *Steady State*

14  *Imagining v. General Electric* doesn't sound like a prisoner

15  case.

16      MS. ROBINSON: It is not, Your Honor.

17      And I agree that they can consider that he committed

18  a crime for his credibility on whether he is telling the truth

19  or not but that shouldn't be a consideration in whether he is

20  entitled to a verdict, and I think that this instruction would

21  help avoid prejudice in considering whether he is entitled to

22  a verdict based solely on the fact that he is an inmate.

23      THE COURT: Certainly they're equal under the law

24  and he has the rights that a prisoner has under the law and --

25  I agree with all that.

1          What's the defendants' perspective on this

2     instruction?

3          MR. DAVIS:  Sure, Judge.  Yeah, this is obviously

4     not an approved Eighth Circuit instruction.  We think it's

5     redundant.  All the venire panel was questioned about whether

6     or not they would immediately discount and not provide a

7     verdict to an inmate because -- just because he was an inmate.

8     The panel all said they would not do that.  And they have also

9     been told that they're allowed to use the conviction for the

10    limited purpose and we think that that's sufficient, that

11    that's enough to get the point across.  They can only use it

12    for credibility and for no other purpose.

13         THE COURT:  All right.  I'm inclined to decline the

14    instruction as tendered.  I'm going to mark it as Instruction

15    A and show it as refused.

16         So after that the next instruction will be 16.

17    That's generally a description of the jury's duties.  That's

18    in 3.07 from the model.

19         Then next will be 4.01, which is a general

20    description of the theory of plaintiff's recovery.  I think it

21    should be given and it was agreed upon.  I'm a little hesitant

22    here.  I don't think there's any question it's under color of

23    state law, so the real question is whether it deprived him of

24    a right or privilege secured by the constitution.  It's the

25    model instruction.  I don't think it hurts to say that.

                              115

1          Eighteen will be the verdict director against -- I
 2     don't care about order.  The order they happen to be in for me
 3     is Reese is the first one and then Turner is the second one
 4     and then Machino is the third one.
 5          Does the plaintiff have a preference as to the order
 6     in which we submit it?
 7          MS. ROBINSON:  No, Your Honor.
 8          THE COURT:  Does the defendant?
 9          MR. DAVIS:  No, Judge.
10          THE COURT:  Twenty-one is the definition of
11     deliberative indifference, which is 4.23.
12          Substantial risk of harm is the definition in
13     Instruction 22.
14          MR. DAVIS:  Judge, if I may?
15          That one was submitted by the defendants.  Plaintiff
16     did not consent to that one.  At this time we'd like to
17     withdraw that instruction.
18          THE COURT:  Plaintiffs have any objection if I do
19     not give that instruction?
20          MS. ROBINSON:  No, Your Honor.
21          THE COURT:  Is there a requirement that substantial
22     risk of harm be defined?
23          MR. DAVIS:  Not that I know of, Judge, but I can't
24     speak for certain.
25          THE COURT:  The authority for it you say is

116

1     Instruction 4.21, which means it would come right out of the

2     Eighth Circuit model instructions.  You get in trouble if you

3     give terms and don't define them if they're defined in the

4     instruction so --

5              MR. DAVIS:  Right.  And I'm not sure, Judge, if this

6     was an optional instruction.  I can't speak to that off the

7     top of my head.  I'm not for sure.  I apologize.

8              MS. ROBINSON:  Your Honor, I believe that committee

9     comments on this definition say that it's optional, that it

10    doesn't have to be given.

11             THE COURT:  Assuming that that is true -- we'll

12    verify that, obviously -- then we will not give 4.21 unless

13    some party requests it.  And I understand neither party is

14    requesting it.  If I review it and decide that it's not

15    optional, then I will give it.

16             So assuming that that's not going to be given, then

17    the next instruction will be 22.  That will be the damage

18    instruction.  The difference in the two appears to me to be

19    the tail that the defendant has included on theirs that says,

20    "Remember, throughout your deliberations you must not engage

21    in speculation, guess or conjecture and you must not award

22    damages under this instruction by way of punishment or through

23    sympathy."

24             Am I correct that the instructions tendered are

25    identical otherwise?

                                117

1          MS. ROBINSON:  Yes, Your Honor.

2          MR. DAVIS:  Yes, Judge.

3          THE COURT:  What does the model instruction say

4    about that tail?

5          MS. ROBINSON:  It's an optional tail, it doesn't

6    have to be included, and so we had left it out just to

7    streamline the instructions since it isn't required.

8          THE COURT:  I'm going to add the tail.  I think it's

9    true.  I don't think it hurts anything and it -- so we will

10   give the tail and the record will note that plaintiff's

11   tendered instruction would not have included the tail and the

12   Court is including it over their suggestion.

13          Thirty-one has to do with the submission of punitive

14   damages.  I notice the tail that's added specifically says you

15   can't award damages under this instruction by way of

16   punishment; however, Instruction 31 if given -- well, it's now

17   Instruction 23 -- if given would allow for the imposition of

18   punitive damages.

19          The Court is still considering whether to do so but

20   I will tell you that right now I'm leaning with the idea that

21   it should be submitted.  I think there's evidence that a

22   jury -- depends what the jury believes, but they have a right

23   to believe the evidence most favorable to the plaintiff, and

24   if you believe the evidence most favorable to the plaintiff,

25   then I think there's a reason to submit the punitive damages.

1          My question is in that instruction the phrase
2    *malicious or recklessly indifferent* is included as the
3    standard by which they must find before they can award
4    punitive damages, and is there a definition of maliciously or
5    recklessly indifferent contained in the instructions or in the
6    law that needs to be given if the punitive damage instruction
7    ultimately is given?
8          MS. ROBINSON:  I don't believe that there was a
9    definition in the instructions but I can double-check on that.
10         THE COURT:  Well, deliberate indifference is
11   defined.  Here's kind of the odd thing here:  Under
12   instruction what I've numbered 21 now, which is 4.23, in order
13   to find in favor of the plaintiff, the jury must find
14   deliberate indifference.
15         Do you agree with that?
16         MR. DAVIS:  Yes, Judge.
17         THE COURT:  So if we find deliberate indifference,
18   that's worse than reckless indifference, so it would be
19   inconsistent for them to find deliberate indifference and
20   award a compensatory damage award but not find reckless
21   indifference for purposes of finding a punitive damage award.
22   So I'm trying to decide how we proceed here.
23         The malicious is certainly a different word.  Is
24   there a definition of malicious anybody found in the
25   instructions?

```
 1          MR. DAVIS:  There was a definition for malicious
 2   under the 1983 claims but it was in regard to a --
 3          THE COURT:  Medical claim?
 4          MR. DAVIS:  Yes.
 5          THE COURT:  We saw that.  That could be adapted with
 6   a little bit of work, I think.
 7          I'm still puzzled by the reckless indifference.  I
 8   don't -- and it's the word or between malicious and recklessly
 9   indifferent.  It's almost that you should instruct the jury
10   that if they find compensatory damages then they must find
11   punitive damages, but we know that's not true because they can
12   choose not to award punitive damages even if they could award
13   punitive damages.
14          Has anybody looked at the definition of malicious
15   and tried to adapt it to this factual situation?
16          MS. ROBINSON:  No, Your Honor.
17          MR. DAVIS:  (Shakes head.)
18          THE COURT:  Anybody want to comment on whether they
19   think submitting the word malicious or recklessly indifferent
20   in that instruction to a jury without a definition, whether
21   that's error?
22          MR. DAVIS:  I would say if we just left the
23   instruction at malicious, I think that that's probably
24   sufficient there.  I mean, I'm more than happy to --
25          THE COURT:  Sufficient or deficient?
```

```
 1          MR. DAVIS:  Sufficient.  Sorry.  To just leave it at
 2    reckless.
 3          THE COURT:  Is there a case somewhere that makes you
 4    think malicious doesn't have to be defined?
 5          MR. DAVIS:  Not off the top of my head, Judge, but I
 6    will do some research on that if you'll give me a couple
 7    minutes.
 8          THE COURT:  What do the plaintiffs think?
 9          MS. ROBINSON:  Your Honor, the model instructions
10    state malicious or recklessly indifferent, so we think that
11    that should be included.  We are happy to do a little bit of
12    research on --
13          THE COURT:  Is there anything in the notes on use
14    that refers to the need to define malicious or recklessly
15    indifferent?
16          MS. ROBINSON:  Not that I'm seeing right off the
17    bat.
18          THE COURT:  It just seems like if you define
19    deliberate indifference as is suggested, you'd almost have to
20    define reckless indifferent, although the definition would
21    probably be if defendants disregarded that risk by recklessly
22    refusing or intentionally failing to take reasonable measures.
23          All right.  Well, right now my inclination is to
24    give Instruction 23.  Obviously, if the jury finds deliberate
25    indifference to award compensatory damages then it's
```

1  appropriate, I think, to consider punitive damages under a

2  reckless indifferent standard.

3          Interestingly, if they don't award compensatory

4  damages then in my opinion it would be error to award punitive

5  damages even though the standard seems to be lower.

6          I did have one question on the damage I forgot to

7  ask.  Is there not going to be a reference to nominal damages?

8          MR. DAVIS:  I don't believe we submitted an

9  instruction on that but we can get one.

10          THE COURT:  I don't know if --

11          MS. ROBINSON:  We would prefer not to have one on

12  nominal damages, but obviously if you would prefer to have one

13  in there, we're happy to add one.

14          THE COURT:  All right.  Well, it would seem to me it

15  would be difficult for a jury to conclude for the plaintiff

16  and say he had no damage.  I think I said yesterday afternoon

17  I don't think it's very substantial, but it would be hard to

18  say there's no damage and just strictly a technical

19  constitutional right.  So if the plaintiff does not want a

20  nominal damage instruction, then I am not going to force them

21  to use one.

22          All right.  On the verdict forms, the difference in

23  what's submitted by the plaintiff and defendant is primarily

24  related to punitive damages?

25          MR. DAVIS:  Yes, Judge, that's correct.

                              122

```
 1              THE COURT:  Any other change?

 2              MR. DAVIS:  No, they're identical.

 3              THE COURT:  Then if I give punitive damages, we're

 4    going to go with Form A, and if I don't give punitive damages,

 5    we'll go with Form B.

 6              Any other instructions anybody wants to tender or

 7    any other issues concerning the instructions anybody wishes to

 8    bring to the Court's attention?

 9              MS. ROBINSON:  Your Honor, we don't have anything

10    additional, but there is on the punitive damages, the Note

11    No. 3, the note on use, it does talk about punitive damages

12    are allowed even though the threshold for liability requires

13    reckless conduct.  So it does talk about -- it does

14    specifically discuss that it's -- it says recklessly

15    indifferent and that that's allowed for punitive damages.

16              THE COURT:  Even if there's not an award of

17    compensatory damages?

18              MS. ROBINSON:  I believe there has to be an award of

19    compensatory damages for the punitive damages.

20              THE COURT:  That's what made me think you might want

21    a nominal instruction, but you don't want that?

22              MS. ROBINSON:  No, Your Honor.

23              THE COURT:  All right.  I guess technically might

24    increase your chance of getting an award of attorneys' fees

25    but decrease your chance of getting money in your client's
```

1   pocket, arguably.

 2          MS. ROBINSON:  It has nothing to do with attorneys'

 3   fees for us on this.  I think it's that our client was injured

 4   and he has -- he's described his injuries.  And even if he --

 5   I believe that the verdict director specifically requires that

 6   he was injured, so I don't know that they could necessarily

 7   find that he -- find for him under the verdict director and

 8   not find that he had some damages.

 9          THE COURT:  If the jury finds his evidence -- if the

10   jury believes his evidence, I think they'll find he's hurt

11   so --

12          MS. ROBINSON:  Yes, Your Honor.

13          THE COURT:  Sometimes lawyers forget that juries

14   have a right to not believe evidence.

15          MS. ROBINSON:  Yes, Your Honor, but -- yes.

16          THE COURT:  Are you arguing that if there's an award

17   of compensatory damages there has to be an award of punitive

18   damages?

19          MS. ROBINSON:  No, Your Honor, I don't believe that

20   that's correct.

21          THE COURT:  I think the law will be that if they

22   find deliberate indifference under the verdict director, then

23   that's more than reckless indifference so they could award

24   punitive damages, but I still think the jury has the option to

25   choose not to.

1          MS. ROBINSON:  Yes, Your Honor, I believe that's

2     correct.

3          THE COURT:  Anything else on instructions we need to

4     talk about?

5          If you're going to find a definition of malicious or

6     reckless indifference, get it to Kristen ASAP.  If not,

7     we'll -- I might play and try to draft one of my own but I'd

8     rather the parties look at it first.

9          Now, did you have a motion for directed verdict that

10    you wanted to take up?

11         MR. DAVIS:  Yes, Judge.

12         THE COURT:  Understanding that the plaintiff's

13    evidence isn't closed but with the belief that there's nothing

14    in the plaintiff's evidence yet to be submitted that would

15    impact this issue, let's go ahead and get that out of the way.

16         MR. DAVIS:  Sure, Judge.  I'll make this quick.  I

17    don't want to waste any of the Court's time.

18         But as you recalled, defendants attempted to file an

19    amended answer, including an affirmative defense that the

20    statute of limitations had expired on plaintiff's claim.  That

21    request was denied by this Court, but we still believe we want

22    to make this argument.

23         THE COURT:  That's fine.  Preserve your argument.

24         MR. DAVIS:  Yes, Judge.

25         So typically -- the Supreme Court says typically the

                                    125

statute of limitations on 1983 claims are governed by the
state in which the suit is brought, their residual personal
injury statute of limitations.  In Missouri that's five years.
It's typically held to have been five years.  But in 1990 the
Missouri legislature enacted RSMo 516.145 which says that all
actions brought by an offender against the Department of
Corrections or any employee or former employee for an act in
an official capacity or by the omission of official duty must
be brought within one year.

        There is a court case that actually defines official
capacity, and in this context it means only that the public
servant is acting within the scope of what he or she is
employed to do rather than being engaged in a personal frolic.
In its plain and ordinary meaning the phrase is used to
delineate between an action performed for work purposes rather
than for personal ones.  And that is a *Kinder* case.

        And then there was a case out of the Western
District, Judge -- and that was *Kinder* -- that said that all
claims, even personal injury claims brought by inmates must be
brought within one year of their occurrence.

        I will say candidly this theory has been tested in
front of the Eastern District Federal Court.  It was rejected,
but there was no analysis in that opinion of the *Kinder* case.
So we believe that that case was decided erroneously and that
the proper statute of limitations for inmate 1983 claims is

126

1    going to be the statute governing all inmate cases.

2             THE COURT:  And when was this suit filed, for the

3    purposes of the record, compared to when the incident

4    occurred?

5             MR. DAVIS:  The incident occurred November 15th,

6    2015, and the suit was filed May 10th, 2018.

7             THE COURT:  Wouldn't that be within three years?

8             MR. DAVIS:  Yes, Judge.

9             THE COURT:  I'm confused.  I could be calculating

10   something wrong.  If it didn't occur -- wouldn't that be the

11   suit was filed within three years of the incident?

12            MR. DAVIS:  The statute governing inmate tort claims

13   is one year of statute of limitations.  So since plaintiff's

14   claim was not filed within one year under the 1990 statute, it

15   is out of time and it's barred.

16            THE COURT:  All right.  Could a state legislature

17   make the statute of limitations for 1983 actions one day?

18            MR. DAVIS:  Well, relying on I believe it's the

19   *Wilson* case, Judge, of the United States Supreme Court, the

20   federal courts are supposed to use the applicable statute of

21   limitations for personal injury actions.  So I think that if

22   the legislature were to set out 1983 claims, I don't think

23   that would be allowed to specifically cite those, but for

24   personal injury actions in general, specifically ones for

25   inmates here, I think that that's -- they would be allowed to

                                 127

1  do that, yes.

2          THE COURT:  But personal injury statute in Missouri

3  is still five years?

4          MR. DAVIS:  The general one, yes, Judge.

5          THE COURT:  Yeah.  In my recollection there was some

6  issue, too, about the date of the amendment?  This was not in

7  your original answer, correct?

8          MR. DAVIS:  Yes, Judge.

9          THE COURT:  All right.

10          Does the plaintiff wish to be heard on the motion?

11          MR. DULLE:  Briefly, Your Honor, yes.

12          THE COURT:  Proceed.

13          MR. DULLE:  I would point out, of course, this is an

14  affirmative defense.  Statute of limitations is an affirmative

15  defense.  Your Honor denied their request to amend, to add

16  this affirmative defense back in March when this case was set

17  for trial in May.  So there's an issue, of course, with the

18  affirmative defense not be properly pled, so not fairly a

19  basis for a directed verdict at this point.

20          But then getting to the -- that's the timing issue.

21  Then we've got the sort of merits of the argument issue which

22  we had sort of briefed back when we were arguing about

23  amending and talked about a lot of these cases.

24          I mean, defendant seemed to rely on this *Kinder* case

25  which was a state law claim and didn't involve any claims

128

1  under 1983.  And, in fact, that case specifically talked about
2  how the Missouri statute of limitations isn't relevant to a
3  1983 claim because the U.S. Supreme Court has told us, and
4  many federal courts have told us that federal courts use the
5  general statute of limitations under state law to determine
6  whether a 1983 action is brought timely, which is five years
7  in Missouri.  What they're essentially asking the Court to do
8  is apply one of these specific statute of limitations.

9       And I haven't reread the case recently but my
10  recollection of Wilson is that one of the Supreme Court's
11  rationales in the *Wilson* case was that if we do this, if we
12  allow every state -- very specific state law statute of
13  limitations to apply to 1983 cases, then we're going to see
14  this -- it's going to become the wild west, basically, in
15  terms of when actions can be brought under federal law based
16  on state law statutes of limitations.

17       As it stands, the state of the law right now is
18  crystal clear that the general statute applies, which is five
19  years.  This case was brought within five years, so we ask the
20  Court to deny the motion.

21       THE COURT:  There's one thing you said and I didn't
22  get it down.  When was it the Missouri legislature made the
23  one-year statute of limitation?

24       MR. DAVIS:  It was in 1990, Judge.

25       THE COURT:  In 1990?

```
 1              MR. DAVIS:  Just 1990.

 2              THE COURT:  Thank you.

 3              The Court believes first that the failure to raise

 4    the affirmative defense till late in the action is prejudicial

 5    to the plaintiff and therefore the Court refused to allow that

 6    amendment and the Court maintains that that's not an

 7    affirmative defense that we'll recognize in this case because

 8    of the untimely nature of the amendment.

 9              Regardless, the Court also believes that the

10    one-year statute is not the statute that applies to 1983

11    actions but that the five-year general statute is the one that

12    is appropriately applied.  So even if the Court were to

13    consider the affirmative defense, the Court would find that it

14    is not applicable in this case.  So your motion for directed

15    verdict is denied.

16              MR. DAVIS:  Yes, Judge.

17              THE COURT:  Anything further I need to take up or

18    consider?

19              MS. ROBINSON:  No, Your Honor.

20              THE COURT:  All right.  Well, you got a few minutes

21    to research malicious or deliberate indifference, if you

22    choose to do so, and otherwise we'll get ready to get started.

23              After you read your deposition, you're going to

24    rest?

25              MS. ROBINSON:  Yes, Your Honor.
```

130

```
 1              THE COURT:  You don't have any other motion for
 2   directed verdict or anything we need to take up?
 3              MR. DAVIS:  No, Judge, that was the only one.
 4              THE COURT:  You'll be ready to present your evidence
 5   at that time?
 6              MR. DAVIS:  Yes.
 7              THE COURT:  All right.  We'll be in recess.
 8              (Court stands in recess:  8:38-9:03 a.m.)
 9              THE COURT:  Any reason why we shouldn't get the jury
10   and proceed?
11              MR. DULLE:  Your Honor, I have a quick procedural
12   question for you.
13              You had asked that we provide you with the marked-up
14   copies of the depo that we want to read in.  Do you want that
15   now?
16              THE COURT:  I would appreciate that, yeah.  My
17   recollection this is -- both sides know all about this and
18   it's all agreed upon?
19              MR. DAVIS:  Yes, Judge.
20              THE COURT:  All right.  Whoever sent us this case,
21   we'll look it at here.  I haven't had a chance but we'll look
22   at it over the break and see how to respond.
23              Go get the jury.
24              My recollection is somebody's going to be on the
25   stand and somebody else is going to read the questions?
```

1            MR. DULLE:  Right.  Do you want to explain that to

        2    the jury?

        3            THE COURT:  I'll do that.  I have to read them an

        4    instruction about a deposition anyway so --

        5            (Jury enters courtroom at 9:05 a.m.)

        6            THE COURT:  Good morning.  Thank you for coming

        7    back.  As if you had a choice, huh?

        8            You'll notice you're one short.  She had some issues

        9    arise and I decided rather than trying to delay the case or

       10    impose hardship on her, we'd be better off just plowing

       11    through and going with the six that we have.

       12            We're making good progress and the case I think will

       13    be submitted to you today.  Whether you'll make a decision

       14    today or not is up to you, but I think we'll get it submitted

       15    to you today, just so you know for timing purposes.

       16            Now, the plaintiffs are still presenting evidence

       17    and the next piece of evidence they're going to present is

       18    through a deposition.  So Instruction No. 11 to you.

       19            (Court reads Instruction No. 11 to the jury.)

       20            THE COURT:  We have found that it's easier to follow

       21    if we have one lawyer read the questions and a different

       22    lawyer read the answers, because otherwise you get -- they get

       23    mixed up and you have to say question, answer, question,

       24    answer every time.  So what they're going to do is one of the

       25    plaintiff's lawyers is going to take the stand and read the

                                      132

1    answers and the other one is going to read the questions.

2          You may proceed.

3          By the way, the witness is under oath during a

4    deposition.

5                        EXAMINATION

6    DEPOSITION OF ROBERT WIDENER, READ AS FOLLOWS:

7    BY MR. DULLE:

8    Q    Sir, would you state your first and last name for the

9    record?

10   A    Robert Widener.

11   Q    And I understand that you are here today in your capacity

12   as a corporate representative of the Missouri Department of

13   Corrections; is that correct?

14   A    Yes.

15   Q    And where are you employed?

16   A    The central office, Missouri Department of Corrections.

17   Q    What is your job title?

18   A    I am the emergency management coordinator for the

19   Missouri Department of Corrections.

20   Q    How long have you been in that position?

21   A    Nine years in April.

22   Q    Okay.  And as you may be aware, this case concerns the

23   South Central Correctional Center in Licking, Missouri.  Have

24   you been to that facility?

25   A    Yes, I have.

                              133

1   Q    They shouldn't have been housed together for sure, and
2   maybe they should have been evaluated about whether either of
3   them could be housed with anyone else based on the fact that
4   they had been fighting earlier that day; is that your
5   understanding?
6   A    Yes.  They -- they -- the individual was in control
7   center should have been looking at those AICS scores and
8   entering them into the AS400 system for the administrative
9   segregation which -- for the administrative segregation which
10  cell assignment they should have.  So somewhere in the process
11  the -- it was lost that these two offenders just had an
12  altercation and should not be placed in a cell together.
13  Q    And you say it was lost.  Do you have an understanding,
14  did the control center officer just not timely enter the
15  information or overlook the information or do you have an
16  understanding of exactly where the disconnect occurred and
17  why?
18  A    I just don't know that it occurred.
19            THE COURT:  I think --
20            MS. GOODRICH:  I apologize.
21  A    I just know that it occurred.
22  Q    (By Mr. Dulle) Okay.  And I think the undisputed
23  evidence in this case is that the fight happened earlier in
24  the day and then a period of hours passed before Spates and
25  Smith were attempted to be celled together.  So, you know,

134

1   over a period of hours.  I assume that's ample time that the

2   records could have been and should have been updated so that

3   these two gentlemen were not ever placed in the cell

4   together without further action.  Is that -- is that fair?

5   I mean, we aren't talking about a 15- or 20-minute lapse of

6   time here.  I think we're talking about hours of time?

7   A     I -- I agree with the fact that they should never have

8   been placed in a cell together.  Without having been there and

9   knowing the workload of that day, having worked in an

10  administrative segregation myself, I know how fast moving

11  that -- that job is.  And while you're right, they should not

12  have been -- absolutely not have been placed in a cell

13  together, the other duties of the officers during that day at

14  that location, without knowing what's going on that day, I

15  can't say that, you know, having someone in a holding cell for

16  an hour or two, you know, it isn't -- it's not -- it's not

17  unheard of.  But you're absolutely correct in the fact that

18  they should not have been housed together in the -- in a cell.

19  Q     So if Spates and Smith should have been enemies, declared

20  enemies that day based on their earlier fight, are you saying

21  that they shouldn't have been in the same housing unit,

22  period, let alone the same cell?

23  A     Well -- well, segregation is a 23-hour-a-day, so, yes,

24  they would have been in segregation together, but they should

25  not be in the same cell together.

135

1  Q    Okay.  So even for offenders who are not declared enemies
2  there's a process outlined there as far as how they can refuse
3  to be celled together; is that correct?
4  A    That's correct.
5  Q    Are you aware of whether the process for compatible
6  offenders to review -- sorry, refuse double cell assignments
7  was followed in this case?
8  A    So -- and I think we're talking about B, right, quote, If
9  offenders continue to refuse a cellmate, he will be maintained
10 in full restraints on a security bench, holding cell or other
11 secured area in accordance with institutional services
12 regarding mechanical restraints, end quote.
13         So we're talking about whether the two agreed to be
14 housed, housed in the same cell, if they just simply agreed,
15 if that would be enough to allow them to do that?  And I say
16 that would not be since they are just recently in an
17 altercation together.
18 Q    Okay.  And even if for whatever reason they were not
19 declared enemies at the time but were compatible, if one or
20 both of them refused to be celled with the other, Exhibit 1
21 outlines a process for that refusal and it doesn't just
22 include going ahead and putting them in the cell together,
23 correct?
24 A    That's correct.
25 Q    And who decides whether they're declared enemies based on

136

1   the fight or not?

2   A    Those -- well, it's not like a policy procedure question.

3   It's more or less for the safety and security of the

4   institution and offender and officer safety that they will --

5   the officers will have these offenders fill out these enemy

6   waiver forms for simple altercations of whether it be you

7   stepped on my foot, you owe me money or whatever the cause of

8   the fight is.  They'll have them fill those forms out against

9   one another.  That way it's on record.  It's placed in the

10  system and that when -- when just -- because inmates or -- I'm

11  sorry, offenders move around so much it's good that we have

12  that kind of information.  That way we know we're not going to

13  place them in a situation like what occurred here.  You

14  understand?  So we have them fill out these forms not

15  necessarily because it's part of our policy but because it's

16  part of safety and security for the offenders and the officers

17  and it just keeps the institutions safer in general.  It's --

18  if folks are constantly getting into fights when -- when

19  around each other, then we try to separate them as much as

20  possible as we can and in a combined area.

21  Q    And so there's no question in this case that based on the

22  fact that Smith and Spates had been in a fight earlier that

23  day that they either were or should have been declared each

24  other's enemies at or near the time of that fight?

25  A    Not that I'm aware of.  I mean, they -- if there was no

                                137

1    previous altercation or anything like that and there's no
2    previous waiver forms, which didn't seem -- didn't seem like
3    there were any, then other than having the -- having a fight
4    that morning there would be no indication why they shouldn't
5    be housed in the same cell together.
6    Q    Okay.  But the fact that they did have a fight earlier
7    that morning was indication they should not have been housed
8    in the same cell together?
9    A    Exactly.
10   Q    Okay.  And I know you said that you've seen Mr. Turner's
11   -- sorry, Correctional Officer Turner's affidavit in this case
12   and he states something to the effect in there of he informed
13   the other officers that Spates and Smith had been in a fight
14   earlier that day and that they needed to contact their
15   sergeant before housing them together.  Do you remember seeing
16   that?
17   A    Yes.
18   Q    Did the Correctional Officers Reese, Turner and Machino,
19   did they have the authority to put the brakes on this housing
20   assignment and try to figure out what was going on instead of
21   just putting Spates and Smith in the cell together?
22   A    Yes, they could have.  They could not not put them in
23   there also based off of what Turner said.  But like I said
24   before, they're all CO1s.  No -- not one of them had authority
25   over the other.  So regardless of what Turner said, if a

138

1  sergeant said, quote, Place him in the cell, end quote, you

2  know, these guys are like, quote, Okay, yes, sergeant, we'll

3  place them in the cell, end quote, that's what they're going

4  to do.

5  Q    Is there a DOC policy that allows officers to let inmates

6  fight or scuffle with each other if the inmates are in

7  agreement, if they seem to want to fight or scuffle?  Is there

8  something that permits that kind of behavior?

9  A    Absolutely not.

10 Q    Okay.  And I think you said the policy would be to

11 administer -- if they won't voluntarily stop, to administer

12 pepper spray to the person instigating the fight or to both if

13 both are fighting, correct?

14 A    Correct.

15 Q    Okay.  So in this situation where -- and I think you've

16 seen the investigative report, Mr. Smith was, you know,

17 uncuffed and hitting my client, Mr. Spates, who was cuffed,

18 then the policy would have been Mr. Smith should have been the

19 one who was pepper sprayed, correct?

20 A    Correct.

21 Q    Okay.  And if somebody testified that it was a direct

22 spray of my client while he was on the ground while someone

23 was standing above him hitting him or kicking him, would that

24 concern you as a corporate representative of the Missouri

25 Department of Corrections?

1    A    Yes, it would.

2    Q    Okay.  And unfortunately it sounds like in this case

3    Officer Turner has testified that he did have actual knowledge

4    that these individuals were in a fight earlier that day and

5    expressed that and this incident still happened, correct?

6    A    That's correct.

7    Q    Okay.  And so at least part of the lapse in this case,

8    would you agree, is the fact that nobody involved the housing

9    unit sergeant in this situation?

10   A    Yes.

11   Q    Is it your understanding that DOC policy would have

12   required a written waiver from both of them before they were

13   celled together on November 12th, 2015, based on the fight

14   that occurred earlier that same day?

15   A    So if they had -- so if they weren't enemies beforehand,

16   right, so there wasn't a conflict until that day, it is all I

17   can know from -- from what I see on the computer screen,

18   right?  So unless I know prior to that there is an issue, I

19   won't know that they should be -- shouldn't be housed together

20   based on what's on the computer screen in front of me.  But

21   knowing that they had both gotten into an altercation, they

22   should also know that they shouldn't be placed in the same

23   cell together regardless if a waiver form has been filled out

24   together or not.

25   Q    Okay.

                              140

1    A    Yet because -- you understand what I'm saying?  So like

2    they should be housed -- there was nothing indicating that

3    there were -- were enemies prior to that altercation.  Just

4    because a waiver form hadn't been filled out yet is no excuse

5    for them to be celled together because they were just in a

6    fight, so that's --

7    Q    Okay.

8    A    That's what I'm saying.

9    Q    So as the corporate representative of the DOC, in your

10   mind the determinative fact was they had been in a fight

11   earlier that day, so regardless of anything else, they should

12   not have been placed in the cell together?

13   A    That's correct.

14              THE COURT:  That is the end of that offer.

15              Further evidence on behalf of the plaintiff?

16              MS. ROBINSON:  Your Honor, the plaintiff rests.

17              THE COURT:  Plaintiff has rested their evidence.

18   It's now the defendants' turn.

19              Defendant, you're authorized to present evidence.

20              MR. DAVIS:  Judge, could we do a sidebar really

21   fast?

22              THE COURT:  Yes, we can.

23   (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS

24   WERE HAD:)

25              MR. DAVIS:  Defendants are not going to present any

                                141

1 additional evidence.  I don't know if you want something like

2 that on the record or how --

3         THE COURT:  Just say defendant rests.

4         MR. DAVIS:  Yes, Judge.

5 (PROCEEDINGS RETURNED TO OPEN COURT).

6         MR. DAVIS:  Judge, the defendants do not have any

7 additional evidence and they rest.

8         THE COURT:  Defendant has rested.

9         There's no rebuttal evidence, correct?

10         MS. ROBINSON:  No, Your Honor.

11         THE COURT:  And so therefore the evidence is closed

12 and we are ready to give the case to you; however, there's

13 some work we need to do before we can do that.  I have to

14 finalize the jury instructions to be read to you, we have to

15 talk a little bit about the parameters of closing arguments.

16         We were going to take a break after that exhausting

17 20 minutes of work that you did there, but we'll take a break.

18 We'll come and get you just as soon as we're ready to proceed.

19 All right?

20         So we'll be in recess.

21         The good news is we're going to get the case to you

22 quickly.

23         (Jury exits courtroom at 9:19 a.m.)

24         THE COURT:  Any motions at the close of the

25 evidence?  Defendants' going to renew your motion for directed

142

```
 1    verdict on the same basis?
 2              MR. DAVIS:  Yep.
 3              THE COURT:  It will be rejected on the same basis.
 4              Anything further I need to take up or consider
 5    before we finalize instructions?
 6              MS. ROBINSON:  No, Your Honor.
 7              THE COURT:  All right.  I haven't yet read this case
 8    on the issue of -- that we discussed earlier at the
 9    instruction conference but my staff and I will go back and
10    we'll try to get the final copy of the instructions to you
11    ASAP.
12              Let's talk about how long you think you need for
13    closing argument.
14              Plaintiff, have you given thought how long you need?
15              MS. ROBINSON:  I would like 20 minutes plus some
16    rebuttal time.
17              THE COURT:  So you want more than 20 minutes?
18              MS. ROBINSON:  Yes, Your Honor, 24 minutes total.
19              THE COURT:  And the defendant, have you given
20    thought to how much time you need?
21              MR. DAVIS:  Yeah, Judge.  We were thinking 20
22    minutes, although I probably will only take around 15.
23              THE COURT:  I'm going to give each side 20 minutes,
24    so you're going to have to dig your rebuttal time out of that.
25    You cannot reserve more than half for rebuttal.
```

                                 143

1          You'll need to give Linda any instructions you want

        2    in terms of warnings, but you will each get up to 20 minutes

        3    of time.

        4          Let me go back and try to finish the instructions

        5    and we'll get them out to you so you can make one last look at

        6    them just as soon as we can get it done.  All right?

        7          Thank you all.

        8          (Court stands in recess:  9:22-9:43 a.m.)

        9          THE COURT:  Going through the instructions, I just

       10    noted one issue I wanted to bring to the parties' attention.

       11          Let me first say that I read the case submitted to

       12    me and I looked at the law and I don't see a definition of

       13    malicious that applies in this case.  I think there is no

       14    definition of reckless indifference.  And if they find

       15    deliberate indifference, it seems to me that then there

       16    clearly is reckless indifference and so a new definition

       17    wouldn't help.

       18          Here's the issue.  You said you didn't want nominal

       19    damages, but in looking at the damage verdict form that you

       20    submitted, the very bottom page says, "You may not award

       21    punitive damages against any defendant unless you have first

       22    found against that defendant and awarded Plaintiff Christopher

       23    Spates nominal or actual damages," and yet there is no place

       24    in the instructions that we allow for nominal damages or we

       25    discuss nominal damages.  So I started to just delete the word

                                         144

1  *nominal or* and just say actual damages, but I didn't want to

2  do it without telling you that I did it since you had tendered

3  the damage instruction.

4         Are you okay with that?

5         MS. ROBINSON:  Yes, Your Honor.

6         THE COURT:  Do you have any objection to that?

7         MR. DAVIS:  Judge, we would again request that the

8  nominal instruction be included, but it's up to you, Judge.  I

9  think we already discussed that.

10         THE COURT:  Is that a new request?  I don't remember

11  you saying that earlier.

12         MR. DAVIS:  No, Judge, we're fine with that.

13         THE COURT:  All right.  Well, I think if plaintiff

14  doesn't want to submit nominal, I'm not going to require it,

15  so I'm going to say take out the word *nominal or* on the bottom

16  of the jury verdict form that the plaintiff tendered.

17         I am going to submit punitive damages to the jury.

18  If they find the evidence most favorable to the plaintiff, I

19  think it probably is -- I know there's sufficient evidence to

20  support that.  I don't know if they'll find that but I think

21  they're entitled to.  Other than that, we think we're done.

22         Is there anybody want to make any further record

23  regarding the instructions or the issue of defining malicious

24  or reckless indifference?

25         MS. ROBINSON:  No, Your Honor.

145

```
 1            MR. DAVIS:  No, Judge.

 2            THE COURT:  Anybody want to tender any instructions

 3    to me other than the one that was tendered that I rejected

 4    earlier?

 5            All right.  We'll go make the final copies, we'll

 6    bring them out to you, then we'll give you a few minutes to

 7    look them over and then we'll get started with closing

 8    arguments.

 9            (Court stands in recess:  9:45-10:02 a.m.)

10            THE COURT:  Be seated.

11            We have provided the parties copies of the

12    instructions we intend to present consistent with the

13    conferences and discussions we've had with the parties.

14            Did anybody identify anything in what we handed to

15    you that surprised you or was different than what you expected

16    to be or any typos or anything like that?

17            MS. ROBINSON:  No, Your Honor.

18            MR. DAVIS:  No, Judge.

19            THE COURT:  Okay.  Any reason why we shouldn't

20    summon the jury?

21            What we'll do is get the jury, I'll read the

22    instructions that haven't been read, then we'll do the

23    plaintiff's close, the defendants' close, the plaintiff's

24    rebuttal, and then we'll get the case to the jury.

25            Have you -- have they given you times and stuff?
```

146

```
 1              COURTROOM DEPUTY:  Yes.

 2              THE COURT:  Are the walkie-talkies all charged up

 3    and ready to go?

 4              COURTROOM DEPUTY:  Yes.

 5              THE COURT:  All right.  Go get the jury.

 6              (Jury enters courtroom at 10:04 a.m.)

 7              THE COURT:  All right.  Be seated.

 8              All right.  The way it's going to proceed is I'm

 9    going to read you instructions, the plaintiff will present the

10    opening part of their close, the defendant will then make

11    their closing argument, and under the rules the plaintiff then

12    gets the last discussion with you -- they'll get their

13    rebuttal -- but the total amount of time that the plaintiff

14    and defendant get are equal, the only difference is the

15    plaintiff is divided into two segments.

16              I'm going to read several instructions to you and

17    these explain what the law is in terms of if you find this,

18    then you must do this.

19              And I will tell you that you will get copies of

20    these instructions to take with you to the jury room, but

21    because you're going to hear arguments from the lawyers, you'd

22    be well to listen as carefully as you can to these

23    instructions so you'll understand what findings you're having

24    to think in your mind whether you need to make.

25              Now, the good news is I'm not going to reread the
```

1  instructions that I've already read to you but those, too,

2  will be provided to you in the jury room.  I'm going to start

3  with Instruction No. 12.

4          Instruction No. 12.

5          "Members of the jury, the instructions I gave at the

6  beginning of the trial and during the trial are still in

7  effect.  Now I'm going to give you some additional

8  instructions.  You have to follow all of my instructions, the

9  ones I gave you earlier as well as those that I give you now.

10  Do not single out some instructions and ignore others because

11  they're all important.  Remember, you have to follow all

12  instructions no matter when I give them, whether or not you

13  have written copies."

14          Although I'm trying to give you written copies of

15  all of them I've read to you.

16          "You will have copies of the instructions I'm about

17  to give you now in the jury room.  You will have copies of

18  some of the instructions with you in the jury room, others you

19  will not have copies of.  This does not mean that some

20  instructions are more important than others.  Remember, you

21  have to follow all instructions no matter when I give them,

22  whether or not you have written copies."

23          I think I've given you written copies of all of them

24  but I may have said something from the bench that we didn't

25  put in writing, and if so, you still need to follow that.

148

1          Instruction 13.

 2          (Court reads Instruction No. 13 to the jury.)

 3          THE COURT:  Instruction No. 14.

 4          Some of these are a little repetitive of what we

 5     read at the very beginning, but that's to remind you.

 6          Instruction No. 14.

 7          (Court reads Instruction Nos. 14-15 to the jury.)

 8          THE COURT:  Again, the burden of proof here is more

 9     likely true than not true.

10          Instruction No. 16.  I'll tell you, this instruction

11     kind of gives you a starting point.  It kind of tells you how

12     to get started, so remember Instruction No. 16.

13          (Court reads Instruction No. 16 to the jury.)

14          THE COURT:  Instruction No. 17.

15          Now, this is where we start talking about the

16     substantive law and the exact facts you have to find.

17          Seventeen.

18          "The plaintiff, Christopher Spates, brings this

19     claim under Federal Statute 42 U.S.C. 1983, which provides

20     that any person or persons who under color of any statute,

21     ordinance, regulation, custom or usage of any state or

22     territory deprives another of any rights, privileges or

23     immunities secured by the constitution or laws of the United

24     States shall be liable to the injured party."

25          That's just the general federal statute that you're

                                    149

```
 1   talking about.
 2              The specifics of that as to each defendant are
 3   included in Instructions 18, 19 and 20 and the elements
 4   applicable to each of the defendants are the same.  So I'm
 5   going to read you three instructions.  They're going to
 6   basically be read the same, only the names of the defendants
 7   will be different.
 8              Instruction No. 18.
 9              (Court reads Instruction Nos. 18-20 to the jury.)
10              THE COURT:  Now, the next instruction is a
11   definition of a word.
12              (Court reads Instruction No. 21 to the jury.)
13              THE COURT:  Now, Instruction No. 22, if you decide
14   to find in favor of the plaintiff under the instructions I've
15   just read to you, it has to do with what amount you should
16   consider.
17              It says -- Instruction No. 22.
18              (Court reads Instruction No. 22 to the jury.)
19              THE COURT:  The next instruction, Instruction
20   No. 23, has to do with damages that are punitive in nature,
21   not just based on the injury but based on a desire to punish
22   the defendants for their conduct.
23              It reads as so, Instruction No. 23.
24              "In addition to the damages mentioned in the other
25   instructions, the law permits the jury under certain
```

150

circumstances to award punitive damages.  If you find in favor
of Plaintiff Christopher Spates under Instructions 18, 19 or
20, and if it has been proved that the conduct of the
defendants as submitted in Instructions 18, 19 or 20 was
malicious or recklessly indifferent to Plaintiff Christopher
Spates' right to be protected from attack, then you may but
are not required to award Plaintiff Christopher Spates an
additional amount of money as punitive damages for the
purposes of punishing the defendants for engaging in
misconduct and deterring the defendants and others from
engaging in similar misconduct in the future.  You should
presume that Plaintiff Christopher Spates has been made whole
for his injuries by the damages you award under Instruction
No. 22."

So, again, Instruction No. 22 is to compensate him
for his injuries.  Instruction No. 23 would be for punishment.

"If you decide to award punitive damages, you should
consider the following in deciding the amount of punitive
damages to award:

"One.  How reprehensible the defendants' conduct
was.  In this regard you may consider whether the harm
suffered by the plaintiff was physical or economic or both,
whether there was violence, intentional malice or reckless
disregard for human health or safety.

"Two.  How much harm the defendants' wrongful

151

1  conduct caused the plaintiff and could cause the plaintiff in
2  the future.

3          "Three.  What amount of punitive damages in addition
4  to the other damages already awarded is needed considering the
5  defendants' financial condition to punish the defendants for
6  their wrongful conduct toward the plaintiff and to deter the
7  defendants from others -- and others from similar wrongful
8  conduct in the future.

9          "The amount of any punitive damage award should bear
10  a reasonable relationship to the harm caused to Plaintiff
11  Christopher Spates.

12          "You may award punitive damages against any or all
13  defendants or may refuse to award punitive damages.  If
14  punitive damages are awarded against more than one defendant,
15  the amounts awarded against those defendants may be the same
16  or may be different."

17          Now, the last document is a jury verdict form and
18  it's what's going to be filled out by your foreperson.  I'm
19  going to give copies of all the instructions, those that I
20  read earlier and those that I just read, and there'll be six
21  copies, one for every one of you.  One of them only will
22  include a jury verdict form.  We don't send back six jury
23  verdict forms because we don't want each person to fill out
24  what they think it ought to be and then it gets confusing.  So
25  there'll only be one jury verdict form and it's the one that

                                152

1    your foreperson should fill out.

2         Pretty simple, but it basically says, Complete this

3    form.  And it says, "On Christopher Spates' claim against

4    Defendant Reese as submitted in Instruction No. -- " and we

5    need to fill that instruction number out.  We'll do that

6    before we give you the verdict form.  Then you find and you

7    write the name of who you're ruling in favor of and then

8    circle.  And it'll be Plaintiff Christopher Spates or

9    Defendant Charles Reese.  You write their name and you circle

10   whoever you're ruling for.

11        Then on the next one, "On Christopher Spates' claim

12   against Robert Turner as described in Instruction No. -- "

13   that will be filled in -- and you'll circle whichever one of

14   those and write the name in on the line.

15        The same with the third, "On Plaintiff's claim

16   against Defendant John Machino as submitted in Instruction, we

17   find in favor of," and write the name and circle it.

18        Then below there, "We find Plaintiff Christopher

19   Spates' damages to be," and this is where you write the

20   compensatory damages, the damages you think that will

21   compensate him for any injury or damage that you believe he

22   incurred as a result of the incidents described in the

23   evidence, if you find he's entitled to a verdict.

24        The next page has to do with the punitive damages

25   and, We asses punitive damages against Charles Reese, We

                                153

access punitive damages against Robert Turner, We assess
punitive damages, and it can anywhere from whatever number you
think is appropriate or you can put none if you don't want to
award punitive damages.

If you do not award compensatory damages, then you
are not to award punitive damages.

But that's what you'll need to fill out.  And when
it's -- it has to be a unanimous decision, because the first
thing I'll do is ask whoever -- when you bring it back in
filled out, is that a unanimous decision, because otherwise
it's not a valid verdict.

All right.  Those are your instructions.  Now the
parties have a right to describe what they think the facts are
in light of those instructions.  I will recognize -- each side
has 20 minutes.  Again, the plaintiffs have to break theirs up
if they want to do a rebuttal and the plaintiff will go first.

You are recognized to proceed.

MS. ROBINSON:  May it please the Court?

THE COURT:  Proceed.

MS. ROBINSON:  Thank you again for your time and
your sacrifice here today.  We know it is an inconvenience for
you but it is crucial for you -- to our system of justice to
have juries who serve and take their jobs responsibly.  This
system holds rich and poor equally accountable and it makes
sure that all members of our society play by the same rules.

154

1          At the beginning of this trial we talked about
 2    everybody's role.  The attorneys now have submitted their
 3    evidence and Judge Harpool has given you the law.  Now you as
 4    the jury get to take the evidence presented from the law
 5    and -- take the evidence presented and the law from the judge
 6    and render a verdict.

 7          As we said at the beginning, the facts are mostly
 8    undisputed.  Mr. Smith and my client, Chris, got into a fight
 9    the morning of November 12th, 2015.  Chris and Smith were
10    separated and taken to ad-seg.  Defendant Turner knew about
11    that fight and escorted one of the gentlemen to ad-seg.

12          After several hours, Defendants Reese and Machino
13    escorted Smith to the same cell where Chris was.  Defendant
14    Turner saw the cell Smith was being escorted to and told the
15    defendants to notify their sergeant before putting Smith into
16    that cell because they had just seen -- he had just seen that
17    fight in the morning.

18          Both Chris and Smith told the officers that they did
19    not want to be in the same cell together.  None of the
20    defendants notified anyone and they did not find a new cell
21    for Smith.  Instead, Smith was put into Chris's cell.

22          Smith and Chris started scuffling before their
23    handcuffs were taken off to see who would get their handcuffs
24    removed first.  As soon as Smith's handcuffs were taken off,
25    he started whaling on Chris, punching him and beating him in

                                    155

1    the back.

2          Chris was cuffed behind his back, his cuffs attached

3    to a tether.  He could not move away from the barrage of

4    punches and he could not defend himself.  The door to the cell

5    was not opened until Smith finished his attack, despite Chris

6    pleading for it to be opened and for help.  During this time

7    Chris was sprayed with pepper spray.

8          Now, you heard from Chris and Smith that the

9    officers were holding onto the tether that was attached to

10   Chris's handcuffs.  You heard that Defendant Turner testified

11   under oath in 2021 that he saw one of the officers holding

12   onto that tether.  Yesterday he tried to say he did not see

13   that, but two years ago he was certain that he saw one of the

14   officers holding onto that tether.  But whether the tether was

15   held in one of their hands or it was attached to the hook

16   outside the door, either way that tether kept Chris in place

17   in the cell while he was attacked.

18         You heard from Chris, Smith and Defendant Turner

19   that there was a comment made about black gladiator combat.

20   Chris and Smith testified that one of the officers made this

21   comment.  They also testified that one of the officers made a

22   comment about missing the first fight and wanting to see

23   another one.

24         Defendant Turner couldn't be 100 percent certain

25   that one of the officers did not make that comment when he

1    testified in 2021.  You get to decide what the truth is.

2            The defense tried to minimize the attack by stating

3    it only lasted a minute.  We watched the video together.  And

4    I'm sorry it wasn't very clear; you couldn't see what was

5    happening very clearly but you could see when Smith went

6    inside the cell and when he came out, and we sat here in

7    silence for that minute period and that entire time Chris had

8    his hands cuffed behind his back.  He could not -- he was

9    being attacked by Smith and he could not move away from the

10   attack, and he was being pepper sprayed.

11           Smith was punching Chris, he was kicking him, he was

12   beating on his back for an entire minute.  Chris could do

13   nothing.

14           Both Chris and Smith testified that one minute felt

15   much longer to them, but a minute is a long time to be

16   attacked when you can do nothing to defend yourself.

17           Now, when I hear these facts I get mad.  I get

18   upset.  It makes me mad because no one should be treated this

19   way.  The officers knew that Chris and Smith had been in a

20   fight that morning.  They saw Chris and Smith scuffling before

21   they took off their handcuffs.  And what did they do?  They

22   watched the cell door close, they stood outside, they uncuffed

23   Smith, and then they watched what happened.

24           Regardless of what you think of Chris, the

25   punishment for his crime is prison.  Once he is in prison, he

1 has rights under the Eighth Amendment, including the right to
2 be free from attack from other prisoners.

3        When we started, I asked you to pay attention to see
4 if the defendants presented any justification for their
5 actions.  They tried to blame this on a miscommunication but
6 they haven't really given any evidence of that
7 miscommunication.

8        You've also heard testimony from the Department of
9 Corrections' representative that the determinative fact was
10 they had been in a fight earlier that day.  So regardless of
11 anything else, they should not have been placed in that cell
12 together.

13        All three defendants knew that Chris and Smith had
14 been in a fight earlier that day, so regardless of anything
15 else, these three defendants should not have placed Smith in
16 Chris's cell that afternoon.

17        The only evidence from the defendants confirmed
18 Chris's testimony.  They haven't offered you any other
19 different story.

20        So let's look at the law that Judge Harpool gave
21 you.

22        Instructions 18, 19 and 20 are the same except that
23 there is one for each defendant, so we'll go through each one.

24        First, Inmate Julius Smith struck or hit Plaintiff
25 Christopher Spates.  There's no dispute that that attack

1   occurred.  And Plaintiff Christopher Spates was incarcerated

2   under conditions posing a substantial risk of serious harm.

3          The two had fought earlier that day.  It was obvious

4   that they were trying to fight again.  Everyone knew that they

5   had been in that fight and everyone -- Smith, Chris, Defendant

6   Turner -- told Machino and Reese not to put them in a cell

7   together.  Chris and Smith started bumping and scuffling.  And

8   the black gladiator comment shows that they knew that there

9   was going to be a fight.

10         Second, Defendant Charles Reese knew of and was

11  aware of the substantial risk of an attack or disregarded the

12  risk to Plaintiff Christopher Spates' safety.

13         And we just talked about that.  They knew.  They

14  were told that they had been in a fight earlier that morning.

15  They saw them scuffling before his handcuffs were uncuffed.

16  They had time to take him out of the cell.  They knew, they

17  knew that there was a substantial risk of an attack.

18         Third, Defendant Charles Reese, with deliberate

19  indifference to Plaintiff Christopher Spates' need to be

20  protected from such attack, failed to protect Christopher

21  Spates.

22         Again, they had actual knowledge of that risk of

23  attack.  They knew that Smith posed a danger to Chris.

24         And, fourth, as a direct result Plaintiff

25  Christopher Spates was injured.

1          Chris testified about his damages.  He had a swollen
2  eye.  He still suffers from back pain.  He still suffers from
3  neck pain.  He still gets headaches.  He suffered fear at the
4  time.  He still suffers from fear from being there.  So you
5  can check off that he was injured.  We know that he was
6  injured.

7          Now, this instruction was for Defendant Reese and
8  you have the same one for Defendant Robert Turner.  So we know
9  that -- we've already talked about the first element there.
10  Defendant Robert Turner knew of and was aware of a substantial
11  risk of attack.  He helped with the fight earlier that
12  morning.  He knew of the risk of attack.

13          Third, Defendant Robert Turner with deliberate
14  indifference to Plaintiff Christopher Spates' need to be
15  protected from such attack failed to protect Plaintiff
16  Christopher Spates.

17          He knew of that risk of attack and he did nothing to
18  stop this attack.  We know that he did nothing.  Smith was
19  placed in the cell, Smith's handcuffs were undone and Smith
20  attacked Chris.  Nothing was done to protect Chris in this
21  instance.

22          And then Instruction -- and we know -- we talked
23  about his injuries.  We know that that one happened.

24          And Instruction 20 is against Defendant John Machino
25  and it's all the same.  We know about the attack.  We know

160

1  that Defendant Machino knew of the substantial risk of attack.

2  He was told of that risk.  He saw that risk.

3          We know that with deliberate indifference to

4  Plaintiff Christopher Spates' need to be protected from such

5  attack that he failed to protect Plaintiff Christopher Spates.

6  He did nothing to stop Smith being placed in that cell.  He

7  participated in putting Smith in that cell with Chris.  So we

8  know that's true against Defendant Machino as well.

9          Now we do have an Instruction 21 on deliberate

10  indifference.  It's established only if there's actual

11  knowledge of the risk of attack that Julius Smith posed to

12  Plaintiff Christopher Spates and if defendants disregarded

13  that risk by intentionally refusing or intentionally failing

14  to take reasonable measures to deal with the problem.

15          We've talked about this.  They had actual knowledge

16  of the risk.  They knew that they were going to get into that

17  fight.  They saw them.  They saw them there.  They saw -- one

18  of them saw the earlier fight.  They knew of that risk and

19  they disregarded that and they placed Smith in the cell and

20  they uncuffed Smith so that he could attack Chris.

21          It doesn't matter that Chris signed an enemy waiver

22  the month before.  It doesn't matter that Chris declined

23  protective custody the month before.  All three defendants

24  knew of the fight that morning, that same morning a few hours

25  before this attack.

1         Defendants ignored Chris when he said that Smith
         2    shouldn't come in his cell.  They ignored Smith when he said
         3    he should not go into the cell.  They ignored Turner when he
         4    told them multiple times that they should not put Smith in the
         5    cell and that they should talk to their sergeant before
         6    putting Smith in the cell.
         7         Defendants disregarded that risk by intentionally
         8    refusing to take reasonable measures.  They could have
         9    notified their sergeant.  They could have notified whoever
        10    gave them the cell assignment.  They could have put Smith in a
        11    different cell.  They did none of these things.
        12         Instruction 22 is the damages instruction.  You've
        13    heard Chris talk about his damages.  He still has back pain.
        14    He still has neck pain.  He still has headaches.  He had a
        15    swollen eye.  He was sprayed with pepper spray.  You heard the
        16    corporate representative say that it was concerning that he
        17    was sprayed with pepper spray when he had his hands cuffed
        18    behind his back and was being attacked.
        19         He's testified about his emotional suffering.  He
        20    was afraid then, at that time, and he still suffers anxiety
        21    now.
        22         So if you agree with me, if you think the defendants
        23    did these things, I want you to do this when it comes time to
        24    fill out the verdict form.  We want you to find in favor of
        25    our client, Christopher Spates.

                                      162

1        Now, Instruction 22 tells you that if you find in
2   favor of the plaintiff, then you must award him an amount of
3   money that will fairly compensate him for his damages.  You
4   must determine physical pain and mental and emotional
5   suffering that he has experienced and is reasonably certain to
6   experience in the future.

7        Now, we think that this would be a reasonable
8   number.  You may agree with us, you may think it's more, you
9   may think it's less.  This is a number that you get to decide
10  when you're back in the verdict room.

11       Now, there's also the matter of punitive damages.
12  Instruction 23 tells you that if you find in favor of the
13  plaintiff like we just discussed and you think that the
14  conduct of any or all of the defendants was malicious or
15  recklessly indifferent to plaintiff's right to be protected
16  from attack, you may award plaintiff an additional amount of
17  damages.

18       So you will have another decision to make:  Was the
19  conduct of any or all the defendants malicious or recklessly
20  indifferent?  We think the answer is yes.  They all knew about
21  the fight.  They all saw them scuffling.  They still put them
22  in the cell together.  They still unhandcuffed Smith so that
23  he could attack Chris.

24       So we think that you should find -- assess punitive
25  damages.  Again, these numbers are up to you, you get to

163

decide these numbers, but we think that you should fill in these numbers.

I want to thank you all for your time and ask you to use the power that you have been granted as an officer of this court to defend people like Chris and to send a message to people like the defendants and find that punitive damages are warranted in this matter.

Thank you.

THE COURT:  Defendant, you're recognized to close.

MR. DAVIS:  May it please the Court?

THE COURT:  Proceed.

MR. DAVIS:  Ladies and gentlemen of the jury, I echo Ms. Robinson's gratitude for your being here these last few days.  We know this is an imposition, but serving as a juror is one of the most important jobs of being a citizen of the country, so we thank you very much for that.

Like the defendants stated yesterday, this case is about one thing, and that is a miscommunication.  Corrections officers are asked to do their best.  That means showing up, putting in the work and doing your job, but doing your best does not demand perfection.

Mr. Reese, Mr. Machino and Mr. Turner, like each and every one of us, is human.  We all make decisions based on the best information that is available to us at any given time.  Miscommunication occurs, we get overwhelmed by our place of

164

1  work and sometimes things slip through the cracks despite our

2  best intentions.

3       When you're in the jury room, like Ms. Robinson

4  said, you'll have a copy of the jury instructions.  I'm going

5  to pull one up for you here.  This is Instruction No. 18.

6  You'll have three of these, right, one for each defendant.  We

7  like to call these guys verdict directors.  They're going to

8  walk you through the steps and the elements that you're going

9  to need to find.

10      Now, before we begin, remember this is a civil case.

11  The burden of proof is a preponderance of the evidence.  The

12  burden is on the plaintiff.  The defendant does not have to

13  prove anything today.  The plaintiff has to prove.

14      Judge Harpool told you, you know, the preponderance

15  of the evidence.  That's a fancy way of just saying that each

16  and every fact that they use to support their claim has to be

17  proven more likely true than not true.

18      So if there's a tie, right, and you're thinking --

19  you're weighing those options and you're trying to decide

20  whether a particular fact has been proven, if you're thinking,

21  You know, it could go this way but, you know, it could also go

22  that way, then that fact has not been proven under that

23  standard and you'll have to find for the defendants.

24      Additionally, remember that plaintiff has to prove

25  every single element here for each and every single one of the

165

1   defendants.

2           So this is the verdict director against Mr. Reese.

3   Like I said, you'll get one for each defendant.  I'm just

4   going to go through this one.

5           First, right, Inmate Julius Smith struck or hit

6   Plaintiff Christopher Spates.  You heard testimony, that's

7   beyond dispute, that did occur.

8           Plaintiff Christopher Spates was incarcerated under

9   conditions posing a substantial risk of serious harm.

10          We heard Mr. Turner testify that the control center

11  is responsible for assigning inmates to cells, right?  It's

12  the control center.  He testified that the control center is

13  above all the corrections officers.  It's even above the

14  sergeants.  It's above everyone.  They oversee the whole

15  prison.  They're supposed to know everything that goes on,

16  right?

17          Mr. Widener said in his testimony that was read to

18  you, right, the control center was unaware that Mr. Smith and

19  Mr. Spates had been in a fight that morning.  They didn't

20  know.  He said it was lost.  So is it reasonable for Mr. Reese

21  and Mr. Machino to believe that the control center would have

22  given them accurate information on where to place Mr. Smith?

23          The second element here, the defendants knew of and

24  were aware of the substantial risk of an attack or disregarded

25  that risk to plaintiff's safety.

166

So, again, you know, Mr. Turner testified that the

control center is the one that tells the corrections officers

in ad-seg where to place these inmates.  These are direct

orders that they're given.  They're told by their supervisors

where to place these inmates.

          And you also saw Mr. Spates.  He signed a waiver.  I

believe plaintiff said it was a month before.  It was not a

month before, it was a week before, November 5th, 2015, where

Mr. Spates said that he didn't fear for his safety.  This is

the kind of documentation that these officers are seeing,

right, Mr. Smith saying there's no enemies in the general

population that he's afraid of.

          So Mr. Widener testified in his deposition that the

system was not updated with the fight and so that information

was not passed down to Mr. Reese and Machino.  They were given

orders to place Mr. Smith in a cell based on bad information.

There was a miscommunication, a mistake.

          Third.  Defendant -- the defendants with deliberate

indifference to Plaintiff Christopher Spates' need to be

protected from such attack failed to protect Christopher

Spates.

          Now, we just looked over this deliberate

indifference instruction, right?  Intentionally refusing or

intentionally failing to take reasonable measures to deal with

the problem.  Negligence or inadvertence does not constitute

                              167

1    deliberate indifference, right?  Negligence or inadvertence

2    does not constitute deliberate indifference.

3            So what do we know?  Plaintiff testified that the

4    attack lasted about a minute.  And Mr. Spates and Mr. Turner

5    both testified that immediately when the fight began pepper

6    spray was disbursed to break up the fight.  The use of the

7    pepper spray is what made Mr. Smith stop attacking Mr. Spates.

8            Immediately the defendants called for a 1049 backup,

9    right?  You saw in the video, you saw the backup come up, two

10   officers came up to help with the situation.  They called for

11   the backup.

12           And you heard from both Mr. Turner and Mr. Spates,

13   they both testified that Mr. Spates was immediately taken to

14   see a nurse, right, where he refused to be seen by the nurse.

15   He actually -- actually have right here, he said -- I wrote it

16   down, he said:  I'm good, take me back to my cell, right?

17   Didn't talk about any injuries.  He didn't say anything about

18   that.  He just wanted to go back to his cell.

19           Now, plaintiff's counsel in her closing argument

20   brought up the black gladiator action.  I think Mr. Smith

21   called it black warrior action or black gladiator combat.

22   We're not really sure what it was but it's very important.

23   Plaintiff's counsel told you that Mr. Spates said one of the

24   defendants said it.  Mr. Spates said Defendant Reese said it.

25   He was very sure about that.  He said Defendant Reese said it.

                                168

1    How could he know that, right?

2         He was up on that stand, he watched the video, he

3    knew who Turner was.  He knew who Mr. Turner was.  They both

4    worked in food service together.  He could not identify

5    Mr. Reese or Mr. Machino in that video even though they were

6    sitting right in front of him.  Even though just a few hours

7    before all of us introduced ourselves in open court, he knew

8    their names, he knew their faces, he could not identify them

9    in that video.  So if he couldn't recognize his face, how

10   could he recognize his voice, right?

11        And that brings up another instruction.  You learned

12   during this trial that Mr. Spates and Mr. Smith were both

13   convicted of first-degree murder, and like Judge Harpool said,

14   you may only use that information to determine whether to

15   believe the witness and how much weight to give his testimony,

16   right?  No other purpose.

17        Mr. Turner told you that he didn't make that

18   comment, right?  He knew that.  He told you that he couldn't

19   be 100 percent sure but he didn't think Mr. Reese or

20   Mr. Machino said that comment because it didn't sound like

21   them because he knew them.  He knew their voices, he knew

22   their faces, he knew who they were and it didn't sound like

23   them.  He said that.

24        And remember, too, that negligence or inadvertence

25   in not enough, right?  The control center is in charge of the

169

1 entire prison. It's telling you that this inmate is assigned
2 to this cell and someone else is telling you no, that's not
3 true, who are you going to believe, right? Is it reasonable
4 to believe the people who supervise you, the people who are
5 giving you direct orders, your boss, right?

6 And, fourth -- fourth, as a direct result, Plaintiff
7 Christopher Spates was injured. We'll go back to this
8 instruction.

9 Plaintiff talked about his injuries, right? He
10 testified -- first he testified he told the nurse he had none,
11 and then later he testified that he had migraines, he had a
12 scar on his wrist, he had neck and back pain when he laid
13 down. He said he took Ibuprofen occasionally but not every
14 day. He testified that he is paranoid at the maximum security
15 prison he resides in. He smiles at corrections officers
16 although he testified he didn't know why. He keeps his back
17 to the wall. He checks his cell every time he goes inside.

18 And, importantly, Mr. Smith testified, too, about
19 the fight that morning. Do you remember that? Mr. Smith
20 testified that he hit Mr. Spates that morning with a closed
21 fist to the face, the body, all over. He kicked him in the
22 stomach and the legs. Mr. Spates testified that that fight
23 lasted about 30 to 45 seconds, right? And all those places
24 where Mr. Spates was hit that morning sound awfully similar to
25 the places he was hit in that cell, so how could plaintiff

170

1  know which fight caused those injuries?

2        And above all else, just remember that for each and

3  every one of these -- you'll get three of these, right --

4  they've all got four elements.  For each of the defendants you

5  will have to determine whether or not plaintiff has met their

6  burden, more likely true than not true, for each of these

7  elements.

8        Now, plaintiff is also asking that you asses

9  punitive damages, right?  Punitive damages in the instruction

10  require malicious conduct.  And I've already told you, right,

11  about the errors in the system that led to Mr. Reese and

12  Mr. Machino placing Mr. Spates in the cell, right?  The

13  control center didn't have up-to-date information; that they

14  were telling Mr. Reese and Machino, put this guy in the cell.

15  Who are we supposed to believe, right?

16        Like we already discussed, you know, Mr. Spates said

17  that Mr. Reese made the black gladiator action comment but he

18  couldn't even identify who Mr. Reese was.  How could he know,

19  right?

20        For a fact to be proven, it has to be more likely

21  true than not true.  So in the event of a tie, the fact is not

22  proven, the verdict must be for the defendants, right?

23        We also heard testimony about the tethers, the

24  leather straps that are affixed to an inmate's handcuffs.

25  Mr. Turner testified that those straps are necessary to keep

171

1   inmates from using the handcuffs as weapons, right?  They're
2   typically affixed to the doors behind the inmate so that when
3   the cuffs are removed, an inmate can't pull those into the
4   cell and use them as a weapon, right?  The leather straps are
5   meant to ensure the safety of the institution by preventing
6   inmates from fashioning them into a weapon, right?

7           And remember, too, that Mr. Turner said he had never
8   known Mr. Reese or Mr. Machino to do something like this.
9   Mr. Turner said that this would put inmates at risk, this
10  would put officers at risk, it would put the institution at
11  risk, it would put the corrections officers' jobs at risk.
12  And why would Mr. Reese and Mr. Machino want to risk their job
13  or even criminal charges for two men they didn't even know?
14  They didn't know them.

15          Ladies and gentlemen of the jury, at rock bottom
16  this case is about two corrections officers, Mr. Reese and
17  Mr. Machino, who were relying on the knowledge of their
18  control center that day to place Mr. Smith into a cell.  And
19  as it turns out, a miscommunication occurred and Mr. Smith was
20  placed in the wrong cell, right?  To me this is nothing more
21  than negligence.  Nothing more than an error.  And after your
22  deliberations, you should return the only possible verdict
23  after hearing the evidence, and that is for the defendants.

24          Thank you.

25          THE COURT:  Plaintiff's rebuttal.

1       MS. ROBINSON:  Thank you.

2           Now, defendants again are trying to blame this whole

3   event on miscommunication and they're trying to say that the

4   control center assigned him to the wrong cell because they

5   didn't have all the information.  But the officers at the cell

6   had all the information.  They were told at that point that

7   they had been in a fight earlier that morning.  They saw them

8   scuffling before they removed the handcuffs.  They still had

9   time to remove Smith at that point.  They saw them scuffling.

10  They knew that a fight was to occur.

11          You also heard testimony that when a cell is

12  assigned, multiple cells were assigned so that if one of the

13  inmates refused the cell that they were going into, they could

14  put them in another cell.  They could refuse the second cell.

15  They could sit on the bench and get more cell assignments.

16          So the officers weren't just following orders.  They

17  had the ability -- they could have contacted their sergeant on

18  the radio to confirm, Hey, we were just told that these guys

19  were in a fight, are you sure you want us to put them in the

20  cell together?  They didn't do that.  They didn't put him in

21  the other cell, they didn't try to get a new cell assignment

22  even though they saw them starting to fight before their

23  handcuffs were removed.

24          Now, Mr. Turner said that he knew it was not one of

25  the officers, but he testified previously he couldn't be sure

                                173

1  that it wasn't one of the officers that made the comment about
2  black gladiator combat.  He didn't know Machino.  But we
3  don't -- we didn't hear any of the defendants deny that they
4  made the comment except for Mr. Turner.  He's the only one
5  that said he did not make that comment.  We didn't hear anyone
6  else say they didn't make that comment.
7          We heard both Smith and Chris testify that it was
8  one of those officers that made the comment.  So all of the
9  evidence that we have is that one of those officers made that
10  comment.
11          But regardless of whether or not that comment was
12  made, they had the evidence.  They knew that they were going
13  to be in a fight and they still put them in the cell together
14  and they still removed one of their handcuffs.
15          You heard the testimony from the Department of
16  Corrections' corporate representative who said the determining
17  fact was that they were in a fight that morning.  It doesn't
18  matter when Chris signed any of those forms that the
19  defendants are talking about.  It doesn't matter that they
20  were signed a week before.  It doesn't matter when they were
21  signed because they were in a fight that morning.  They should
22  not have been put into a cell together because they were in a
23  fight that morning.
24          We believe we have proved every element required to
25  find a verdict in our client's favor and we would ask you to

174

1 go back to the jury room and return that verdict for our

2 client, find that he was damaged and award punitive damages.

3         Thank you.

4         THE COURT:  All right.  That concludes the evidence

5 and the trial and it's now up to you to make your decision.

6         We will get copies of the instructions to each of

7 you.  We will have a copy of the verdict form with the numbers

8 filled in for you that you need to take back with you.

9 Remember, there'll just be one copy of the verdict form.

10 Remember the one instruction that sets forth the process you

11 follow, you pick a foreperson.

12         Now, any time you're deliberating you all should be

13 in the room.  We've got an hour before lunch and so -- before

14 noon and so -- you don't always have to eat lunch at noon.  So

15 you all go back and start deliberating and if at some point

16 you think somebody needs to get something to eat, you let

17 Linda know and we'll discuss what we're going to do at that

18 point.

19         You'll communicate with Linda any questions you have

20 and you'll communicate with Linda when you have a verdict or

21 if you go to lunch or take a break.  All right?

22         All right.  With that, jury, you are dismissed to go

23 begin deliberations.

24         Linda, lead them to the room and explain the

25 walkie-talkie process with them.

175

```
 1                   (Jury exits courtroom at 10:58 a.m.)

 2                   THE COURT:  Be seated.

 3                   Take that down if you would, whoever has it.

 4                   Just to make sure you all know, the parties are

 5         responsible for their own exhibits, so you will withdraw any

 6         exhibit you offered.  If there's an appeal, it's your job to

 7         be able to provide that to the appellate court.  We don't

 8         provide that service.

 9                   Why don't we -- I need you all to stay fairly close.

10         If somebody does leave the courthouse, leave a cell number

11         with some of the court personnel so we know to call you if we

12         do have a verdict or a question.

13                   I do ask that you get your exhibits together,

14         because if the jury asks for any exhibit, I will give them all

15         of the exhibits.  The only one that we will have any issue

16         with will be the video and we may not be able to give that to

17         them unless they specifically ask for it, and if they do,

18         we'll have to come up with a mechanism by which we can let

19         them show that exhibit to them.

20                   Any questions anybody has?

21                   All right.  I appreciate the professional way

22         everybody performed in trial.  I'm old and cranky sometimes

23         but I have a pretty fixed idea of how cases should be tried,

24         comes from lots of years of experience and usually from

25         mistakes is how you learn most about how to try a lawsuit.
```

176

We'll be in recess.  Stay close or at lease leave

 2   numbers where you can get back real quick.

 3           (Court stands in recess:  11:00-12:25 p.m.)

 4           THE COURT:  We have a series of questions from two

 5   of the jurors.  Unfortunately, I don't believe there's a

 6   single question they asked that we can answer, or should

 7   answer with anything substantive.

 8           The first question:  Who pays the punitive damages,

 9   the individual or the employer?

10           That's by Kathy -- Kacie Turner and Beth Stewart.

11   They want to know that.

12           Then the same two also want to know:  How long were

13   Reese, Turner, Machino employed at the prison?  What is their

14   working relationship?  How long was Chris located at Licking?

15   What is the history, timeline and relationship between Chris

16   and Turner?  How long did they work together in food service?

17           Anybody think there's a single question that I just

18   read that we're able to give any answers to other than, You

19   must make a decision based on the evidence you received?

20           Everybody agree with that?

21           MR. DAVIS:  Yes, Judge.

22           MS. ROBINSON:  Yes.

23           THE COURT:  I always try to not be dismissive of the

24   questions, try to be respectful, but they're clearly wanting

25   contextual issues and clearly who pays the judgment is not

                                   177

1     something we can respond to.

2              I think -- I usually write an answer to each

3     question but I think I'll write one general response to all

4     the questions since it's going to be essentially the same.

5              "You must reach your verdict on the evidence

6     presented."  I usually try to refer them back to the

7     instructions.  "Please review the instructions in light of the

8     evidence you received."

9              Anybody have any problem with that?

10             MR. DAVIS:  No, Judge.

11             MS. ROBINSON:  (Shakes head.)

12             THE COURT:  All right.  I've dated it 8/22/23 at

13    12:30.  "Jurors, you must reach your verdict on the evidence

14    presented.  Please review the instructions and make your

15    factual determinations on the evidence received," and then

16    signed by me.

17             I'll ask Linda to deliver my response back to the

18    jurors.

19             Let's mark the questions however -- I'll mark it as

20    Jury Question No. 1 and Jury Question No. 2, even though

21    there's multiple questions on the one, and then I'm going to

22    note on the bottom of this one, Response to Jury Questions.

23             There you go.

24             We'll file those so that if there's ever an appeal

25    everybody will have a record of what questions were asked and

                                178

```
 1  how I've responded.

 2          Anybody have anything else we need to take up or

 3  consider?

 4          All right.  We'll be in recess again.

 5          (Court stands in recess:  12:31-1:02 p.m.)

 6          THE COURT:  The Court has been advised that the jury

 7  has reached a verdict.  Anybody have any reason why we

 8  shouldn't summon the jury and learn what that verdict is?

 9          MR. DAVIS:  No, Judge.

10          MS. ROBINSON:  (Shakes head.)

11          THE COURT:  Linda, would you go get the jury?

12          I'm sure your lawyers have advised everybody but we

13  expect respectful responses to the jury.  If you don't like

14  it, say nothing, and if you like it, say nothing.  No

15  celebrations and no adverse responses.  You'll have time after

16  the jury leaves to do that.

17          (Jury enters courtroom at 1:04 p.m.)

18          THE COURT:  Be seated.

19          Ladies and gentlemen of the jury, I have been

20  advised that you have reached a verdict.  Who has been

21  appointed as your chairperson?

22          FOREPERSON:  (Indicating.)

23          THE COURT:  All right.  You are Martin Sanders?

24          FOREPERSON:  Yes, sir.

25          THE COURT:  Is the verdict unanimous?
```

```
 1           FOREPERSON:  Yes, sir.

 2           THE COURT:  Have you completed the form?

 3           FOREPERSON:  Yes, sir.

 4           THE COURT:  Linda, would you go get the form and

 5    I'll read it.

 6           "On the claim of Christopher Spates' claim against

 7    Defendant Charles Reese as submitted in Instruction No. 18, we

 8    find in favor of Plaintiff Christopher Spates.

 9           "On Plaintiff Christopher Spates' claim against

10    Defendant Robert Turner as submitted in Instruction No. 19, we

11    find in favor of Plaintiff Christopher Spates.

12           "On Plaintiff Christopher Spates' claim against

13    Defendant John Machino as submitted in Instruction No. 20, we

14    find in favor of Plaintiff Christopher Spates.

15           "We find Plaintiff Christopher Spates' damages to be

16    $85,000.

17           "We asses punitive damages against Charles Reese as

18    follows:  $50,000.  We asses punitive damages against

19    Defendant Robert Turner as follows:  $40,000.  We asses

20    punitive damages against Defendant John Machino as follows:

21    $50,000."

22           Signed by Mr. Sanders, the chairperson, and dated

23    August 22nd, '23, this date.

24           Ladies and gentlemen of the jury, I have read a

25    verdict.  Is that the verdict of each of the jurors?
```

180

1          I see each head nodding.

2          Does either party request any further polling of the

3     jury?

4          MR. DAVIS:  Yes, Judge, we would ask that the jury

5     be polled on the verdict.

6          THE COURT:  All right.  Mr. Sanders, was that your

7     verdict?

8          FOREPERSON:  Yes, sir.

9          THE COURT:  Ms. Foster, was that your verdict?

10         JUROR:  Yes.

11         THE COURT:  Ms. Stewart, was that your verdict?

12         JUROR:  Yes, it was.

13         THE COURT:  Ms. Turner, was that your verdict?

14         JUROR:  Yes.

15         THE COURT:  Ms. Cropper, is that your verdict?

16         JUROR:  Yes, Your Honor.

17         THE COURT:  Mr. Silvers, was that your verdict?

18         JUROR:  Yes, Your Honor.

19         THE COURT:  The jury has been polled and it is a

20    unanimous verdict of the jury.

21         I accept the verdict as having been fully completed

22    in accordance with the terms of the jury verdict form and the

23    instructions.

24         Couple things I want to tell you all.  No. 1, I've

25    been telling you for two days you can't talk to anybody

                                  181

1  outside of each other about the verdict.  That prohibition is

2  now gone away and you can talk to anybody you want to.  I

3  emphasize the word want to because if someone contacts you and

4  wants to talk to you, you don't have to.  Sometimes parties

5  like to call jurors and say what were you thinking, why did

6  you make this decision.  If they do and you want to talk to

7  them, you may, but if you don't want to talk to them, you tell

8  them, I'd prefer not to talk, and if they don't immediately

9  accept that, you let me know and we'll have a discussion with

10  them because they need to respect your privacy if you don't

11  want to talk to anybody.

12          I'm going to ask each of you to go back to the jury

13  room and stay for about five minutes.  I want to come back and

14  talk to each of you.  I won't keep you long, I promise, but I

15  do want to have a little conversation with each of you.  All

16  right?

17          All right.  By the way, if you a need work excuse,

18  go to the clerk's office before you leave and get it from the

19  clerk.  You'll get paid for your service -- the little bit

20  that is paid -- in two to three weeks.  All right?

21          You'll go back to the jury room, I'll see you in

22  just a moment.

23          (Jury exits courtroom at 1:06 p.m.)

24          THE COURT:  Be seated real briefly.

25          Remember to preserve and maintain your exhibits.

```
 1              Any post-trial motion should be filed in accordance

 2    with the rules of civil procedure.  I'll let you advise

 3    yourself on the deadlines.  I won't do it for you.

 4              If the plaintiff wants to prepare a formal judgment,

 5    you may do so.  Likewise, any application for attorneys' fees

 6    that you think is appropriate under law, you need to file it

 7    within the time limit allowed.

 8              Anything else I need to take up or consider on

 9    behalf of anyone here?

10              MR. DAVIS:  No, Judge.

11              MS. ROBINSON:  No, Your Honor.

12              THE COURT:  All right.  I appreciate the

13    professionalism with which the verdict was received and also

14    the professionalism with which the case was presented.

15              Mr. Spates, you're going to be -- go back to the

16    custody of the Licking Correctional Facility, if that's where

17    you still are.  Your lawyers can be in contact about what

18    happens from here on out.

19              Safe travels to everyone.  Thank you.  We'll be in

20    recess.

21              (Court stands in adjournment at 1:08 p.m.)

22                       END OF VOLUME 2

23

24

25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2        I, Jeannine M. Rankin, Federal Official Court Reporter,

 3   in and for the United States District Court for the Western

 4   District of Missouri, Southern Division, do hereby certify

 5   that the foregoing is a true and correct transcript of the

 6   stenographically reported proceedings.

 7

 8

 9

10

11                        /s/ Jeannine M. Rankin

12   Date:      10/28/2023    Jeannine M. Rankin, CCR, CSR, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25
```