IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI, SOUTHERN DIVISION

CHRISTOPHER K. SPATES,          )
                                )
          Plaintiff,            )
                                ) Case No.
          vs.                   ) 18-CV-3150-MDH
                                )
GEORGE A. LOMBARDI, et al.,     )
                                )
          Defendants.           )


              CIVIL JURY TRIAL - VOLUME 1
        BEFORE THE HONORABLE M. DOUGLAS HARPOOL
              MONDAY, AUGUST 21, 2023
                SPRINGFIELD, MISSOURI

APPEARANCES:
FOR THE PLAINTIFF:          MS. LAURA C. ROBINSON
                            HUSCH BLACKWELL LLP
                            3810 E. Sunshine, Ste. 300
                            Springfield, MO  65809

                            MR. J. BRENT DULLE
                            HUSCH BLACKWELL LLP
                            190 Carondelet Plaza, Ste. 600
                            St. Louis, MO  63105

FOR THE DEFENDANTS:         MR. AUSTIN DAVIS
                            MISSOURI ATTORNEY GENERAL'S OFFICE
                            P.O. Box 899
                            Jefferson City, MO  65102

                            MS. JESSICA L. WARD
                            MISSOURI ATTORNEY GENERAL'S OFFICE
                            149 Park Central Square, Ste. 1017
                            Springfield, MO  65806

                            MS. DIANE F. PETERS
                            MISSOURI ATTORNEY GENERAL'S OFFICE
                            615 East 13th Street, Ste. 401
                            Kansas City, MO  64106

COURT REPORTER:             MS. JEANNINE RANKIN, RPR,CSR,CCR
                            UNITED STATES DISTRICT COURT
                            222 N. Hammons Parkway
                            Springfield, MO  65806

1

I N D E X

Page No.

AUGUST 21, 2023 - Volume 1

RECORD . . . . . . . . . . . . . . 4

INSTRUCTION NOS. 2-7 READ . . . . . . . . . 5

OPENING STATEMENT BY MS. ROBINSON . . . . . . 8

OPENING STATEMENT BY MR. DAVIS . . . . . . . 14

PLAINTIFF'S EVIDENCE

WITNESSES:

    CHRISTOPHER K. SPATES
    Direct Examination by Ms. Robinson . . . 19
    Cross-Examination by Ms. Ward . . . . 41
    Redirect Examination by Ms. Robinson . . 47

INSTRUCTION NO. 8 READ . . . . . . . . . . 48

INSTRUCTION NO. 9 READ . . . . . . . . . . 48

    JULIUS SMITH
    Direct Examination by Mr. Dulle . . . 51
    Cross-Examination by Ms. Ward . . . . 62
    Redirect Examination by Mr. Dulle . . . 64
    Recross-Examination by Ms. Ward . . . . 65

    ROBERT TURNER
    Direct Examination by Ms. Robinson . . . 66
    Cross-Examination by Mr. Davis . . . . 92
    Redirect Examination by Ms. Robinson . . 99

INSTRUCTION NO. 10 READ . . . . . . . . . . 101

RECORD . . . . . . . . . . . . . . . 101

AUGUST 22, 2023 - Volume 2

INSTRUCTION RECORD . . . . . . . . . . . 112

DEFENSE MOTION . . . . . . . . . . . . 125

INSTRUCTION NO. 11 READ . . . . . . . . . 132

2

I N D E X

Page No.

<u>PLAINTIFF'S EVIDENCE (ctd.)</u>

WITNESS:

      DEPOSITION OF ROBERT WIDENER READ . . .  133

PLAINTIFF RESTS . . . . . . . . . . . .  141

DEFENSE RESTS . . . . . . . . . . . .  142

DEFENSE MOTION . . . . . . . . . . .  143

INSTRUCTION NOS. 12-23, FORMS OF VERDICT READ . .  148

CLOSING ARGUMENT BY MS. ROBINSON . . . . . .  154

CLOSING ARGUMENT BY MR. DAVIS . . . . . . .  164

REBUTTAL CLOSING ARGUMENT BY MS. ROBINSON . . .  173

JURY QUESTIONS . . . . . . . . . . .  177

VERDICT . . . . . . . . . . . . . .  179

COURT REPORTER'S CERTIFICATE . . . . . . .  184

\* \* \* \* \* \*

| INDEX OF EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| JOINT EXHIBIT: | | |
| J1    SOP21-1.2 | 68 | 68 |
| J3    Report of Incident Form | 88 | 88 |
| J5    Video of 11/12/2015 | 31 | 31 |
| DEFENDANTS' EXHIBIT: | | |
| D1    Enemy Waiver | 41 | 41 |
| D2    Protective Custody Waiver | 43 | 43 |

\* \* \* \* \* \*

3

```
 1           CHRISTOPHER SPATES v. GEORGE A. LOMBARDI, et al.

 2                      CASE NO. 18-CV-3150-MDH

 3                         CIVIL JURY TRIAL

 4                          August 21, 2023

 5                      *   *   *   *   *   *

 6           (Voir dire conducted.)

 7           THE COURT:  Let's try to get to work here.

 8               There's some things I need to tell you.  One is, we

 9  will start most mornings at 9:00.  It won't be like today or

10  you're going to have a very grumpy judge.  We will be done

11  usually 4:30 or 5:00 in the day.  It depends on when a witness

12  is -- if I finish a witness at 4:20, I'm not going to start

13  one that's going to take an hour at 4:20.  On the other hand,

14  if we have one who we can be done in another 15 minutes, we'll

15  go to 4:45 or something like that.

16               If you live more than 75 miles away, you're entitled

17  to have a hotel paid for by the federal government.  You can

18  talk to Linda about the details of that.

19               If at any time you are uncomfortable as a juror, you

20  let me know.  If you need to take a break -- we'll take

21  breaks, one in the morning and one in the afternoon, so we'll

22  never go more than a couple hours without a break.  If you

23  need a break before that, let me know.

24               You are allowed to bring water into the -- we'll

25  have water in the jury room for you and you can bring bottles
```

4

1  of water in here if you want that.

2          I'll try to keep it at the right temperature but the

3  chances of that are pretty slim in this courthouse.  It's

4  either hot or cold.  Feel free to bring a sweater or something

5  if you feel you're cold.  That's not a problem.

6          The breaks are usually going to be around 3:00 and

7  around 10:30 but that varies a little bit.  Again, kind of

8  like the other thing, it depends where we are.  And I will

9  usually break for about 15 minutes.

10          If you're going to go outside to your car -- which

11  is where your phone will be and you'll have a desire to go out

12  there -- that's fine, but just remember, don't dilly-dally out

13  there -- that's my technical legal term -- so we can get you

14  back in here and get back to work.

15          Earlier you took an oath to tell the truth during

16  jury selection; however, there's another oath that you take as

17  a juror.  So if you would each stand and raise your right

18  hand, Linda will administer the oath of a juror to you.

19          (Jury duly sworn by courtroom deputy.)

20          THE COURT:  Let the record reflect that all seven

21  jurors have taken the oath and agreed to be bound by it.

22          I have several instructions that I need to read to

23  you at this time.  First is Instruction No. 2.

24          (Court reads Instructions Nos. 2-5 to the jury.)

25          THE COURT:  Instruction No. 6.

5

```
 1            "Jurors, to make sure that this trial is fair to all
 2    parties, you need to follow these rules.  First, do not talk
 3    or communicate among yourselves about this case or about
 4    anyone involved with it until the end of the trial when you go
 5    to the jury room to consider your verdict.
 6            "Second.  Do not talk with anyone else about this
 7    case or about anyone involved with it until the trial has
 8    ended and you've been discharged as jurors.
 9            "Third.  When you are outside the courtroom, do not
10    let anyone tell you anything about the case or about anyone
11    involved with it until the trial has ended and your verdict
12    has been accepted by me.  If someone tries to talk to you
13    about the case during the trial, please report it to the
14    courtroom deputy, Linda.
15            "Fourth.  During the trial do not talk with or speak
16    to any of the parties, lawyers or witnesses in the case, not
17    even to pass the time of day.  It's important not only that
18    you do justice in this case but that you act accordingly.  If
19    a person from one side of the lawsuit sees you talking to a
20    person from the other side, even if it's just about the
21    weather, that might raise a suspicion about your fairness.  So
22    when the lawyers, parties and witnesses do not speak to you in
23    halls or in the elevator or the like, please understand
24    they're not being rude; they know they are not supposed to
25    talk to you while the trial is going on and they're just
```

6

1  following the rules.

2          "Fifth.  You may need to tell your family, close

3  friends and other people that you are a part of this trial.

4  You can tell them when you have to be in court but must warn

5  them not to ask you about this case, tell you anything they

6  know or think they know about this case or talk about this

7  case in front of you.

8          "Remember, you must not communicate with anyone in

9  any manner about anything or anyone including the Court

10 related to this case.  You must not tell anyone anything about

11 the jury's deliberations in this case until after I accept

12 your verdict or until I give you specific permission to do so.

13 If you talk about the case with someone other than the jurors

14 during deliberation, it looks as though you might already have

15 decided the case or that you might be influenced in your

16 verdict by their opinions.  That would not be fair to the

17 parties and it might result in the verdict being thrown out

18 and the case having to be tried over again.

19          During the trial, while you're in the courthouse,

20 after you leave for the day, do not give any information to

21 anyone by any means about this case."

22          Now, as an aside, some of that may sound like a bit

23 overkill and stuff, but remember, these are the same

24 instructions we read in every case, including some very high

25 publicity cases where there are people who are actually -- try

7

1  to pay jurors to tell them what they're thinking and stuff

2  before the trial's over.  This case isn't as high publicity as

3  those, but to these parties it's just as important that we

4  follow the proper rules.  That's the reason we read them.

5  THE COURT:  "Six.  Do not research or investigate

6  the case, facts or the law on the internet, in libraries,

7  newspapers, dictionaries or otherwise.  Do not view or visit

8  anyplace discussed in this case and do not use the internet or

9  other means to search for or view anyplace discussed in the

10  testimony.

11  "Seven.  Do not read or otherwise receive any

12  information, including any news stories or internet articles

13  or blogs that are about the case or about anyone involved with

14  it.  Do not listen to any radio or TV reports or digital

15  streaming about the case or about anyone involved with it.  In

16  fact, until the trial is over I suggest you reduce or limit

17  reading or receiving any digital streaming or any newspapers

18  or news journals and avoid listening to any television or

19  radio newscasts at all.  I do not know whether there will be

20  news reports about this case, but if there are, you might

21  accidentally find yourself reading or listening to something

22  about the case.  If you want, you can have someone collect

23  information or clip out stories and set them aside to give to

24  you after the trial is over.  I assure you that by the time

25  you've heard all the evidence in this case you will know what

8

1    you need to return a just verdict."

2            Again, I don't know that this will be a high

3    publicity case but as I said, some of them we have are and

4    it's important that you try to avoid those outside influences.

5            "The parties have a right to have you decide their

6    case based only on evidence admitted here in court.  If you

7    research, investigate or experiment on your own or get

8    information from other sources, your verdict might be

9    influenced by inaccurate, incomplete or misleading

10   information.  Witnesses here in court take an oath to tell the

11   truth and the accuracy of their testimony is tested through

12   cross-examination.  All of the parties are entitled to a fair

13   trial before an impartial jury and you have to conduct

14   yourselves in a way that assures the integrity of the trial

15   process.  If you decide a case based on information not

16   admitted in court, you will deny the parties a fair trial.

17   You will deny them justice.

18           "Remember, you've taken an oath to follow the rules

19   and you must do so.  If you do not, the case might have to be

20   retried and you could be held in contempt of court and

21   possibly punished.

22           "Eight.  Do not make up your minds during the trial

23   what your verdict should be.  Keep an open mind until after

24   you and your fellow jurors have discussed all the evidence."

25           Instruction No. 7.

9

1              (Court reads Instruction No. 7 to the jury.)

         2              THE COURT:  That's all the opening instructions.  I

         3     know you're disappointed I don't have four or five more to

         4     read to you at this time but we read those later.

         5              With that said, we start the trial with opening

         6     statements.  Again, these are not evidence; it's an

         7     explanation of what the lawyers think the evidence will be.

         8     Each side gets the same amount of time, and the plaintiff will

         9     go first.

        10              Plaintiff, you're recognized to present your opening

        11     statement.

        12              MS. ROBINSON:  May it please the Court.

        13              Good afternoon.  My name is Laura Robinson, and with

        14     my co-counsel, Brent Dulle, we represent Mr. Christopher

        15     Spates.

        16              As you heard in jury selection, this case involves a

        17     right that is enshrined in the United States constitution.

        18     Most of you know the Eighth Amendment as one that protects

        19     from cruel and unusual punishment.  In addition, the Eighth

        20     Amendment requires that prison officials, including

        21     correctional officers, protect the people in their custody.

        22              Unfortunately, we are here today because the three

        23     defendants allowed another inmate to violently attack my

        24     client in a cell.  The evidence will show that the defendants

        25     had plenty of reason to know that the attack was going to

1    happen and plenty of opportunity to prevent this attack from

2    happening.

3              Throughout the trial everyone has a role.  The

4    attorneys on both sides are going to present evidence through

5    witnesses and exhibits, Judge Harpool will make rulings on the

6    legal issues and then at the end will give you the law that

7    will allow you to return a verdict, but your role as the jury

8    is the most important.  You take the evidence presented and

9    you -- and the law from Judge Harpool and you will render a

10   verdict.  At the end we will ask you for a verdict in favor of

11   Mr. Spates.

12             We think your job will be simple because most of the

13   facts are undisputed and straightforward.  After getting into

14   a fight with another inmate, my client and the other inmate

15   were separated and they were taken to administrative

16   segregation, then later that same day they were put into the

17   same cell and the other inmate attacked my client.  All this

18   occurred while the defendants looked on and held my client's

19   hands behind his back.

20             My client, Mr. Spates, was incarcerated at South

21   Central Correctional Center in Licking, Missouri, as you've

22   already heard.  The evidence will show that on the morning of

23   November 12th, my client and another inmate whose name is

24   Julius Smith -- and I will call him Smith through this -- were

25   involved in a fight outside on the yard at the prison.  After

11

1    the fight my client and Smith were separated.  One of the

2    defendants took -- escorted one of the gentlemen to

3    administrative segregation.

4          In prison, if you get into a fight with another

5    inmate, you are separated from the general population and

6    you're taken to a separate wing called administrative

7    segregation, or ad-seg.

8          So my client and Mr. Smith were both escorted to

9    separate parts of ad-seg.  My client spent several hours alone

10   in the cell, and then that same afternoon, on November 12th,

11   only a few hours after that fight in the morning, the other

12   two defendants escorted Smith to the same cell as my client.

13   Upon seeing each other, both Smith and my client protested

14   being put into the same cell.

15         At this time Mr. Turner, one of the defendants,

16   walked up to the scene and when he saw that they were trying

17   to put Smith into my client's cell, he let the two other

18   guards know that the two inmates had been in a fight that

19   morning and that they shouldn't go into the same cell.  He

20   told them that they should contact their sergeant and let him

21   know that this fight had occurred so that they could determine

22   where to put Smith, whether he should still go into that same

23   cell, but since they had been in a fight that morning, he

24   wanted them to know that they should look for a separate cell

25   for Smith.

1          My client and Smith both told the officers that they

 2    did not want to be put in the same cell together.  Mr. Turner

 3    told the other two defendants about the fight that had

 4    occurred mere hours in advance.

 5          The evidence will show that none of the defendants

 6    notified the sergeant.  None of the defendants notified

 7    anyone.  Mr. Smith was put into the cell with my client.  At

 8    the same time a comment to the effect of seeing some black

 9    gladiator action was made while they were putting Smith into

10    the cell with my client.

11          The defendants ordered my client to get handcuffed,

12    so he put his hands through the food port in the cell door

13    behind his back and the defendants put handcuffs on him.  The

14    defendants then requested that the door to his cell be opened

15    and Mr. Smith was put inside the cell.

16          The evidence will show that as soon as the cell door

17    shut, Smith and my client were already starting to scuffle

18    with each other.  They were both handcuffed at the time but

19    they were already starting to push and shove a little bit to

20    try to get their handcuffs undone first.

21          The evidence will show that after Smith was put into

22    the cell and the door was shut, the door was reopened.  Rather

23    than removing Smith after seeing the two scuffling, one of the

24    defendants threw a property bag into the cell and then the

25    door was shut again.  The defendants then removed Smith's

```
 1   handcuffs.  Before they removed my client's handcuffs, Smith
 2   began attacking my client.  My client's hands were handcuffed
 3   behind his back so he could not defend himself and he could
 4   not protect himself.
 5         You will hear my client testify that he tried to
 6   move away from Smith's blows but he felt like he was stuck to
 7   the door.  You will hear further testimony that one of the
 8   defendants held onto a tether that was attached to my client's
 9   handcuffs behind his back so that he could not move away from
10   the door.  They continued to hold onto this tether while Smith
11   attacked my client.  Mr. Spates could not move away from the
12   door and he could not protect himself from his attack.
13         One of the defendants sprayed pepper spray through
14   the food port in the door.  When his pepper spray canister
15   malfunctioned, one of the other defendants then began spraying
16   pepper spray through the food port.
17         Keep in mind that the defendants are holding onto a
18   tether attached to my client's handcuffs through the same food
19   port that they are spraying the pepper spray through, so my
20   client can't move away from the door and he can't move away
21   from the pepper spray being sprayed into the cell.
22         This attack lasted around one minute.  During this
23   entire time my client was pleading with the defendants to open
24   the door and help him.  Instead, they left him in the cell
25   with his hands cuffed behind his back holding onto his tether
```

1    and dispensing pepper spray into the cell.  Only after Smith
2    stopped attacking my client did the defendants finally request
3    that the door to the cell be opened.  At this point Smith and
4    my client were again separated and taken to separate areas.

5            You will hear testimony from my client about his
6    injuries, both from the attack and from the pepper spray.  You
7    will also hear from at least one of the defendants.

8            The defendants will probably give you a lot of
9    reasons why Smith and my client were placed into the same
10   cell; however, you will have to decide whether those reasons
11   are legitimate, reasonable, rational, thoughtful, or something
12   else.  Pay attention and see if you hear any justifiable
13   reason on why it took the defendants a minute of watching
14   through the window while my client was being attacked before
15   they opened the door to remove him.

16   You will have testimony from Robert Widener who
17   worked for the Department of Corrections.  Mr. Widener was not
18   present at South Central on November 12th but did give his
19   testimony as a spokesperson for the Department of Corrections.

20           You will hear Mr. Widener testify that because
21   Mr. Spates and Smith had been in a fight earlier that day,
22   regardless of anything else they should never have been placed
23   in the same cell together.

24           Throughout this trial ask yourself whether the
25   defendants were acting to protect the prisoners in their care.

1          After you see the evidence and hear the testimony,

 2     we are going to ask you to find that the defendants violated

 3     Mr. Spates' Eighth Amendment rights under the constitution.

 4     We will ask you to decide what the price should be for their

 5     failure to protect my client from the brutal attack.  We will

 6     ask you to rely on the undisputed facts of this case to reach

 7     the only conclusion supported by the evidence and by common

 8     sense.  We will ask you to hold the defendants accountable for

 9     their actions that day and find the defendants liable for

10     failing to protect Mr. Spates.

11          My client, my co-counsel and I echo Judge Harpool's

12     remarks and we want to thank each one of you for your service

13     on this jury.  We understand that it is an imposition but we

14     appreciate it because my client can't get justice without your

15     service, so thank you very much.

16          THE COURT:  Defendants are recognized for their

17     opening statement.

18          MR. DAVIS:  Good afternoon.

19          Now, members of the jury, this case is about one

20     thing.  You'll see this case is about miscommunication.  And

21     I, along with my co-counsel Jessica Ward and Diane Peters, who

22     you saw earlier today, we represent the three defendants in

23     this case.  They are Robert Turner, John Machino, and Charles

24     Reese.  We call him Chuck.

25          We will show you throughout this trial that a

16

mistake occurred because of miscommunication.  You're going to
hear a lot of things during this trial but I anticipate at
least these will stick out to you.

No. 1.  Maximum security prisons are dangerous
places and the safety of inmates, corrections officers and the
public is paramount in running a prison.

Two.  You'll hear that a fight did break out the
morning of November 12th, 2015, between Mr. Spates and
Mr. Smith.

Three.  You will hear that Officer Turner escorted
one of these -- either Mr. Smith or Mr. Spates, he's unsure
which one, but he escorted one of them down to ad-seg.  That's
true.  You'll hear that Mr. Spates spent a few hours in his
ad-seg cell alone before Mr. Reese and Mr. Machino escorted
Mr. Smith to his assigned ad-seg cell.

And you'll hear from a DOC rep who's going to tell
you how inmates are assigned to cells.  It's based on a
computer system, and information has to be placed in the
computer system to identify which offenders are compatible,
and if the proper information is not placed into the computer
system, i.e., that a fight had broken out that morning, the
computer doesn't know not to put these two people together.

You'll hear that after Mr. Reese and Mr. Machino
placed Mr. Smith in Mr. Spates' cell, a fight broke out, and
you will see that when Mr. Turner -- or when the fight did

break out, Mr. Turner, Mr. Reese and Mr. Machino immediately
got to work to separate that fight.

You're going to hear why doors can't just be opened
while an inmate is unrestrained.  And you'll hear that
Mr. Spates was seen by medical staff and reported no injuries
in the immediate aftermath of the fight other than being hit
by pepper spray.

And ask yourself this question:  Why would three
corrections officers want to see two inmates fight one another
in a Level 5 maximum security prison just to break it up
immediately?

The evidence will show you that the defendants did
their very best that day.  Doing your best does not mean being
perfect.

At the end of this trial after you hear all the
evidence you'll see that this was nothing more than a
miscommunication.

Thank you.

THE COURT:  All right.  Plaintiff, you're recognized
to present your first witness.

MS. ROBINSON:  Your Honor, our first witness will be
Christopher Spates.

THE COURT:  I'm sorry?

MS. ROBINSON:  Our first witness is Mr. Spates.

THE COURT:  Okay.  He's going to take a while, so I

18

```
 1    want you all to get introduced to the jury room and get
 2    oriented and stuff before we start a long witness.  Linda is
 3    going to escort you all back to the jury room to show you
 4    where it is and how to get there and you can get your water
 5    and bring it with you because he's going to take a while to
 6    testify.  Rather than break it up in the middle, let's try to
 7    do it like that.
 8              So we'll take about a 10-, 15-minute recess at this
 9    time.  It's earlier than we normally take them but I do want
10    you to -- I don't want to mess up and forget to give you time
11    to get oriented and everything, and you can bring your water
12    in.
13              All right.  Linda.
14              We'll be in recess.
15              (Jury exits courtroom at 1:42 p.m.)
16              THE COURT:  We'll take about a 10-minute break.
17              Mr. Spates, we'll want you to be on the stand before
18    the jury comes back in the room.  We'll do that when I come
19    back in.
20              (Court stands in recess:  1:42-2:01 p.m.)
21              THE COURT:  We have two jurors who the men want
22    hearing assist devices so might take us a moment to get those
23    adjusted for them.  Then we have one other issue with one of
24    the other jurors I need to talk to the lawyers about after
25    trial today.
```

19

```
 1              Linda, you want to go get the jury?

 2              Any reason why we shouldn't?  All right.

 3              We will take a break following the plaintiff's

 4  testimony to get him off the stand.

 5              (Jury enters courtroom at 2:03 p.m.)

 6              THE COURT:  Be seated.

 7              Linda, get the hearing assist devices.

 8              Have they got them?

 9              COURTROOM DEPUTY:  Yes.

10              THE COURT:  Would you all who wanted the hearing

11  assist devices put them on and make sure they're working for

12  you?  Does that work?  Is that helping at all?

13              It is you but not you?

14              JUROR:  It cuts in and out.

15              THE COURT:  That's the same thing you said before

16  you had the hearing assist device, right?

17              JUROR:  What?

18              THE COURT:  Did you feel like it was cutting in and

19  out?

20              JUROR:  When you were talking.

21              THE COURT:  Nobody else noticed that, so that's what

22  I'm trying to figure out what's going on.

23              JUROR:  I don't know.

24              THE COURT:  Try this one.

25              Is that better?  All right.  There we go.
```

```
 1              All right.  Plaintiff, present your first witness.
 2                      DIRECT EXAMINATION
 3    BY MS. ROBINSON:
 4    Q    Good afternoon.  Can you please state your name for the
 5    record?
 6    A    Christopher Spates.
 7              THE COURT:  Just a second.  The witness needs to be
 8    sworn.
 9              Go ahead.
10    CHRISTOPHER SPATES, PLAINTIFF HEREIN, DULY SWORN:
11              THE PLAINTIFF:  I do.
12              THE COURT:  Now you can proceed.
13                      DIRECT EXAMINATION
14    BY MS. ROBINSON:
15    Q    Is it okay if I call you Chris while we talk today?
16    A    Yes, ma'am.
17    Q    Chris, where did you grow up?
18    A    St. Louis city.
19    Q    And who raised you?
20    A    My mother.
21    Q    Did she work while she was raising you?
22    A    Yeah.  During my childhood she did home health care.
23    Q    Okay.  And do you have any siblings?
24    A    Yeah, I have five.
25    Q    And how much education do you have, Chris?
```

21

```
 1   A    Graduated high school.

 2   Q    Did you -- were you involved in any clubs or activities

 3   while you were in high school?

 4   A    Yeah, I ran track and I played football.

 5   Q    Chris, you're currently at the South Central Correctional

 6   Center; is that correct?

 7   A    Yes, ma'am.

 8   Q    And you are there because you are convicted of first

 9   degree murder?

10   A    Yes, ma'am.

11   Q    And were you sentenced in 2014?

12   A    Yes, ma'am.

13   Q    Do you have any education beyond high school?

14   A    I took a paralegal course during my time at South Central

15   Correctional Center.

16   Q    Okay.  Did you -- how did you get involved in this

17   paralegal course?

18   A    Reading Prison Legal News.  They got magazines, Prison

19   Legal News.  I seen advertisement for it towards the back of

20   the book.

21   Q    Okay.  So did you -- was this offered through the prison

22   or was this something that you sought out?

23   A    No, it was something that I sought out.

24   Q    Okay.  And are you married?

25   A    Yes, ma'am.
```

```
1   Q    How long have you been married?

2   A    March 11, 2019.

3   Q    Okay.  And is your wife here today?

4   A    Yes, ma'am.

5   Q    Do you have any children?

6   A    Yeah, I got one biological son.  He's going to be 15 in

7   November.  Got two through marriage, 5 and 12.

8   Q    Okay.  And is one of your children here today?

9   A    Yes, ma'am, back there.

10  Q    And did you -- after high school were you employed at

11  all?

12  A    No.  I played -- well, I didn't play play but I was on

13  the roster for a semi-pro football team.

14  Q    Okay.  So let's talk about the morning of November 12th,

15  2015.  At this time you were at South Central Correctional

16  Center; is that correct?

17  A    Yes, ma'am.

18  Q    Can you tell -- can you say what happened in your own

19  words that morning?

20  A    I was on my way -- I went to property to get my property

21  and when I came back out, Julius Smith was walking down the

22  walk and I was on my way towards the housing unit that he was

23  going to, he turned around, we started fighting on the walk.

24  Correctional officers came and broke up the fight, took us

25  down to the hole.
```

23

```
 1   Q    And Julius Smith is an inmate at South Central as well --
 2   or he was at that time?
 3   A    Yes, ma'am.
 4   Q    So you and Mr. Smith were involved in a fight.  Were you
 5   outside or inside or --
 6   A    No, it was outside.
 7   Q    Okay.  Was it in the yard?
 8   A    Yeah.  Everything outside is considered the yard.  So,
 9   yeah, we was on the yard.
10   Q    So after the fight occurred, what happened then?
11   A    We went down to the hole.  They took me to a cage in A
12   Wing.  I don't know where they took him to.  But they offered
13   me a cell -- well, took me back to a cell, an empty cell, so I
14   went in there.  Well, I was -- first I was in the cage for 40
15   minutes, 40 minutes, 30 minutes, and then they took me to the
16   cell.  I was in there by myself for about two or three hours.
17   Q    Okay.  And when you say the hole, is that administrative
18   segregation?
19   A    Yes, ma'am.
20   Q    Okay.  Can you describe -- when you talk about the cage,
21   is that just a place to be held before you went into your
22   cell?
23   A    Yes.  It's a cage that they put you inside of and strip
24   you out, make sure you ain't got nothing on you before they
25   put you in a cell with somebody else.
```

1   Q    Okay.  So how -- about how much time do you think you

2   were -- from the time of the fight in the morning until the

3   events that occurred that we will discuss in the afternoon,

4   how much time do you think elapsed there?

5   A    About three to four hours.

6   Q    Okay.  And was this fight this morning your first fight

7   between you and Mr. Smith?

8   A    No, ma'am.

9   Q    Okay.  So after you -- you were in ad-seg alone.  Can you

10  describe the cell that you were in in ad-seg?

11  A    Okay.  It's -- it's about 12 feet in height, then in

12  width is 6, 6 1/2 feet, and then in length it's probably 12,

13  13 feet.  And there's nothing in there but you got a bunk bed

14  towards the back on the wall, one bunk bed, metal bunk bed,

15  and towards the front of the cell you got a sink and a toilet.

16  That's all that's in the cell.

17  Q    Okay.  Is the wall of the cell to the hallway, is that

18  solid?

19  A    Everything in there is solid.

20  Q    Okay.  So the door is solid as well?

21  A    Metal door.

22  Q    Okay.  Can you describe the door in more detail?

23  A    The door is about 7, 7 1/2 feet tall and 3 1/2 feet in

24  width.

25  Q    Does it have a window?

                              25

```
 1   A    Yeah.  The window is probably 3 inches wide, so it's a
 2   thin window, about 3 inches wide, probably 12 to 13 inches
 3   long.  No, it was longer than that.  That's only a foot.  So
 4   it was probably 18 to 19 inches long.
 5   Q    Okay.  And does it -- where does it start on the door and
 6   where does it end?
 7   A    It start about 4 feet off the ground then go up.
 8   Q    Okay.  And as part of the door is there a way for them to
 9   hand stuff to you without opening the door?
10   A    Yeah.  It's called the chuck hole or food port.
11   Q    Okay.  And can you describe that?
12   A    Yes.  It's like a square shape but it ain't an even
13   square, so it's probably a foot in length and probably like 5
14   or 6 inches in height.
15   Q    Okay.  So it's not a very big hole?
16   A    No, it's not.
17   Q    Okay.  So you were in the cell alone in ad-seg that
18   afternoon of November 12th; is that correct?
19   A    Yes, ma'am.
20   Q    Can you -- can you describe what happened that -- after
21   you had been in the cell alone for a while?
22   A    I was laying down on my bunk.  Well, before I laid down I
23   was just talking to a guy that I called my friend down there,
24   telling him what happened on the yard about the fight, then I
25   laid down.  I was in there and then Officer Reese and Machino
```

1  and Turner came to the door, told me that I got a cellie.  I

2  got up, went to the door, saw who it was and I told them, Nah,

3  he ain't comin here.

4  Q    Okay.  What was the officers' response when you told them

5  that you did not want Mr. Smith in your cell?

6  A     Initially when they came to the door Reese told me to

7  cuff up and that's when I said, Nah, I ain't cuffing up.  He

8  ain't coming in here.  And Turner said, He is coming in there.

9  And then --

10 Q    Go ahead.

11 A     All right.  Then Smith, the guy that I fought, he said,

12 No, I'm good, take me to another cell.  Officer Reese, he said

13 he missed the first fight, it's time for some real black

14 gladiator action.  And then Turner told me to cuff up or I was

15 going to get maced.

16 Q    Okay.  Had you previously refused a cellmate in ad-seg

17 before?

18 A    I refused cells in ad-seg.  I've never refused a cellie,

19 but I've seen people refuse cellies before.

20 Q    Okay.  And when you refused a cell previously, what

21 occurred?

22 A     Well, you get two cell offers when you go to the hole.

23 If you refuse the first cell, they'll take you to the second

24 cell.  If you refuse the second cell, they'll sit you on a

25 bench for two to three hours until they find you another cell

1  to go to.

2  Q   Okay.  Chris, so you told the officers that you did not

3  want Mr. Smith in your cell and Mr. Smith also stated that he

4  didn't want to come into your cell; is that correct?

5  A   Yes, ma'am.

6  Q   And what did they -- what did the officers do after you

7  told them this?

8  A   Like I said, Officer Reese stated that he missed the

9  first fight, he wanted to see some real black gladiator

10  action.  Officer Turner told me to cuff up or I was going to

11  get maced.

12  Q   Did you -- after the officers made these comments, did

13  you agree to have Mr. Smith come into your cell?

14  A   Under duress.  I was afraid of getting maced.  I just

15  cuffed up.  I never said verbally that he can come in, I just

16  cuffed up.

17  Q   Okay.  So when you cuffed up, can you describe how that

18  occurred?

19  A   I turned my back towards the door and held my hands like

20  this, stuck them out the food port backwards.

21  Q   Okay.  And then the officers put the handcuffs on?

22  A   Yes, ma'am.

23  Q   And then you were able to pull your hands back in through

24  the --

25  A   After I was cuffed, yes.

1   Q    To your knowledge was that a normal occurrence to be --
2   for the person in the cell to be handcuffed when the officers
3   were bringing a cellmate?
4   A    It really depends on what officer it is.  Some officers
5   tell you to lay on your bunk while they let the next person in
6   or get on your knees in the back of the cell while they let
7   the next person in.
8   Q    Okay.  But it wasn't -- it wasn't an unusual request?
9   A    No, it wasn't.
10  Q    Okay.  So what was going through your mind when you were
11  getting handcuffed after you had stated that you didn't want
12  Mr. Smith in your cell?
13  A    They tricked me.  These people tricked me.
14  Q    What happened then when Mr. Smith entered the cell?
15  A    We started shoulder bumping, rasseling, head butting,
16  trying to see who was going to get their hands uncuffed first.
17  Q    So you were both handcuffed at this point?
18  A    Yes, ma'am.
19  Q    So while you and Mr. Smith were scuffling, did the
20  officers say anything to you at this point?
21  A    No, they didn't say anything.
22  Q    Did they pull Mr. Smith out of the cell at this point?
23  A    No, ma'am.
24  Q    When they -- once Mr. Smith walked in, was the cell door
25  shut?

```
 1   A    It was open for a second until he got all the way in,

 2   then they started to shut it.  As they started to shut it,

 3   that's when we got trying to see who was going to get to the

 4   food port first.

 5   Q    So as the cell door was shutting, you and Mr. Smith

 6   started scuffling?

 7   A    Yes, ma'am.

 8   Q    Did the cell door open back up?

 9   A    Yes, it did.  During us shuffling and scuffling, it

10   opened back up and the officer threw my property inside.

11   Q    Okay.

12   A    My ASA property; the essentials that you get when you're

13   put in the hole, your sheet, blanket, writing tablet,

14   envelopes, things like that.

15   Q    Okay.  And so they threw the property bag in.  At this

16   point did they pull Mr. Smith out of the cell?

17   A    No, ma'am.

18   Q    What happened next?

19   A    They shut the door again and as it was shutting we

20   started doing the same thing that we was just doing, rassling,

21   tussling, head butting, shoulder bumping.

22   Q    Do you know, were the officers watching you at this

23   point?

24   A    Well -- wait a minute.  I skipped over a part.

25           When the door came open before they threw the mace
```

1    -- I mean, before they threw my property in there, Officer

2    Reese took the mace can off his side and started shaking it

3    and then the door shut.

4    Q    Okay.  And then the door shut again?

5    A    Yes, ma'am.

6    Q    And so you and Mr. Smith were scuffling to try to get

7    your hands through the food port at that point?

8    A    Yes, ma'am.

9    Q    Who got their hands through first?

10   A    Smith.

11   Q    And what happened next?

12   A    First I started thinking of like, I hope he ain't got a

13   knife, was the first thing that ran through my head.  Then

14   they uncuffed him.  They uncuffed one of them, he turned

15   around, faced me, still had one hand out the chuck hole.  They

16   uncuffed the other one, he said, You know you're through

17   bookin', and then he just got to whaling on me.

18   Q    Okay.  So when he was -- when he was attacking you, can

19   you describe the attack?

20   A    It was like -- like a dog being chained to a gate getting

21   whupped on.

22   Q    Was he punching you?

23   A    Yeah, he was punching in the beginning and then I fell

24   down to my knee, then he got to kicking and punching at the

25   same time.

31

```
 1   Q    Okay.  Were you trying to get away from him at this
 2   point?
 3   A    Yes, ma'am.
 4   Q    And could you get away from him?
 5   A    No, ma'am.
 6   Q    Can you describe why you could not get away from him?
 7   A    My handcuffs -- well, the handcuffs that they use in
 8   ad-seg are connected to a tether.  It's like a thick leather
 9   belt.  It's like two belts smashed together, like 4 inches in
10   width.  They probably 19, 20 inches in length.  So somebody
11   was holding onto the tether so I couldn't move away from the
12   door.
13   Q    And your hands are still behind your back at this point?
14   A    Yes, ma'am.
15   Q    And you said that when Mr. Smith was unhandcuffed, he
16   stated that -- what was it that he said?
17   A    He said, You through bookin'.
18   Q    And what was running through your mind when he said that
19   to you?
20   A    I hope he ain't got a knife.
21   Q    And then immediately after that is when he started
22   attacking you?
23   A    Yes, ma'am.
24   Q    And during -- do you know about how long this attack
25   lasted?
```

```
 1    A    I thought it was about three minutes, but after I looked
 2    at the camera footage, it didn't last that long.  Probably
 3    like a minute, minute 15 seconds, something like that.
 4    Q    But it felt much longer?
 5    A    Felt way longer.
 6    Q    Okay.  So you just mentioned a camera.  Do you know
 7    whether the ad-seg hallway had a video camera?
 8    A    It's a lot of cameras in all the housing units including
 9    ad-seg.  So, yes, it's a camera in the hallway at ad-seg.
10    Q    Okay.  And you saw some video footage?
11    A    Yes.  The footage that I saw was the footage from inside
12    of the wing.  It wasn't the hallway camera.  It was the
13    footage from inside 2 House, A Wing.
14    Q    Okay.  And if you saw this footage, would you be able to
15    recognize it?
16    A    Yes, ma'am.
17         MS. ROBINSON:  Your Honor, I would move to admit
18    Joint Exhibit 5 which is the video footage that he is
19    describing here.
20         THE COURT:  It is a joint exhibit?
21         MS. ROBINSON:  Yes, Your Honor.
22         THE COURT:  Five will be admitted.
23    Q    (By Ms. Robinson) Chris, we're going to show you this
24    video.  Do you recognize the people that are in the video
25    right now?
```

33

```
 1   A    Yes, ma'am.

 2   Q    Okay.  Can you tell me who you see where?

 3   A    You got to rewind it.

 4        Look like Turner coming up the steps.

 5   Q    Okay.  Can you recognize the people on the walkway?

 6   A    Nuh-uh.

 7        MS. ROBINSON:  Can you fast forward a little bit?

 8   Q    (By Ms. Robinson) This video is not the best quality,

 9   but can you see the three gentlemen in front of the cell?

10   A    Yeah.  Yeah.  I was mistaken.  The one in front of the

11   cell, the tallest one in front of the cell, that's Turner.

12   Q    Okay.  And do you know who the other gentlemen are there?

13   A    No, I really wasn't familiar with the other two

14   defendants.

15   Q    Okay.  Do you know if that is Mr. Smith that they are

16   escorting?

17   A    Yes, ma'am.

18   Q    Okay.  And so they have just walked up outside of your

19   cell at this point; is that accurate?

20   A    Yes, ma'am.

21   Q    Okay.  And can you read the time stamp on there?

22   A    2:15:32 seconds, p.m.

23   Q    Okay.  So they are standing outside of your door having a

24   discussion at this point; is that accurate?

25   A    Yes, ma'am.
```

1   Q    And do you remember -- this is the point that you would

2   be saying that you didn't want Mr. Smith in your cell and he

3   was saying he didn't want to go in there; is that accurate?

4   A    Yes, ma'am, that's when he turned his back towards me,

5   turned his back towards the cell.

6   Q    Okay.  And can you see here the door is opening?  Does

7   that look about the time that he would have gone into your

8   cell?

9   A    Yes, ma'am.

10  Q    Okay.  What is the time stamp on that now?

11  A    2:16:18 seconds, p.m.

12  Q    Okay.  Then is that the point that the door reopened?

13  A    Yes, ma'am.

14  Q    And it looked like they threw some property in there and

15  the door is shutting again.  And what time is it now?

16  A    2:16:38 seconds.

17  Q    And then the officers would have taken off Mr. Smith's

18  handcuffs; is that accurate?

19  A    Yes, ma'am.  They're still taking them off.

20       MS. ROBINSON:  Can you pause it there?

21  Q    (By Ms. Robinson) So now we're -- can you read the time

22  stamp on there?

23  A    2:17:50 seconds.

24  Q    Okay.  And they are opening the door now?

25  A    Yes, ma'am.

35

```
 1   Q    So what was going on in the cell between the 2:16:38 mark
 2   and this 2:17:50 mark?
 3   A    I was getting assaulted.
 4   Q    And you were unable to do anything to defend yourself at
 5   that point?
 6   A    No, ma'am.
 7   Q    Okay.  And what were the -- what were the officers doing
 8   at this point?
 9   A    Spraying mace.
10   Q    Okay.  And they were spraying that through?
11   A    Through the food port.
12   Q    Is it normal for the officers to stay by the door of the
13   cell when they put a prisoner into the cell?
14   A    Yeah, until they get both of the handcuffs back.
15   Q    Okay.  And during this time that we just saw on the video
16   when you were getting assaulted, what were you doing?
17   A    Trying to ball up, but I really couldn't.
18   Q    Okay.  So were you standing up or were you -- how were
19   you?
20   A    I was standing initially until he hit me a few more times
21   and then I fell down to my knee.
22   Q    Okay.  So you were trying to ball up on the ground?
23   A    Yes, ma'am.
24   Q    And so where was he -- when he was attacking you, where
25   were you getting hit?
```

36

```
 1   A    In my head, neck and back.

 2   Q    Okay.  And would it have been the back of your head?

 3   A    Yes, ma'am.

 4   Q    And before you fell down, where were you getting hit?

 5   A    In my face.

 6   Q    Okay.  During this attack did you say anything to the

 7   guards?

 8   A    I was yelling, saying, Help, open the door.

 9   Q    And did they say anything?

10   A    Nah, I didn't hear them say anything.  I just heard the

11   mace can.

12   Q    Did Mr. Smith stop attacking on his own?

13   A    Yes, ma'am.

14   Q    Okay.  At what point was the door reopened?

15   A    Once Mr. Smith stop hitting and walked towards the back

16   of the cell and laid down.

17   Q    And then the door was reopened?

18   A    Yes, ma'am.

19   Q    Okay.

20        Okay.  And is that you --

21   A    Yes, ma'am.

22   Q    -- walking out of the cell?

23        So you were escorted out of the cell and where were

24   you taken?

25   A    Like I said, it's a holding cage in the wing towards the
```

```
 1   front, towards where I was walking to at the bottom of the
 2   steps.  I was taken to the cage.
 3   Q    Okay.  So the similar place to where you had been earlier
 4   before you went into the cell?
 5   A    The exact same cage.
 6   Q    Okay.  And your hands were handcuffed behind your back
 7   the entire time that that occurred; is that correct?
 8   A    Yes, ma'am.
 9   Q    Were you allowed to wash off the pepper spray before you
10   were taken to the cage?
11   A    No, ma'am.
12   Q    Were you allowed to wash it off when you were in the
13   cage?
14   A    No, ma'am.
15   Q    Can you describe what kind of injuries you had after this
16   attack?
17   A    I get these migraine headaches out of nowhere.  They feel
18   like the headaches that you get when you haven't eaten, feel
19   like those, neck and back pain just out of nowhere.
20   Q    Are these things that you are still feeling now?
21   A    Yes, ma'am.
22   Q    At the time of the attack did you have any other
23   injuries?
24   A    From the attack?
25   Q    Yes.
```

```
 1   A    I got this little scar on my wrist from the handcuffs.
 2   The handcuffs ate into my skin.
 3   Q    Okay.  Did you have -- did you have a black eye, a
 4   swollen eye?
 5   A    Swollen eye.
 6   Q    Okay.  Did you have any adverse effects from the pepper
 7   spray?
 8   A    Yeah.  It -- really, the pepper spray was worser than the
 9   beating for real later on, because you get it and you wash it
10   off, but once you get inside the shower and get it wet again,
11   it reactivates, so now your whole body's just burning, and it
12   lasts for a long time.
13   Q    How long do you think that that lasted for?
14   A    Probably two weeks getting in the shower, washing my
15   hair, thinking that I got it all out, but get in the shower
16   again and there's still some in there, drains down my body
17   again, reactivate.
18   Q    Okay.  And you said -- you said that you had started
19   getting headaches.  Did that happen immediately after the
20   attack?
21   A    No, it happened -- it happened probably like a week or
22   two after the attack, while I was still in ad-seg though.
23   Q    So you started getting periodic headaches.  They don't
24   last all the time, do they?
25   A    No, most of the time they go away when I -- like if I lay
```

39

1   down, take a nap, they'll go away.

2   Q    Okay.  And you said that you had back pain; is that

3   correct?

4   A    Yeah.  The back pain usually happens like when I'm laying

5   down or when I'm idle for a long period of time.

6   Q    And that -- that began shortly after the attack?

7   A    Yes, ma'am.

8   Q    And you're still experiencing that?

9   A    Yes, ma'am.

10  Q    And you said that you had neck pain?

11  A    Yes, ma'am.

12  Q    And that started shortly after the attack?

13  A    Yes, ma'am.

14  Q    And do you still experience that?

15  A    Yes, ma'am.

16  Q    Do you have any other injuries that came from this

17  attack?

18  A    Physical injuries, no.

19  Q    Do you have any emotional?

20  A    Yeah.  Yeah.  Like I'll be paranoid a lot, nervous.  Like

21  when I see a group of COs, I smile a lot out of nowhere, like

22  I don't know what I'm smiling for, I just smile.  Like when

23  I'm in a wing, I keep my back against the wall or I stand with

24  my back inside the shower and I lean on the shower door.

25  Every time before I go in my cell I always open it up and see

                                    40

1   who in there just to make sure nobody waiting on me.

2   Q    Okay.  Chris, you testified that you and Mr. Smith had

3   been in other fights.  Can you explain why this was different

4   from the previous fights that you had been in?

5   A    All the other incidents were fights; I'm hitting him, he

6   hitting me, I'm weaving, he weaving, but this incident right

7   here, this wasn't a fight.  This was an attack.  I couldn't

8   protect myself at all, hands behind my back literally.  I

9   couldn't do nothing.  I couldn't grab him.  I couldn't hold

10  him.  I couldn't stop him.  Couldn't do nothing but sit there.

11  Q    Now, you saw a nurse immediately after the attack; is

12  that correct?

13  A    Yes, ma'am.

14  Q    And do you remember what you told the nurse at the time?

15  A    I told her, I'm good, take me back to my cell.

16  Q    Why did you tell her that?

17  A    I was trying to get the mace off me.  I ain't feeling

18  nothing.  My adrenaline was pumping.  Didn't know that my eye

19  was swollen until I got back in the cell.  Didn't feel no pain

20  until the next day, the adrenaline pumping.

21  Q    Okay.  So when they took you to see the nurse, you were

22  still covered in pepper spray.  Did you have any way of

23  removing the pepper spray?

24  A    I took my T-shirt off and started wiping my face with it.

25  Q    Was that very effective?

```
 1   A    Not really.

 2   Q    Okay.  Before the events on November 12th, 2015, did you

 3   know any of the officers, Mr. Reese, Mr. Turner or

 4   Mr. Machino?

 5   A    Only Mr. Turner.

 6   Q    Okay.  And how did you know Mr. Turner?

 7   A    Working in the kitchen.

 8   Q    Okay.  Did you have any -- any issues with him?

 9   A    None.

10   Q    Okay.  Chris, can you explain why you filed this lawsuit?

11   A    I filed the lawsuit because the pain for real.  The pain,

12   and just knowing that they -- what they did was wrong.  See,

13   at first I really didn't -- I knew that they did something

14   wrong but I didn't understand what they did until I started

15   like reading about, like I said, the Prison Legal News and

16   things like that.  I'm like, man, yeah, they was wrong.  It

17   was all the way wrong.

18             MS. ROBINSON:  If I can have just one second.

19             No further questions.

20             THE COURT:  Cross-examination.

21             MS. WARD:  Yes, Your Honor.  Thank you.

22                       CROSS-EXAMINATION

23   BY MS. WARD:

24   Q    Good afternoon, Mr. Spates.

25   A    Good afternoon.
```

```
 1   Q    Your attorney previously mentioned your conviction for
 2   murder in the first degree.  Were you also convicted for armed
 3   criminal action at that same time?
 4   A    Yes, ma'am.
 5   Q    Thank you.  And is that what brought you to SCCC, the
 6   prison in Licking?
 7   A    Yes, ma'am.
 8   Q    I'm going to --
 9             MS. WARD:  Judge, I would ask permission to show him
10   Exhibit D1.
11             THE COURT:  Has it been admitted?
12             MS. WARD:  That was one of our two that I wanted to
13   admit and have him look over that we had not agreed to.
14             THE COURT:  That is admitted over objection and you
15   may approach the witness and show it to him.
16             MS. WARD:  Thank you, Judge.
17   Q    (By Ms. Ward) We'll try to pull that up on the screen
18   in front of you.  Does that show for you?
19   A    No, ma'am.
20             THE COURT:  Okay now.
21   Q    (By Ms. Ward) Can you look at that document and tell me
22   if you recognize that?
23   A    Yes, ma'am.
24   Q    And that document's marked D1.  Can you tell us what it
25   is?
```

```
 1   A    It's an enemy waiver.

 2   Q    And did you complete that enemy waiver?

 3   A    Yes, ma'am.

 4   Q    What does it state?

 5   A    It states that Julius Smith is not my enemy.

 6   Q    Okay.  And is that your signature on that page and your

 7   handwriting?

 8   A    Yes, ma'am.

 9   Q    And that was completed on September 23rd of 2015; is that

10   right?

11   A    Yes, ma'am.

12   Q    That meant that you did not wish to be on the enemy list

13   with Mr. Smith at that time; is that right?

14   A    It's a formality.  You have to sign those to get out of

15   ad-seg.

16   Q    Okay.  So you were in ad-seg prior to signing that?

17   A    I was in ad-seg when I signed this.

18   Q    What were you in ad-seg for?

19   A    For fighting him.

20   Q    For fighting Mr. Smith?

21   A    Yes, ma'am.

22   Q    Okay.  So in order to get out of ad-seg, you had to

23   declare that he wasn't your enemy any longer?

24   A    Yes, ma'am.

25   Q    Okay.  And that would indicate that you were okay with
```

1   having contact with him, correct?

     2   A     Yes, ma'am.

     3   Q     Okay.

     4         MS. WARD:  And, Your Honor, I'd like to show him

     5   Exhibit D2 -- that's the second exhibit that was not agreed

     6   to -- if that's okay?

     7         THE COURT:  That will be admitted over objection.

     8   It may be shown to the witness.

     9         MS. WARD:  Thank you.

    10   Q     (By Ms. Ward) Do you have Exhibit D2 in front of you?

    11   A     Yes, ma'am.

    12   Q     Can you recognize that document?

    13   A     It's a protective custody waiver.

    14   Q     And did you -- what is selected in that document?

    15   A     I do not need protective custody.

    16   Q     And is that your handwriting and your signature on the

    17   document?

    18   A     Yes, ma'am.

    19   Q     And that basically just says you don't need -- you don't

    20   feel the need for protective custody, you're not aware of any

    21   enemies among the offender population and you don't believe

    22   you're in any danger; correct?

    23   A     Yes, ma'am.

    24   Q     Is that how you felt at that time?

    25   A     Like I said, you got to sign those to get out the hole.

                                    45

1   Q    But that is your check mark, your initial and your

2   signature at the bottom?

3   A    Yes, ma'am.

4   Q    Okay.  Thank you.

5        Did you feel frightened before Mr. Smith was placed

6   in the cell with you?

7   A    Before?

8   Q    Uh-huh.  At the time of the altercation we're talking

9   about here on November 12th, when he was still in the hallway

10  before they put him in the cell with you, were you frightened?

11  A    Yeah, I told them not to put him in there.

12  Q    Okay.  Did you tell them that you were afraid for your

13  safety?

14  A    That's my enemy means don't put him in there.

15  Q    Did you say that's my enemy?

16  A    Yes, ma'am.

17  Q    Okay.  When you indicated that this happened in a pretty

18  short period of time, about a minute, was that right, the

19  altercation?

20  A    Inside the cell?

21  Q    Yes.

22  A    Yes, ma'am.

23  Q    Okay.  When was the mace deployed?  Was it deployed

24  immediately after the altercation started?

25  A    Immediately.

46

```
 1   Q     Okay.  And Mr. Smith, was he maced in the face?

 2   A     I didn't see where he got maced at, but at the end when

 3   he stopped whaling on me I saw him wiping his face.

 4   Q     Okay.  Where were you maced at?

 5   A     Everywhere.

 6   Q     In your face?

 7   A     In my face, my hair, my back, shoulder.

 8   Q     And afterwards -- we've already talked about -- your

 9   counsel talked with you about seeing the nurse.  Did the nurse

10   try to give you a towel to wipe your face off?

11   A     The nurse didn't try to give me anything.  The nurse was

12   asking questions.

13   Q     Okay.  But you had your shirt off at the time and were

14   wiping your face?

15   A     Yes, ma'am.

16   Q     Okay.  And did you indicate to her that you didn't need

17   to see the nurse, that you just needed to wipe your face?

18   A     I told her, I'm good, take me back to my cell.

19   Q     And did you tell her that you just wanted to wipe your

20   face off?

21   A     Yeah.

22   Q     Okay.  You testified that you were in a fight earlier

23   that day, the reason why I guess you were placed in ad-seg.

24   How long did that earlier fight with Mr. Smith last?

25   A     Probably about 30 to 45 seconds.
```

47

```
 1  Q    And what kind of injuries did you get in that fight?

 2  A    None.

 3  Q    None at all?

 4  A    None.

 5  Q    Where did he hit you at?

 6  A    It was -- it was mostly like a rassling match.  It was

 7  like a wrestling match.  He swung, I grabbed him, we was on

 8  the ground rassling and the police came -- COs came, pulled us

 9  apart.

10  Q    Okay.  So you were physically wrestling on the floor for

11  30 to 45 seconds?

12  A    Yes, ma'am.

13  Q    Okay.  So almost the same amount of time as this

14  altercation that happened, correct?

15  A    Yes, ma'am.

16  Q    Okay.  Medication-wise, what are you taking for your

17  injuries?

18  A    Ibuprofen.

19  Q    Okay.  How often do you take that?

20  A    It depends on when the pain start.

21  Q    Do you take it every day?

22  A    Not every day.

23  Q    Okay.  Do you have any other medications that you take

24  for this?

25  A    No, just Ibuprofen.
```

48

1    Q    Okay.

2          MS. WARD:  I have nothing further, Your Honor.

3          THE COURT:  Any redirect?

4          MS. ROBINSON:  Yes, Your Honor, just briefly.

5                    REDIRECT EXAMINATION

6    BY MS. ROBINSON:

7    Q    Chris, the exhibits that you were just showed, the enemy

8    waiver, do you remember what date that was signed?

9    A    I think it said 9/23.

10   Q    Okay.  So that was almost two months prior to the

11   incident at issue here?

12   A    Yes, ma'am.

13   Q    Okay.  And how about the protective custody waiver, do

14   you remember what date that was signed?

15   A    I believe it was the same day.

16   Q    Okay.  So the fact that those were signed two months

17   earlier, does that change the fact that you and Mr. Smith had

18   been in a fight earlier on the same date?

19   A    Not at all.

20   Q    And were the officers aware of the fact that you were in

21   a fight with Mr. Smith that same date?

22   A    Yes, ma'am.

23   Q    Okay.  Did you hear them being told that?

24   A    Not -- I didn't hear them.

25   Q    Okay.

                              49

```
 1  A    Yeah, I didn't hear it.

 2            MS. ROBINSON:  No further questions.

 3            THE COURT:  Recross?

 4            MS. WARD:  No, Your Honor.  Thank you.

 5            THE COURT:  All right.  Let's go ahead and take

 6  another break now because I've got something I've got to go

 7  back and do in my office, frankly.  I think I can get back by

 8  three.  So we're going to take a break.

 9            Let me read to you an instruction that I need to

10  read to you, Instruction No. 8.

11            (Court reads Instruction No. 8 to the jury.)

12            THE COURT:  Instruction No. 9.

13            (Court reads Instruction No. 9 to the jury.)

14            THE COURT:  Now, I'm not going to repeat this before

15  every recess but keep them in mind throughout the trial

16  because they will apply throughout the trial.

17            I did want to inquire -- and I know you all told me

18  this a couple hours ago in jury selection, but who lives far

19  away?  Does anybody live more than 75 miles away?

20            A couple of you do.

21            You didn't know you were going to be here today, how

22  late.  Do either of you have reasons you need to be home by a

23  certain hour?

24            JURORS:  (Shake heads.)

25            THE COURT:  I assume you didn't bring things to
```

spend tonight, or did you bring things to spend tonight?

           JURORS:  (Shake heads.)

           THE COURT:  That's common.  Okay.

           I'm thinking about quitting closer to 4:30 today than later just because of your first day you never know how long you're supposed to be here.

           Are the gentlemen with the listening devices, are they working for you?

           JUROR:  For the most part.

           THE COURT:  All right.  In that case we'll go ahead and take a recess, let's say five after three.  That'll give you time to run to your car if you want to run to your car.

           So figure we'll get out of here about 4:30, if you need to call somebody at home and tell them when you're going to get home.

           All right.  We'll be in recess.

           (Jury exits courtroom at 2:50 p.m.)

           THE COURT:  You may step down.  Thank you, sir.

           On the jury instruction conference, I'm thinking maybe we ought to do that in the morning rather than at noon tomorrow just because if we need to make changes, we'll want to have them done and not have to sit around and wait on them. Let's plan at 8:30 we're going to use that time to have an instruction conference.

           So go through the proposed instructions, everybody,

```
 1    and identify the differences and we'll try to make some
 2    rulings so you'll know what's going to happen.
 3              Anything else I need to take up before we take a
 4    little break?
 5              MR. DULLE:  Our next witness, Judge, will be the
 6    other inmate.  We're told that he's here.  Just so Your
 7    Honor's aware, that's what we plan to do next.
 8              THE COURT:  All right.  Who has control of him, our
 9    marshals or the correctional facility he came from?
10              We'll be ready for that next witness down there and
11    escort him up over here.  I'd like to have him on the stand
12    before the jury comes in.
13              All right.  Thank you.
14              (Court stands in recess:  2:51-3:07 p.m.)
15              THE COURT:  We ready to call the jury?
16              MR. DULLE:  Are we going to break again when his
17    testimony finishes?
18              THE COURT:  Well, I was trying to decide if I needed
19    to.  I don't really think I need to.  So my guess is that we
20    just would have him exit through that door and then call your
21    next witness.  Depends what time it is, obviously.  If it's --
22    I told them we're going to break at 4:30.
23              Go get the jury.
24              (Jury enters courtroom at 3:10 p.m.)
25              THE COURT:  Be seated.
```

52

```
 1              Plaintiff, your next witness.

 2              MR. DULLE:  At this time, Your Honor, the plaintiff

 3    calls Julius Smith to the stand.

 4              THE COURT:  Mr. Smith, would you raise your right

 5    hand to be sworn.

 6    JULIUS SMITH, PLAINTIFF'S WITNESS, SWORN:

 7                        DIRECT EXAMINATION

 8    BY MR. DULLE:

 9    Q    Good afternoon, sir.  Could you please introduce yourself

10    to the jury?

11    A    My name is Julius Smith.

12    Q    Thank you.

13              And, Mr. Smith, my name is Brent Dulle.  We've not

14    met before but he spoke on the phone.  Do you recall that?

15    A    I recall.

16    Q    I told you then and I'm telling you now, I'm one of the

17    lawyers, along with Laura Robinson, representing Chris Spates

18    in this matter.  Do you understand that?

19    A    Yes, I do.

20    Q    Thank you, sir.

21              You are currently an inmate incarcerated with the

22    Missouri Department of Corrections; is that correct?

23    A    Correct.

24    Q    Thank you, sir.

25              And you're currently serving a life sentence for
```

53

```
 1   murder; is that also correct?

 2   A    Correct.

 3   Q    Mr. Smith, do you know Chris Spates, my client, sitting

 4   over here?

 5   A    I remember him.

 6            THE COURT:  Just a second.  Can we come over here.

 7   (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS

 8   WERE HAD:)

 9            THE COURT:  By what authority did you put in his

10   sentence when the motion in limine did not allow it?

11            MR. DULLE:  I think that was an oversight on my

12   part, Your Honor.  I meant to get the conviction in, not the

13   sentence.

14            THE COURT:  You thought you'd ask and just slip that

15   other thing in there, did ya?

16            MR. DULLE:  It was unintentional, Your Honor.  I

17   apologize.

18            THE COURT:  One more stunt like that, you'll be

19   redressed in front of the Court.  You understand me?

20            MR. DULLE:  I do, yes.  I apologize.

21            THE COURT:  We don't take things like that lightly

22   in federal court.

23            MR. DULLE:  I don't take it lightly either, Your

24   Honor.  I think I just -- in the moment I just -- it was

25   unintentional.  I apologize.
```

```
 1            THE COURT:  All right.

 2  (PROCEEDINGS RETURNED TO OPEN COURT:)

 3            THE COURT:  You may proceed.

 4            MR. DULLE:  Thank you.

 5            THE COURT:  Please, do not thank me for my rulings.

 6  I make rulings because that's what the law requires.

 7            MR. DULLE:  Of course, Your Honor.

 8            THE COURT:  Proceed.

 9  Q    (By Mr. Dulle) Mr. Smith, my question to you before our

10  sidebar was do you know Chris Spates?

11  A    Yes, I know him.

12  Q    Okay.  Did you encounter Mr. Spates when you were both

13  incarcerated at South Central Correctional Center in Licking,

14  Missouri?

15  A    Yes.

16  Q    Thank you.

17            Did you and Mr. Spates ever have a physical fight

18  while you were incarcerated together?

19  A    Yeah, we had numerous fights.

20  Q    Okay.  Do you know about how many?

21  A    Probably at least six.

22  Q    Okay.  Was there ever a day at SCCC where you and Chris

23  had more than one fight in the same day?

24  A    Yes.

25  Q    Thank you.
```

```
 1              Do you recall that that day was November 12th, 2015?
 2   A    Yeah, sound about right.
 3   Q    Okay.  I want to ask you a little bit about the first
 4   fight that day.  Can you tell us -- tell the jury, rather,
 5   where that occurred, if you recall?
 6   A    It was on the main walk in front of the property room.
 7   He was just getting out of the hole.  I saw him getting out of
 8   the hole, went to grab his property.
 9   Q    All right.  And what did you do?
10   A    We had a fight in front of the property room.
11   Q    Okay.  Can you just briefly describe that fight?
12   A    I struck him, struck him first, and then we, you know,
13   started having a -- like a hold on each other, a tussle, and
14   then we broke free and we started fighting again until the COs
15   got there.
16   Q    How long do you think that lasted until the COs came?
17   A    Probably about two, three minutes.
18   Q    Once the COs came, what did they do?
19   A    They restrained us and took us down to the ad-seg, the 2
20   House.
21   Q    Okay.  Ad-seg, that's also what some people call the
22   hole?
23   A    Yeah, the hole.
24   Q    What happens once -- to you once you got to ad-seg?
25   A    We on the bench for a while, waited until a cell came
```

56

1    open, which was his cell.

2    Q    Okay.  Do you know how long approximately it was that you

3    were waiting for that cell?

4    A    I waited for about an hour till they put me in a cell.

5    Q    Okay.  You said they eventually took you to his cell?

6    A    They took my directly to his cell.

7    Q    Do you recall who it was that took you to that cell?

8    A    Like four or five COs.  I don't remember their names

9    personally.

10   Q    Okay.  Would you recognize any of them if they were in

11   the courtroom today?

12   A    Maybe so.  It's been eight years.  Been a while.

13   Q    But you couldn't say who it is as we sit here?

14   A    No.

15   Q    Okay.  Tell us what happened once you got to that cell,

16   to Chris's cell in ad-seg.

17   A    They told me I was going to take that cell.  They told

18   me, You go on in there, take that cell.

19   Q    Did you respond to that?

20   A    I couldn't do nothing.  I told them I didn't want to go

21   but they forced me to go in there.

22   Q    You told them that you didn't want to go in?

23   A    Yeah.

24   Q    Did you tell them why you didn't want to go in?

25   A    We just had a fight, wasn't supposed to be in there

                                 57

```
 1   anyway.

 2   Q    Do you recall anything that the -- that they said in

 3   response?

 4   A    That they wanted to see us go at it, they wanted to see

 5   some warriors fights or stuff like that.  They said a bunch of

 6   things but that's one thing in particular that stood out.

 7   Q    Okay.  Do you recall whether any of them made any

 8   reference to your skin color or to your race?

 9   A    Yeah.  They said they wanted to see some black warriors

10   go at it, if that's what you mean.

11   Q    Okay.  Do you recall whether -- or did you hear Chris

12   Spates say anything about the possibility of you going in that

13   cell with him?

14   A    Not that I recall, because they were still being loud at

15   the same time.

16   Q    Okay.  He was in the cell, you were outside the cell at

17   this time?

18   A    True.

19   Q    Okay.  And where were your hands?

20   A    Cuffed.  Like tethered.  Not like this, it's behind our

21   backs, like a leash.

22   Q    Okay.  So your hands are behind your back and the tether

23   is connected to the handcuffs; is that correct?

24   A    Correct.

25   Q    Thank you, sir.
```

```
 1            Other than the -- what you mentioned, did any of

 2   them say anything about -- or acknowledge what you'd said

 3   about the fight the two of you had had earlier in the day, you

 4   and Chris had?

 5   A    Yeah.

 6   Q    What did they say about that?

 7   A    Want to see you all do it again.

 8   Q    Okay.  How long do you think it was before you were

 9   standing outside the cell?  Eventually you went in the cell,

10   right?

11   A    Right.

12   Q    How long do you think it was approximately that you were

13   standing outside the cell?

14   A    Standing outside that cell for at least five minutes

15   going back and forth on:  I'm not supposed to be in there.

16            It's like, You going in there.

17            Like, I'm not supposed to be in there.

18            You're going in there.

19            Find me another cell.

20            No, you're going in this cell.

21   Q    Okay.  In your mind did you make it clear that you didn't

22   want to go in that cell?

23   A    Right.

24   Q    At some point you went in though, right?  I want to talk

25   about that moment.
```

```
 1   A    (Nods head.)

 2   Q    Did -- do you recall whether Mr. Spates was handcuffed

 3   inside the cell before you went in?

 4   A    They handcuffed him before they rolled the door open.

 5   Q    And they did that through the food port or the chuck

 6   hole?

 7   A    Yeah, through the chuck hole.

 8   Q    And do you remember where his hands were cuffed?

 9   A    His behind his back too.

10   Q    Just like yours?

11   A    True.

12   Q    Do you recall whether there was a tether?  Was he

13   attached to a tether?

14   A    Yeah.  That's how they cuff us up before they put us in

15   the cell, they tether us.  You gotta tether the thing to

16   another -- there's a hole in the door that they lock us to so

17   you can't move.

18   Q    Okay.  What happened once you went into the cell?

19   A    They let me -- they let me uncuff first.

20   Q    Can you talk a little bit more about how that happened?

21   A    Once they opened the door, they made him stand to the

22   side while I was standing in front of the food port to make

23   sure I was uncuffed first once the door closed.

24   Q    Okay.  Were they doing something to keep Chris away from

25   the food port?
```

60

1  A    You got to hold his tether to the side -- to the side

2  while I stand in the middle of the chuck hole.

3  Q    Was there any physical contact between you and Chris that

4  you recall before either of you was uncuffed?

5  A    No, besides the fact that we was trying to rassle to get

6  first out of the cuffs, because they was basically making us

7  fight again, so we had to rassle to try to get out of the

8  cuffs.  They moved him and kept me at the chuck hole to get

9  uncuffed first.

10  Q    Okay.  And did you -- did you eventually get uncuffed?

11  A    Yes.

12  Q    Is that a yes?

13  A    Yeah.

14  Q    What did you do as soon as you got your hands out of the

15  cuffs?

16  A    When they let me out the cuffs, I started assaulting him

17  first.  I started swinging first, started hitting him.

18  Q    Hitting him with a closed fist?

19  A    Yeah, hitting him with a closed fist.

20  Q    Do you remember what part of his body you were hitting?

21  A    Face.

22  Q    Anything else?

23  A    Face, kneeing him in the face, everything else.

24  Q    Did he stay on his feet the whole time?

25  A    Kinda sorta.

```
 1   Q    What do you mean?

 2   A    'Cause we was already at a kneeled position to where we

 3   was like already bent forward in order to get uncuffed, so he

 4   was still like bent forward, so he was never fully standing

 5   straight up.

 6   Q    Okay.  Thank you.

 7        While he was -- while you were hitting him in the

 8   face and taking a knee at him, did he ever get uncuffed during

 9   that time?

10   A    No.  I was the only one to get uncuffed.

11   Q    Could you tell whether somebody was holding the other end

12   of the tether that whole time?

13   A    Yeah, the tether was being held by them unless they still

14   had it in the locked position.  Other than that, it was being

15   held by them.  They didn't let him go to where he could have

16   move around the cell.  He was stuck at the door the whole

17   time.

18   Q    So he couldn't put his hands up to block your punches?

19   A    No, he couldn't do nothing.

20   Q    And he couldn't move away from the door to avoid your

21   punches?

22   A    Couldn't do anything.

23   Q    How many times do you think you punched him?

24   A    At least five minutes' worth, close to five minutes.  We

25   was in there for like five minutes before they finally got us
```

```
 1   to stop -- got me to stop.

 2   Q    Okay.  How did they get you to stop?

 3   A    They maced the cell.  They maced us.

 4   Q    Through the food port again?

 5   A    Yeah, through the food port.

 6   Q    Okay.  Do you recall how long the mace -- how long are

 7   they spraying the mace into the cell?

 8   A    Probably about a minute or two, because I kept swinging

 9   until it was unbearable to breathe.

10   Q    So despite the mace, you were still taking swings at

11   Chris?

12   A    Correct.

13   Q    Okay.  Eventually you said you couldn't breathe?

14   A    Couldn't breathe, so I stopped.

15   Q    What did you do when you stopped?

16   A    Restrained, submitted to the restraints.

17   Q    Okay.  At that point did they open the door?

18   A    Yeah, they finally opened it.

19   Q    Did they open the door at any point before that?

20   A    Nah.  Even with him saying, Could you all open the door,

21   roll the door, they didn't open it.

22   Q    Was Chris saying stuff like that?

23   A    Yeah, he was trying to get them to open the door.

24   Q    Okay.  Why did you attack Chris?

25   A    Just a long rivalry.  Just we always been at a dislike.
```

1   Didn't like him.

2   Q    Okay.  Were you afraid in those moments?

3   A    It was either him or me, man.  It was either him or me.

4   They let him out of the cuffs first, he probably would have

5   did the same thing to me.  We just had to fight.

6                MR. DULLE:  No further questions, Your Honor.

7                THE COURT:  Cross-examination?

8                MS. WARD:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10  BY MS. WARD:

11  Q    Good afternoon, Mr. Smith.

12  A    Good afternoon.

13  Q    You testified that you and Mr. Spates had fought in the

14  morning of November 12th, 2015, correct?

15  A    Correct.

16  Q    And can you tell me how long that first fight lasted?

17  Did you say two to three minutes?

18  A    Two to three minutes.

19  Q    Where did you hit him during that two to three minutes?

20  A    Face, body, kind of like all over.

21  Q    How did you hit him?  Did you use your hands?  Were they

22  closed fists?

23  A    Yeah, closed fist.

24  Q    So you fought for quite a few minutes, correct?

25  A    Correct.

1   Q    Was it a pretty bad fight?

2   A    Yeah.  Correct.

3   Q    Okay.  Did you use your legs at all?  Did you kick him?

4   A    Yeah.

5   Q    Where did you kick him at?

6   A    Stomach, legs.

7   Q    Did you hit him in the back at all?

8   A    No, it was pretty much face-to-face.

9   Q    Did you hit him around the head or neck?

10  A    Yeah.  Head and neck, yeah.

11  Q    And that was with a closed fist?

12  A    Closed fist, yeah.

13  Q    You also testified today that you were outside of the

14  cell during the afternoon incident when they were trying to

15  get you in the cell with Mr. Spates, that you were there for

16  about five minutes.  Are you sure about that?

17  A    Could have been five minutes, two, three minutes.  It

18  just seemed like a long period of time.

19  Q    Okay.  And along the same lines, you indicated that you

20  all fought for about five minutes?

21  A    Yeah, that was about five minutes.

22  Q    You're certain?

23  A    Yes.

24  Q    You talked about the tether.  You mentioned that the

25  tether is hooked to things.  Was the tether that you had on,

                                    65

```
 1   was it hooked to the door?

 2   A    Nah, they had it in their hands.  Because you got a hook

 3   for one -- his hook was already hooked because he was in the

 4   cell, so they just had me held by hand on the tether, like a

 5   leashed dog.  They had me on a leash.

 6   Q    So you were held by hand.  And Mr. Spates, was he

 7   tethered to the door?

 8   A    He was tethered locked to the door.

 9   Q    Was he like that during the entire altercation?

10   A    (Nods head.)

11   Q    So nobody was holding his tether?

12   A    They could've grabbed it by then, but when they first

13   brought me to the cell, they hooked him to the thing so

14   they're going to cuff me up, brought me in the door.

15   Q    I'm sorry.  You nodded your head and I didn't wait for

16   your actual verbal answer.  You are saying he was cuffed to

17   the door the entire time?

18   A    Yes.

19           MS. WARD:  I have nothing further.

20           THE COURT:  Redirect?

21           MR. DULLE:  Thank you.

22                   REDIRECT EXAMINATION

23   BY MR. DULLE:

24   Q    Sorry, Mr. Smith.  I just want to clarify one or two

25   issues.
```

1          The tether -- you mentioned a hook that the tether
     2     can go onto; is that correct?
     3     A    Yes.
     4     Q    And where is that hook?  Is it inside the cell or is it
     5     outside the cell?
     6     A    Outside the cell against the wall.
     7     Q    Okay.  So if the tether is connected to the hook, it's
     8     not inside the cell?
     9     A    True.
    10     Q    Then it runs through the food port?
    11     A    Yes.  Correct.
    12     Q    Okay.
    13          MR. DULLE:  That's all, Your Honor.  Thank you.
    14          No further questions.
    15          THE COURT:  Recross?
    16          MS. WARD:  Yes, Your Honor, just very briefly.
    17                      RECROSS-EXAMINATION
    18     BY MS. WARD:
    19     Q    When you were tethered -- or you had the tether with
    20     someone holding onto it.  When were you maced?
    21     A    When we was in the cell fighting.  I was out of cuffs by
    22     then.
    23     Q    Did you get maced immediately upon the fight starting?
    24     A    Nah, they waited for a quick second, then they -- I'd say
    25     they waited probably for a minute, then they started macing

                                    67

1    me.

2    Q    Were you maced before Mr. Spates, or do you recall?

3    A    I was maced before he was maced.

4    Q    You were?  Okay.

5            MS. WARD:  Nothing further.  Thank you.

6            THE COURT:  All right.  This witness is excused.  He

7    may step down.

8            Officer, if you'd escort him.

9            Thank you, sir, for your testimony.

10           Call your next witness.

11           MS. ROBINSON:  We call Robert Turner.

12           THE COURT:  Mr. Turner, if you would come forward.

13   ROBERT TURNER, PLAINTIFF'S WITNESS, SWORN:

14           THE WITNESS:  Yes, I do.

15                      DIRECT EXAMINATION

16   BY MS. ROBINSON:

17   Q    Good afternoon.  Can you state your name for the record?

18   A    Robert Turner.

19   Q    And where are you concurrently employed?

20   A    Jefferson City Correctional Center.

21   Q    And what do you do there?

22   A    I'm a transportation officer.

23   Q    And is that part of the Missouri Department of

24   Corrections?

25   A    Yes, it is.

68

1   Q    How long have you been employed by the Missouri
2   Department of Corrections?
3   A    A little over 12 years.
4   Q    What was -- what were your previous roles there?
5   A    Roles in DOC?
6   Q    Yes.
7   A    I've been utility officer, food service, and then
8   transportation.
9   Q    And were you employed by the DOC in November of 2015?
10  A    Yes, I was.
11  Q    And where were you located at that time?
12  A    I believe I was probably in food service and they had put
13  me out on the yard to work out there that day.
14  Q    Were you at South Central Correctional Center at that
15  time?
16  A    Yes, I was.
17  Q    And were you a correctional officer in November 2015?
18  A    Yes, I was.
19  Q    Do you remember how long you had been a correctional
20  officer at South Central in 2015?
21  A    I started there at South Central Correctional Center in
22  February of 2012.
23  Q    So you had been there a couple years by that point?
24  A    Yes.
25  Q    And did you work at the Jefferson City Correctional

69

1   Center before the South Central?

2   A    Yes.  I started in April of 2011.

3   Q    Okay.  And what were your responsibilities and duties as

4   a correctional officer at South Central Correctional Center?

5   A    Keeping the safety and security of the institution, both

6   offenders and staff.

7   Q    Have you ever been stationed to work in administrative

8   segregation?

9   A    For the day.

10  Q    Okay.  Have you ever transported any inmates to

11  administrative segregation?

12  A    Yes, I have.

13  Q    Can you give a description of what administrative

14  segregation is?

15  A    When people have either had fights, declared PC, which

16  means protective custody, just admin -- admin PC where they've

17  gotten some info and then they -- we escort them down there

18  for administration segregation.

19  Q    Okay.  So are the -- the inmates are taken out of the

20  general population and placed into ad-seg?

21  A    Yes.

22  Q    And one of the reasons they may be placed there is if

23  they've requested protective custody?

24  A    Yes.

25  Q    I would like to show you Joint Exhibit 1.

1    THE COURT:  Joint Exhibit 1 is admitted without
          2  objection.
          3    MS. ROBINSON:  Thank you, Your Honor.
          4  Q    (By Ms. Robinson) Okay.  Have you seen this document
          5  before, Mr. Turner?
          6  A    Yes, I have.
          7  Q    Can you describe what it is?
          8  A    It's the SOPs for administrative segregation, the
          9  policies and the -- what we need to be doing as far as being
         10  down in administrative segregation, working down in that area.
         11  Q    Okay.  And have you been trained on this policy?
         12  A    We go over them.  It's usually the officers that are
         13  stationed down there that really look it over and go by it.
         14  We go over it during our annual training, our core training,
         15  to refresh our memories on things.  We go over different areas
         16  of policies each year.
         17  Q    Okay.  On page 8 of this policy there is a Section D4 and
         18  it -- can you read that for me, Section D4?
         19  A    "Offenders that refuse double cell assignments with a
         20  capable offender should be given direct orders and issued a
         21  conduct violation for refusing.  The following procedures will
         22  then be followed."
         23  Q    Okay.  So what does a refusal here mean?
         24  A    Means the offender that's being taken up there does not
         25  want to take the cells.

                                    71

1  Q    Okay.  Can that refusal be verbal?

2  A    Yes.

3  Q    Okay.  Is there anything in particular that the inmate

4  would have to say for that refusal?

5  A    They usually will say that they're my enemy or I just

6  don't want to be celled with that person.

7  Q    Okay.  In 2015 if you escorted an inmate to ad-seg, what

8  would you do if an inmate refused a cell?

9  A    When I escort them down to the ad-seg, I put them in a

10  holding cell, what they call the cage but it's called a

11  holding cell.  I leave them there and let the officers there

12  deal with the -- placing them where they need to be.

13  Q    Okay.  So did you ever escort an inmate to a cell in

14  ad-seg?

15  A    From the showers and stuff like that when I was working

16  down there.

17  Q    Okay.  Did you ever have an inmate refuse a cell?

18  A    No, I cannot recall ever having an inmate refuse a cell

19  that I've been -- that I've offered them.

20  Q    Okay.  Section -- if we can look at Section D4A.  Can you

21  read that part?

22  A    "Staff will review all available options.  The offender

23  may be offered to cell with another offender or placed

24  temporarily in a single cell if it is deemed not to jeopardize

25  the institution's security."

```
 1   Q    Had you -- prior to November 2015 had you witnessed an
 2   inmate refuse a cell?
 3   A    Yes, I have seen some.  They've refused and then the
 4   second cell they refused, then they was placed on the
 5   restraint bench.
 6   Q    So it was not unheard of for inmates to refuse cells?
 7   A    No.
 8   Q    Okay.  Were you familiar with a process of assigning the
 9   cells to -- or assigning inmates to the cells in ad-seg?
10   A    No, I'm not familiar with that.
11   Q    Okay.  Do you know if correctional officers could open
12   the cell doors in ad-seg?
13   A    In the wing itself?
14   Q    Yes.
15   A    No.
16           THE COURT:  Just a second.
17           No, you don't know or no, they couldn't?
18           THE WITNESS:  No officers can open the cells out in
19   the wing themselves.
20   Q    (By Ms. Robinson) Okay.  So how would those cell doors
21   be opened?
22   A    By the control bubble in the housing unit.
23   Q    Okay.  How would -- how would the control bubble officer
24   know when to open the cell?
25   A    We'd get on the radio.  We had a specific channel for
```

1   ad-seg.  We'd say, Housing Unit 2 bubble, cell so and so, we'd
2   put our hand on the door, they would see us, then they would
3   roll the door stating that it's good to be opened at that time
4   because there's enough officers there and the door is prepared
5   to be opened, everybody's in the restraints that need to be.
6   Q    Okay.  Do you know how long it would usually take for the
7   door to open once it was requested to be opened?
8   A    Usually about 20 or 30 seconds at the most.
9   Q    During the course of your employment at South Central did
10  you encounter my client, Mr. Spates?
11  A    Yes.  I believe he's probably worked in food service.
12  Q    Okay.  Did you have any issues with him when --
13  A    No.
14  Q    -- you encountered him?
15       Did you encounter Mr. Julius Smith during your time
16  there?
17  A    It's been a long time.  I cannot recall of him ever
18  working in the kitchen or really any other kind of
19  interactions with him.
20  Q    Okay.  Are you aware of any fights that had occurred
21  between Mr. Smith and Mr. Spates?
22  A    That morning I escorted one of them to the administrative
23  segregation.  I don't recall which one.
24  Q    But it was after a fight that had occurred between the
25  two of them?

1   A    Yes.

2   Q    Okay.  Do you remember what happened with the fight or

3   how you got to be involved?

4   A    No, I do not recall that.  I just remember that they had

5   been in a fight that morning.

6   Q    Okay.  Do you remember if you were working on the yard

7   that day?

8   A    I still cannot recall what I was actually doing.

9   Q    Okay.  But you do remember helping break up the fight; is

10  that correct?

11  A    If I would have broke up the fight, I'd've done a use of

12  force report and I've looked for it and I have not done no use

13  of force report on that incident.

14  Q    Okay.  But you do remember helping escort one of them to

15  ad-seg after the fight?

16  A    Yes.

17  Q    Okay.  Do you remember what happened the afternoon of

18  November 12th, 2015?

19  A    Yes.

20  Q    Can you tell us what you remember?

21  A    What I remember is while -- I was called to one of the

22  housing units to bring ad-seg property down to the housing

23  unit.  Ad-seg property consists of writing utensils, stamps,

24  envelopes, clothing, personal hygiene as far as boxers, shirt

25  and socks, pillows and sheets and blankets to be delivered

75

1    down there.  That's ad-seg property.

2    Q    Okay.  So you were delivering -- was it like in a bag?

3    A    It was in the -- the blanket.  We put everything in the

4    middle of the blanket, bring the corners up, tie them off.

5    After you got them tied off, it makes a little handle that

6    looks like a bag.

7    Q    Okay.  So you were delivering that to ad-seg?

8    A    Yes.

9    Q    Do you remember who you were delivering that to?

10   A    No, I do not recall who I was delivering it to.

11   Q    What did -- what happened when you were delivering that

12   in ad-seg?

13   A    I seen that they was escorting Mr. Smith to a cell and as

14   I walked up to the cell, I looked to see who was in the cell,

15   and I told the other officers that these two had been in a

16   fight earlier that morning, you don't need to be putting them

17   in there, you need to contact your sergeant and verify.

18   Q    Okay.  Do you remember which officers it was?

19   A    The only one I knew at that time was Mr. Reese.  I didn't

20   recall until I watched the video the other day on who the

21   other officer was.

22   Q    Okay.  Do you recall now?

23   A    Yes.

24   Q    And who is that?

25   A    Mr. Machino.

```
 1   Q    Okay.  So you saw Mr. Reese and Mr. Machino walking

 2   Mr. Smith to the cell; is that correct?

 3   A    Yes.

 4   Q    And you saw that inside the cell was my client,

 5   Mr. Spates?

 6   A    Yes.

 7   Q    Okay.  And you told the two officers that Mr. Smith and

 8   Mr. Spates had been in a fight earlier that morning?

 9   A    Yes.

10   Q    And you suggested that they call their sergeant before

11   they put Mr. Smith in the cell; is that correct?

12   A    Yes.  I strongly suggested that they needed to call their

13   housing unit sergeant to find out what's -- where they need to

14   put him at.

15   Q    Okay.  And did they call their sergeant?

16   A    No.

17   Q    So what happened next?

18   A    They continued to get Mr. Spates wanting to cuff up and

19   he never -- he kept refusing, then finally he did cuff up, and

20   as he cuffed up, I told them, Guys, don't do this.  The door

21   rolled open, they placed him in there and then it was a

22   scuffle to try to get their hands out of the chuck hole.

23   Q    Okay.  Was there time when they -- when Mr. Smith and

24   Mr. Spates started scuffling to remove Mr. Smith from the

25   cell?
```

```
 1   A    Yes, they was scuffling to get their hands out of the
 2   chuck hole.  Then I told them again, You need to get him out.
 3   Q    Okay.  Did they remove him at that point?
 4   A    No.
 5   Q    Did they contact their sergeant at that point?
 6   A    No.
 7   Q    Why did you advise them to let their sergeant know about
 8   the fight?
 9   A    Because I think that the sergeants had the capability of
10   being able to place them where they needed to be.
11   Q    Okay.  And were you concerned about them being placed
12   into the cell together?
13   A    Yes.
14   Q    And what was your concern about that?
15   A    Because they'd been in a fight earlier and then they was
16   scuffling to get their hands out of the chuck hole.  Someone
17   was wanting to fight.
18   Q    Okay.  So you were concerned that they were going to
19   fight again?
20   A    Yes.
21   Q    Okay.  Did you call a sergeant to notify them what was
22   happening?
23   A    No.  It seemed like things were escalating too fast.  I
24   should have called.  It was just a lapse of judgment right
25   there because I was trying to get them talked to pulling him
```

78

```
 1  out without having to call the sergeant.
 2  Q    Okay.  So what did you do at this point?
 3  A    After they placed them in there I was preparing myself to
 4  try to get this stopped because I know there was going to be a
 5  fight.
 6  Q    Okay.  Did you hear Mr. Smith and Mr. Spates -- did you
 7  hear either one of them tell the other officers that they had
 8  been in a fight that morning?
 9  A    Yes.
10  Q    Do you remember which one you heard say that?
11  A    I believe both of them said that.
12  Q    Okay.  And you heard Mr. Spates say he did not want
13  Mr. Smith in his cell; is that correct?
14  A    Yes.
15  Q    And you heard Mr. Smith say that he did not want to go
16  into that cell; is that correct?
17  A    That is correct.
18  Q    Did you hear either one of the other officers say that he
19  had missed the earlier fight?
20  A    No.
21  Q    Did you hear a comment about some black gladiator action
22  or something to that effect?
23  A    Yes, I did, but I did not hear it from my general area
24  within about 4 feet of me.  I don't know if it came from
25  another cell or what.  There was a lot of noise going on then.
```

79

1    Q    Okay.  But you heard the comment?

2    A    Yes, I did.  And I informed them, I said, That's

3    unacceptable, that kind of talk.

4    Q    But you don't know who made that comment?

5    A    I have no idea who made that comment because I was

6    focused on the incident going on right here in front of me.

7    Q    Okay.  What did you do when you heard that comment about

8    black gladiator action being made?

9    A    I said, That is an inappropriate comment.

10   Q    Did you order Mr. Spates to submit to handcuffs?

11   A    No, I did not.

12   Q    Did you tell Mr. Spates that if he didn't comply with

13   being handcuffed that you would use your pepper spray on him?

14   A    No, I did not.

15   Q    Did you put the handcuffs on Mr. Spates?

16   A    No, I did not.

17   Q    Do you know who did?

18   A    It was either Reese or Machino.  Because I was not

19   escorting either one of them up there, I didn't have no

20   dealings with them at that point.

21   Q    Okay.  Do you remember who called to have the cell door

22   opened?

23   A    No, I do not recall who called to have the cell door

24   opened.

25   Q    At that time when the cell door was being opened, did any

1  of the officers inform the bubble officer about the fight that

2  had occurred earlier that morning?

3  A    Can you please repeat that one more time?

4  Q    Yes.

5        At the time that the cell door was being opened --

6  or the request was made to have the cell door opened, did

7  either one of the officers inform the bubble officer that

8  Mr. Spates and Mr. Smith had been in a fight earlier that

9  morning?

10  A    I don't believe that nobody said anything about that.

11  They -- I don't know if they made the call to open it or put

12  their hand up on the door while the bubble officer was

13  watching us.

14  Q    Okay.  Do you remember how long it took between asking

15  for the door to be opened and the door actually opening?

16  A    No, I do not recall how long it took.

17  Q    Do you remember Mr. Spates and Mr. Smith starting to

18  scuffle when Mr. Smith went inside the cell?

19  A    Yes.  They was trying to get their hands out of the chuck

20  hole to get their wrist restraints removed.

21  Q    Do you remember the door opening again after Mr. Smith

22  was placed inside the cell?

23  A    No, I don't remember the door being opened a second time

24  after they placed him in there before they removed the

25  restraints.

81

1  Q    What are officers supposed to do when they see inmates

2  start scuffling or otherwise trying to fight?

3  A    Tell them to stop fighting.  If they don't, then we use

4  an MK-4 of pepper spray in their facial area.

5  Q    What did you do when you saw Mr. Smith and Mr. Spates

6  start to scuffle?

7  A    When Mr. Smith was released from his wrist restraints?

8  Q    Before he was released, when they were starting to

9  scuffle trying to get their hands through the food port.

10  A    I told them that they needed to be pulled out.

11  Q    Did you -- did you tell the other officers that it wasn't

12  going to end well?

13  A    Yes.

14  Q    What did Mr. Machino do when he saw Mr. Smith and

15  Mr. Spates start to scuffle?

16  A    I don't recall what Mr. Machino was doing or his

17  reaction.

18  Q    Do you recall what Mr. Reese was doing when he saw them

19  start to scuffle?

20  A    I was more focused on trying to get them to pull them

21  out.  I wasn't seeing what he was doing.

22  Q    Okay.  Were Mr. Smith and Mr. Spates still scuffling when

23  Mr. Smith's restraints were removed?

24  A    I believe Mr. Spates moved away from the door at that

25  time before his restraints were removed because Mr. Smith's

82

```
 1   hands were out of the chuck hole at that time.

 2   Q    Okay.  Do you know how it was determined that Mr. Smith's

 3   restraints should be removed first?

 4   A    Say one more time, please.

 5   Q    Do you know how it was determined that Mr. Smith's

 6   restraints should be removed first?

 7   A    His hands were out of the chuck hole first so they

 8   removed his first.

 9   Q    What happened when Mr. Smith's restraints were removed?

10   A    He started hitting and swinging on Mr. Spates.  I

11   immediately pulled my pepper spray out and sprayed in there.

12   My can malfunctioned, something went wrong with it, I backed

13   away.  Mr. Reese then administered some pepper spray into the

14   cell and it -- I mean, it was pretty much immediately I

15   started seeing him swing on him.  He was swinging blindly;

16   Mr. Smith was swinging blindly at Mr. Spates.  And then at the

17   same time when they started fighting, a 1049 -- which calls

18   for a fight between two offenders -- was called.

19   Q    Okay.  Do you remember who called the 1049?

20   A    No, I do not recall.

21   Q    And you saw Mr. Smith hit Mr. Spates?

22   A    Yes.

23   Q    Do you remember if he hit him with open or closed fists?

24   A    They looked like they was clubbing blows with his palm

25   at -- the bottom of his hand facing down on him.
```

1   Q    Okay.  Was he hitting his back like that?

2   A    Yes.

3   Q    Was he hitting his head like that?

4   A    I did not see.  As soon as he -- I sprayed, my can

5   malfunctioned, I stepped away, I couldn't see in there

6   anymore.

7   Q    But you did see him hitting his back?

8   A    Yes.

9   Q    And what was Mr. Spates doing at this time?

10  A    He was hunkered down almost into the fetal position

11  trying to absorb the blows and protect his vital areas, his

12  face and his neck and his throat.

13  Q    Okay.  Do you recall seeing one of the officers holding

14  onto the tether of Mr. Spates?

15  A    No, I do not recall seeing that.

16  Q    Do you recall giving your deposition on March 8th, 2021?

17  A    Yes.

18  Q    And when you gave your deposition, you swore to tell the

19  truth during that deposition; is that correct?

20  A    Yes.

21  Q    Okay.  On page -- can you see your deposition?

22  A    I can see the symbol.  I see the front.

23  Q    Okay.  So we're going to look at page 53 of your

24  deposition.  So you were asked, What did Officer Reese do --

25           THE COURT:  Wait, wait, wait, wait, wait, wait,

1    wait.  That's not how we do it.

2    Q    (By Ms. Robinson) Can you read the Lines 4 through 10?

3         THE COURT:  That's not how we do it either.

4         He gets the right to refresh his recollection first.

5    So tell him the lines you want him to read to himself.

6         MS. ROBINSON:  I'm sorry.

7    Q    (By Ms. Robinson) Can you read Lines 4 through 10 to

8    yourself?

9         MS. ROBINSON:  I apologize.

10   A    Yes.

11        Okay.

12   Q    (By Ms. Robinson) Does that help you remember whether

13   you saw one of the officers holding onto the tether of

14   Mr. Spates?

15   A    It says, I can't recall what he was -- it says going but

16   it would be doing.  And, I mean --

17        THE COURT:  Does that refresh your recollection --

18        THE WITNESS:  No, it does not.

19        THE COURT:  -- of one of the officers holding the

20   tether?

21        THE WITNESS:  No.

22        THE COURT:  Now you may have him read the deposition

23   question and answer.

24   Q    (By Ms. Robinson) So you were asked:  What did Officer

25   Reese do while Smith attacked Spates?

                                    85

```
 1              ANSWER:  I can't recall what he was going -- he was
 2     actually doing.  I know one of them had ahold of the restraint
 3     of one of the offenders, I guess of Spates, and I don't know
 4     who had the restraint.
 5              Is that your testimony?
 6     A    That's what I said but I didn't -- I don't recall what --
 7     who was holding what restraints.  He could have been holding
 8     the loose restraint of Mr. Smith that got unhooked first.
 9     Q    Can you read to yourself, then, Lines 11 through 24.
10              THE COURT:  Can you get that where it's on my
11     screen?  My screen's blank.
12              That's all right.  We'll get it fixed later.  Go
13     ahead.
14              MS. ROBINSON:  We do have a paper copy, if you want?
15              THE COURT:  Well, let's see how this goes.
16              MS. ROBINSON:  Okay.
17     Q    (By Ms. Robinson) Does that help refresh your memory on
18     what you saw?
19     A    Like I said, I -- I don't remember if they had the
20     restraint -- the tether in their hand or if it was attached to
21     something.
22     Q    So in your deposition you were asked, One of the
23     officers --
24              THE COURT:  Can you give us lines, just for our
25     record?
```

```
 1              MS. ROBINSON:  On page 53, Line 11 through 24.
 2    Q    (By Ms. Robinson) QUESTION:  One of the officers held
 3    Spates handcuffed while Smith attacked him?
 4              ANSWER:  The -- we have a tether.  What we do is we
 5    got a tether that has wrist restraints on one end and we hold
 6    it, that way we can access the cuffs in order to do the escorts
 7    also.  They have to have a restraint with a tether on it in
 8    order to -- if they try to run or try to act up, we've got a
 9    way of -- gosh, I really don't know how to say this, it's not
10    really like reining them in, but trying to keep them in control
11    so they don't run off too far away or to go off and do
12    something that they're not supposed to be doing.
13              So do you remember that one of the officers held
14    Spates' handcuffs at this point?
15    A    No, I do not recall who had -- if any of them had the
16    tether in their hand holding --
17              THE COURT:  Read the earlier part one more time.
18    Give the page and line.
19              MS. ROBINSON:  Page 53, Line 4 through 10.
20              QUESTION:  What did Officer Reese do while Smith
21    attacked Spates?
22              ANSWER:  I can't recall what he was going -- he was
23    actually doing.  I know one of them had ahold of the restraint
24    of one of the offenders, I guess of Spates, and I don't know
25    who had the restraint.
```

```
 1              THE COURT:  All right.

 2              Was that your testimony at deposition?

 3              THE WITNESS:  Yes, I believe so.

 4              THE COURT:  All right.  Proceed.

 5   Q    (By Ms. Robinson) Then can you look at Page 54 and read

 6   to yourself Lines 16 through Page 55, Line 5?

 7              THE COURT:  Is this on the same question?

 8              MS. ROBINSON:  Yes, Your Honor.

 9   A    You said from where, 16?

10   Q    (By Ms. Robinson) Line 16, and it'll go through Page

11   55, Line 5.

12   A    Go ahead and roll on over to 55.

13              You said down to how far?

14   Q    To Line 5.

15   A    Okay.

16   Q    Does this refresh your recollection on whether you saw

17   one of the officers holding Mr. Spates's tether?

18   A    It says here that -- on Line 5:  I cannot recall who that

19   officer was that was holding it.

20              I don't recall if they was holding the tether or had

21   it secured to the anchor point.

22   Q    So on Page 54, Line 16 through 55, Line 5:

23              QUESTION:  So during the attack one of the officers

24   had the other end of the tether?

25              ANSWER:  Yes.
```

88

```
 1              QUESTION:  For Smith.  And was there -- well, was it
 2   for Smith or was it for Spates, the tether?
 3              ANSWER:  They both had tethers on them, and then
 4   when they released Smith's restraints, that tether was no
 5   longer in use.
 6              QUESTION:  Okay.  That makes sense.  And another
 7   officer was still holding the tether for Spates?
 8              ANSWER:  Yes, ma'am.
 9              QUESTION:  During the attack?
10              ANSWER:  Yes, ma'am.
11              QUESTION:  And do you know who that officer was?
12              ANSWER:  I cannot recall who that officer was.
13   A    Yes.
14   Q    So that was your deposition testimony?
15   A    Yes.
16   Q    So you testified that you saw one of the officers holding
17   Mr. Spates' tether during the attack; is that correct?
18   A    No, that both of them had tethers connected to them.
19   Q    Okay.  So on --
20   A    But when one of them was released, one of them had a
21   tether on them, they pulled it out and away from the cell.
22   Q    So your testimony on March 8th of 2021, you were -- the
23   question was:  And another officer was still holding the
24   tether for Spates?  And your answer was:  Yes, ma'am.
25              Is that what your testimony was on that date?
```

1    A    Yes, that's what my answer was, but I cannot recall if it
2    was actually attached to the anchor point or if the officer
3    had it in his hand.
4    Q    Okay.  But you testified during your deposition that he
5    was holding it; is that correct?
6    A    Yes, I did testify to that point.
7    Q    Okay.  Thank you.
8              I'm going to show you what's been marked as Joint
9    Exhibit 3.
10             MS. ROBINSON:  And I would move to admit that.
11             THE COURT:  This is Joint 3?
12             MS. ROBINSON:  Yes, Your Honor.
13             THE COURT:  Joint 3 will be admitted without
14   objection.
15   Q    (By Ms. Robinson) Do you recognize this document?
16   A    Yes.  It's a Use of Force Report.
17   Q    Okay.  And does it have your signature on it?
18   A    Yes, it does.
19   Q    And you state --
20             MS. ROBINSON:  Can you scroll to the bottom of it?
21   Q    (By Ms. Robinson) You state that you administered a
22   burst of pepper spray to the facial area of Mr. Smith; is
23   that correct?
24   A    Yes, I tried to do that.
25   Q    How did you aim pepper spray at Mr. Smith's face if one

                                   90

```
 1   of the officers was holding the tether connected to
 2   Mr. Spates' restraints through the food port?
 3   A     The food port's wide enough to set a tray through and if
 4   the officer that was holding -- if there was an officer
 5   holding it, he could be off to the side and I could see in
 6   through the window and put my pepper spray up to the chuck
 7   hole and administer a burst of pepper spray into the cell.
 8   Q     Okay.
 9   A     He wasn't standing exactly in front of the chuck hole.
10   Q     Did you also try to administer pepper spray to
11   Mr. Spates?
12   A     I tried to hit both of them.
13   Q     And why were you trying to administer pepper spray to
14   Mr. Spates?
15   A     You try to get both of them to -- for the -- to get them
16   both to stop.  I know Mr. Spates wasn't fighting but I mainly
17   was aiming for Mr. Smith.
18   Q     Okay.  But you did also aim somewhat for Mr. Spates; is
19   that correct?
20   A     My first objective was to aim for Mr. Smith.  My can
21   malfunctioned and -- I might have got some out onto Mr. Smith
22   but I don't believe I was able to get it all on either one of
23   them -- on Mr. Spates.
24   Q     Do you know how the attack ended?
25   A     They both quit fighting.  We opened the door, went in and
```

1    placed restraints on them and brought them out to be examined
2    by medical.
3    Q    And when you say they both quit fighting, was Mr. Spates
4    fighting at this point?
5    A    At that point no because he was -- when I was saying
6    fighting, it's just a general area.  They was both in there
7    and one of them was getting beat up on.
8    Q    Okay.  Was the door to the cell opened at all during the
9    time that Mr. Smith was attacking Mr. Spates?
10   A    No.
11   Q    Do you remember who requested that the door be opened?
12   A    No, I do not recall.
13   Q    But it would have had to -- the bubble officer would have
14   had to open the door; is that correct?
15   A    Yes.
16   Q    Do you recall how the bubble officer knew to open the
17   cell door?
18   A    The 1049 was called, help was coming in, and as
19   everything calmed down in the cell, then we'd place our hand
20   on the door or indicate via radio to open the cell and we
21   would go in and place the restraints on them.
22   Q    You said a 1049 was called; is that correct?
23   A    Yes.
24   Q    What does that mean?
25   A    A 1049 means that there's a fight between offenders.

1  Q   Okay.  And do you know at what point that was called?

2  A   Immediately as soon as they started whaling on each

3  other.

4  Q   Can you describe what you observed when the cell door was

5  opened?

6  A   It was just a lot of CO gas that was -- OC gas, I mean,

7  that was in there.  We was all sort of choking on the

8  particles that was floating around in the air.

9  Q   Okay.  Did you notice whether Mr. Spates looked injured?

10 A   I did not notice because I believe I was focused on

11 putting the restraints back onto Mr. Smith.

12 Q   Did you notice if Mr. Smith had visible pepper spray on

13 him or if he was suffering from pepper spray?

14 A   Everybody had a little bit of pepper spray on them that

15 entered in there.

16 Q   Okay.  Did Mr. Spates look distressed because of the

17 pepper spray?

18 A   I have no idea because I was -- I got Mr. Smith out of

19 there and escorted him down to a holding cell somewhere in

20 Housing Unit 7. -- I mean -- I'm sorry, not seven, I'm still

21 thinking of JCCC -- Housing Unit 2.

22 Q   Okay.  So you took Mr. Smith to a different housing unit

23 after the fight?

24 A   No.  No.  I work at JCCC and JCCC's ad-seg is Housing

25 Unit 7.  I took him someplace else in Housing Unit 2 to place

93

```
 1   him in a holding cell to be assessed by medical.
 2   Q    So you took him just to a different location in ad-seg?
 3   A    Yes.
 4   Q    Okay.  Thank you.
 5           MS. ROBINSON:  No further questions.
 6           THE COURT:  Cross-examination?
 7           MR. DAVIS:  Yes, Judge.
 8                   CROSS-EXAMINATION
 9   BY MR. DAVIS:
10   Q    Mr. Turner, can you tell me, what kind of a corrections
11   facility is South Central in Licking?
12   A    It's a Level 5.
13   Q    And what does a Level 5 --
14           THE COURT:  All right.  Get over here.
15   (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS
16   WERE HAD:)
17           THE COURT:  We're not going to go around the world.
18   Okay?
19           MR. DAVIS:  Okay.
20           THE COURT:  I gave you that you could talk about the
21   importance of a correctional officer.  I didn't tell you you
22   could go into history of classification of officers in
23   different facilities.
24           MR. DAVIS:  Okay, Judge.
25           THE COURT:  So get to the point.
```

```
 1          MR. DAVIS:  Yes.  Okay, Judge.
 2   (PROCEEDINGS RETURNED TO OPEN COURT:)
 3   Q    (By Mr. Davis) Mr. Turner, have you ever been assigned
 4   to work in ad-seg before?
 5   A    For the day.
 6   Q    For the day.  But you were typically a utility officer at
 7   South Central; is that correct?
 8   A    Yes, utility officer, food service, then transportation.
 9   Q    And what does a utility officer do in South Central?
10   A    Go anyplace that has a vacancy that needs to be filled.
11   Q    And so on November 12th, 2015, why were you in ad-seg
12   that day?  What were you doing in ad-seg?
13   A    I was delivering property down to ad-seg that day.
14   Q    So you weren't necessarily in ad-seg, being assigned to
15   work in ad-seg, you were just delivering property to ad-seg on
16   that day and then you were going to go somewhere else; is that
17   correct?
18   A    Yes.
19   Q    And you testified earlier that you don't know how inmates
20   are assigned to cells in ad-seg; is that correct?
21   A    No, I do not know.
22   Q    So when you -- so you testified you were in ad-seg
23   delivering property; is that correct?
24   A    Yes.
25   Q    And you see Mr. Machino and Mr. Reese escorting Mr. Smith
```

95

1    to a cell; is that correct?

2    A    That is correct.

3    Q    And you followed those officers to wherever they were

4    putting Mr. Smith; is that correct?

5    A    That is correct.

6    Q    And when they got to that cell, you looked inside and saw

7    that it was Mr. Spates; is that correct?

8    A    That is correct.

9    Q    And then you told them these two were in a fight earlier

10   this morning, call your sergeant; is that correct?

11   A    Yes, that is correct.

12   Q    And Mr. Reese and Mr. Machino were provided compatible

13   cells by the bubble; is that correct?

14   A    By the control center.  The bubble is -- the only thing

15   they do is inform open the doors that needs to be opened.

16   Q    And the control center, is -- that is above the sergeant;

17   is that correct?

18   A    Yes.

19   Q    So if somebody above the sergeant is telling Mr. Reese

20   and Mr. Machino to put Mr. Smith into Mr. Spates's cell,

21   wouldn't the sergeant just defer to the control center?

22           MS. ROBINSON:  Objection, Your Honor, calls for --

23           THE COURT:  Sustained.

24           MR. DAVIS:  I'll withdraw the question, Judge.

25   Q    (By Mr. Davis) So once Mr. Smith is placed in the cell

96

1  and the cell door closes -- I think there was a little back
2  and forth about this, but Mr. Spates's handcuffs have a
3  tether on them; is that correct?
4  A     I believe so.  I don't recall -- my deposition said that
5  there was a tether but I do not actually recall of the
6  tether -- where it was located at, where it was anchored, who
7  had it or what.
8  Q     And when you say anchored, what does that mean?  What
9  does it mean when the tether is anchored?
10 A     There is a loop on the door or on the side of the door
11 frame that the tether would be fastened to.
12 Q     And why do corrections officers tether the handcuffs like
13 that?
14 A     To be able to retrieve them if one of them tries to pull
15 away after getting one of the restraints loose and then they
16 have a weapon on them at that point.
17 Q     So the tether prevents the inmate from pulling the
18 handcuffs into the cell and using it as a weapon; is that
19 correct?
20 A     Yes, that is correct.
21 Q     Now, when Mr. Machino and Mr. Smith -- sorry.
22        When Mr. Machino and Mr. Reese are with Mr. Smith
23 outside the cell, there was -- you heard the testimony that
24 somebody said black gladiator action; is that correct?  I
25 think it might have also been black warrior, something along

97

1    those lines.  Do you remember hearing that testimony?

2    A    Yes.

3    Q    Do you remember hearing those words?

4    A    I remember hearing that.

5    Q    And do you remember who said that?

6    A    No, I do not recall anyone -- yes, I do recall hearing it

7    but I do not know where that came from.

8    Q    Did it sound like Mr. Machino's voice?

9    A    No, it didn't sound like Mr. Machino or Mr. Reese.  It

10   had sort of like an urban slang to it.

11   Q    So when Mr. Machino -- when Mr. Reese is placed in the

12   cell with Mr. Spates and the door is closed, the handcuffs of

13   Mr. Smith are removed first; is that correct?

14   A    Yes, that is correct.

15   Q    And after Mr. Smith's handcuffs are removed, what does he

16   do?

17   A    He starts beating on Mr. Spates.

18   Q    And how did you respond to that?

19   A    Immediately administer pepper spray and someone had

20   called a 1049.

21   Q    Why did you administer pepper spray?

22   A    Because there was a fight, and when there is an

23   altercation inside of a cell, pepper spray is deployed.

24   Q    And is that practice when there's an altercation in a

25   cell, to deploy pepper spray?

1  A    Yes.

2  Q    And what does the pepper spray do?

3  A    It subdues them enough for us to go in to place

4  restraints on them to keep us from getting injured or to make

5  the fight actually stop and for them to comply with the stop

6  fighting orders given.

7  Q    So is it practice, then, for the inmates to be subdued

8  before a cell is opened with an uncuffed inmate?

9  A    Yes.

10  Q    So after the pepper spray is administered, does Mr. Smith

11  stop hitting Mr. Spates?

12  A    Yes.

13  Q    And then at that point is the cell door opened?

14  A    I believe so.

15  Q    And so what do you do next?  After the cell door is

16  opened, what do you do?

17  A    We enter to place restraints on the offender that has not

18  got restraints on, Mr. Smith, and escort him out and away from

19  the incident to place him in a holding cell to be assessed by

20  medical staff.

21  Q    Then after Mr. Smith is placed in the holding area to be

22  seen by medical, you filled out some paperwork; is that

23  correct?

24  A    Yes.

25  Q    On the use of force that was used?

1    A    Yes.

2    Q    Is that standard practice?

3    A    Yes, any time that there's pepper spray deployed or a

4    hard hand has to be used to gain compliance.

5    Q    Have you ever seen Mr. Machino place two inmates in the

6    same cell together for the purpose of seeing them fight?

7    A    No.

8    Q    Have you ever seen Mr. Reese place two inmates in the

9    same cell together for the purpose of seeing them fight?

10   A    No.

11   Q    Have you personally ever placed two inmates in the same

12   cell together for the purpose of seeing them fight?

13   A    No, I have never.

14   Q    Because if you did that, then you would have to go break

15   up that fight; is that correct?

16   A    That is correct.

17   Q    That puts you at risk, your safety at risk; is that

18   correct?

19   A    Yes, that is correct.

20   Q    And that puts the inmates' safety at risk; is that

21   correct?

22   A    Yes.

23   Q    It puts the safety of the institution at risk; isn't that

24   correct?

25   A    Yes.

100

```
1    Q    It would put your job at risk?

2    A    Yes.

3    Q    You would get fired for doing something like that?

4    A    Yes, that and/or charges brought against me.

5              MR. DAVIS:  Just one second, Judge.

6              No further questions, Your Honor.

7              THE COURT:  Redirect?

8              MS. ROBINSON:  Yes, Your Honor.

9                      REDIRECT EXAMINATION

10   BY MS. ROBINSON:

11   Q    Mr. Turner, you testified that you did hear the black

12   gladiator action comment made; is that correct?

13   A    Yes, that is correct.

14   Q    But you don't remember who said it; is that correct?

15   A    That is correct.

16   Q    Okay.  So you said that you didn't think that it sounded

17   like Mr. Machino or Mr. Reese but you can't be sure that it

18   wasn't one of them; is that correct?

19   A    No, that is not correct.

20   Q    So you are sure that it was not Mr. Machino or Mr. Reese?

21   A    I was 3 feet away from them and I could not -- I did not

22   hear their -- anything coming from their voice.

23   Q    Now, you previously gave your deposition, the same

24   deposition on March 8th, 2021; is that correct?

25   A    Yes.
```

```
1   Q    I'm going to have you read your deposition testimony that
2   you gave at the time.  If you will look at page 64 -- page 65,
3   Line 13 through 18.
4   A    Okay.
5   Q    Does that refresh your memory on how sure you were at the
6   time you gave your deposition?
7   A    Yes.
8   Q    And what did you say then?
9   A    I did not hear no southern drawl.
10  Q    You were asked on page 65, Line 13 through 18:
11       QUESTION:  And you say you don't believe it was
12  Officer Reese or Officer Machino who made the black gladiator
13  comment, but are you sure about that?
14       ANSWER:  I cannot be a hundred percent sure.
15       Is that what you testified to at the time?
16  A    Yes.
17  Q    Okay.  Thank you.
18       MS. ROBINSON:  No further questions.
19       THE COURT:  Recross?
20       MR. DAVIS:  No, Judge.
21       THE COURT:  You may step down.
22       I'm assuming you don't have a five-minute witness,
23  so we'll call it a day.
24       I need you to be back here by 8:45.  We'll get
25  started as close to 9:00 as we can.  We're making pretty good
```

progress considering the late start and the breaks.

There was one juror that had trouble tomorrow on babysitting or something.  If you will stay after, we'll bring you back in and talk to you about it.  Okay?

JUROR:  Okay.

THE COURT:  I'm not going to read all those warnings again.  You've heard them three times today already.  I do need to read Instruction No. 10.

(Court reads Instruction No. 10 to jury.)

THE COURT:  With that, you are released for the night.  We'll see you tomorrow at 8:45.  We are making good progress.  We're going to get the case to you as soon as the evidence is all in and that's all I can tell you.  All right?

Thank you all for your service.  We'll be in recess.

(Jury exits courtroom at 4:24 p.m.)

THE COURT:  Be seated for a second.

I need to find some way to get the exhibits up on my screen.  Do you think it's you just don't know how to do it or --

MS. GOODRICH:  I was under the impression that these screens, the podium and your screen were automatic as soon as we displayed to it and we could only turn on the witness, the well and the juror screens.

THE COURT:  Okay.

Linda, I'm having trouble seeing anything on my

1    screen.

 2              COURTROOM DEPUTY:  I emailed IT.

 3              THE COURT:  They can come up and meet with you.

 4    We'll figure it out.

 5              Now, your witness list is exhausted; is that right?

 6              MS. ROBINSON:  Yes, Your Honor.

 7              THE COURT:  Other than a deposition?

 8              MS. ROBINSON:  We have a deposition to read.

 9              THE COURT:  You're going to read that first thing in

10    the morning?

11              MS. ROBINSON:  Yes.

12              THE COURT:  As far as you know, you'll be able to

13    rest?

14              MS. ROBINSON:  Yes, Your Honor.

15              THE COURT:  So you all will be ready to present

16    evidence as soon as you can, so it's very important that we

17    have our instruction conference at 8:30 in the morning.

18              Try to narrow down the differences in the

19    instructions to make that go as smooth as possible.  Once I

20    make the final rulings on instructions, my staff can get them

21    ready so we don't have to wait a long time before we actually

22    do the closings and things.

23              You all think you'll be done by noon?

24              MS. PETERS:  Yes.

25              THE COURT:  All right.  It's not my job to try

                                   104

1    lawsuits or decide the facts but I'm puzzled at the difficulty
     2    of settling this case.

     3            Correctional facility can't be very proud about
     4    their conduct in this case, regardless of the comment.  The
     5    fact is that two guys should have never been put in the same
     6    cell.  May be miscommunication, may be something else.

     7            And I heard the plaintiff testify about his
     8    injuries.  I think he had some injury, it doesn't sound like
     9    any permanent, long-term injury, and I wouldn't think a jury
    10    would be inclined to give a lot of money on the case.

    11            We'll see what a jury says if you all are not able
    12    to resolve the case otherwise.

    13            With that, anything I need to take up or consider?

    14            MR. DAVIS:  Judge, we just want to put one thing on
    15    your radar.  We expect -- the defendants expect to put on a
    16    directed verdict argument.  Just one issue, it'll be super
    17    quick.  We'll get something written, filed in the morning and
    18    it'll be super fast, like a couple minutes.

    19            THE COURT:  All right.  We'll take that up right
    20    after -- this deposition's probably going to be 15 minutes?

    21            MS. ROBINSON:  At most.

    22            THE COURT:  Can we take the directed verdict up and
    23    rule on it without hearing this deposition testimony?  Would
    24    it change the ruling on it at all?

    25            MR. DAVIS:  No, probably not.

                                   105

1          THE COURT:  What's going to be in the deposition is
2    going to be agreed upon by the parties anyway?
3          MR. DAVIS:  Exactly.
4          THE COURT:  We may try to take that up.
5          Tell you what, let's move the instruction conference
6    to 8:00 instead of 8:30, that way we can take up the directed
7    verdict too and won't have to send the jury right back out
8    after.
9          Then I assume you'll have a motion at the close of
10   all the evidence?
11         MR. DAVIS:  Yes.
12         THE COURT:  Are they aware of what issue you're
13   going to raise on directed verdict?
14         MR. DAVIS:  I don't think they are but we can talk
15   about it after this.
16         THE COURT:  Surprises aren't very helpful, so if you
17   can avoid it, I'd appreciate it.
18         Anything else we need to take up or consider?
19         MS. ROBINSON:  No, Your Honor.
20         THE COURT:  Go get that juror.
21         I want you guys to hear.  All I know is what she
22   told Linda is that she discovered over the noon hour that she
23   didn't have a babysitter for the next two days.
24         I kind of hate letting someone off on that basis
25   since we sat here all morning and talked about issues like

                                    106

```
 1   that, but we'll see what she says.  This is why I have an
 2   alternate even on short trials.
 3                 (Juror enters courtroom.)
 4                 THE COURT:  Ma'am, if you would, come in and stand
 5   here at the podium.
 6                 The courtroom deputy advised me that you had
 7   mentioned to her a possible problem you have, so would you
 8   relay that to all of us?
 9                 JUROR:  Yes.  Our job is running shorthanded and my
10   husband, he had to switch shifts, so it makes it to where I
11   don't have a babysitter.
12                 THE COURT:  What's running shorthanded?
13                 JUROR:  Our job.
14                 THE COURT:  What's your job?
15                 JUROR:  A bunch of the teenagers called out.
16                 THE COURT:  I'm sorry?
17                 JUROR:  I work at Wendy's.  So we have a bunch of
18   teenagers on the night shift.
19                 THE COURT:  So I'm still puzzled.  He was going to
20   be your babysitter?
21                 JUROR:  Yeah.  We work different shifts, that way
22   when he's at work I --
23                 THE COURT:  So you both work at Wendy's?
24                 JUROR:  Yeah.
25                 THE COURT:  Okay.  I get it now.
```

107

1               How old are your kids?

2               JUROR:  Seven, nine, and 13.

3               THE COURT:  Will they not be in school?

4               JUROR:  Well, say -- he's going to be at work at

5   night, so I'll have to be home in the evening to be able to be

6   home with the kids to watch them.

7               THE COURT:  Why wouldn't you be home in the evening?

8               JUROR:  He'll be gone during the evening.

9               THE COURT:  All right.

10              JUROR:  So I have to be home during the evening

11  while he's at work during the evening.

12              THE COURT:  Okay.  Well, what about jury service

13  prevents you from being home in the evening?

14              JUROR:  Well, it takes me like an hour and 20

15  minutes to get home.

16              THE COURT:  Okay.  Now we're getting to -- where do

17  you live?

18              JUROR:  In Neosho.

19              THE COURT:  So what time does he need to go to work

20  in the evening?

21              JUROR:  At 2:30.

22              THE COURT:  In the afternoon?

23              JUROR:  Yeah, 2:30.

24              THE COURT:  And you don't have any alternative

25  babysitting arrangements you can make, no other family

```
 1   members?

 2            JUROR:  Nope.

 3            THE COURT:  And your 13-year-old can't take care of

 4   the others until you get home?

 5            JUROR:  Nope.

 6            THE COURT:  Why not?  Thirteen-year-olds babysit all

 7   the time.

 8            JUROR:  Well, I don't know.  I don't think she's

 9   mature enough.

10            THE COURT:  You know, if I let people off for

11   excuses like this, I'm not going to have any jurors ever.  We

12   sat through all of jury selection and you didn't say a word

13   about any of these possible issues.  Why not?

14            JUROR:  Well, at first I was fine until he called me

15   during lunch and told me that the boss told him what had

16   happened, how everybody was calling out.

17            THE COURT:  Do I need to call the manager at Wendy's

18   in Neosho and talk to him?

19            JUROR:  You can.

20            THE COURT:  I might need to.

21            JUROR:  Okay.

22            THE COURT:  Because jury service is pretty

23   important.

24            Does he know that this is interfering with your jury

25   service, the manager?
```

109

```
 1                JUROR:  I believe so.

 2                THE COURT:  And he doesn't care?

 3                JUROR:  I don't know.  I guess not.

 4                THE COURT:  All right.  Well, give me the name of

 5     the manager and his phone number in Neosho and you try to make

 6     alternative arrangements overnight.  All right?

 7                JUROR:  All right.

 8                THE COURT:  You don't have a neighbor that could

 9     watch the -- I mean, you'll be home at, you know, around 6:30

10     or 7, so just for a few hours there between school and

11     latchkey.  Is there not a latchkey program in Neosho where

12     kids can go?

13                JUROR:  Nope.

14                THE COURT:  Have you looked?

15                JUROR:  No.

16                THE COURT:  All right.  Before you leave give me the

17     name and number of your manager.

18                JUROR:  Okay.

19                THE COURT:  In the meantime, I want you to try to

20     make alternative arrangements.  Then you call me in the -- you

21     be here in the morning at 8:45 unless you call in and explain

22     why you're not going to be here.  All right?

23                JUROR:  All right.

24                THE COURT:  Thank you.

25                And do we have your number?
```

110

```
1              JUROR:  Yes.

2              THE COURT:  Linda, have you got her number?

3              COURTROOM DEPUTY:  No, I do not have it.

4              (Juror exits courtroom.)

5              THE COURT:  Things that make trials special.

6         Anybody have any comments on that they want to make,

7    any record?  I mean, the problem is if she's really

8    distracted, not going to be a focused juror anyway, but I

9    didn't want her to think that she could just walk away.  I may

10   or may not call the Wendy's manager.  I have a feeling he

11   would somehow be able to get by without it if they tried.  And

12   I know I'm old but I had a lot of 13-year-old babysitters in

13   my day.  I guess it's a little different now.

14        All right.  Anybody got any issues I need to take up

15   or consider?

16        All right.  We'll see you in the morning at 8:00 for

17   instruction conference.

18             (Court stands in recess at 4:34 p.m.)

19                      END OF VOLUME 1

20

21

22

23

24

25

                            111
```